**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| *In re Tempus AI, Inc. Genetic Privacy Litigation* | Case No. 1:26-cv-01525 |
| | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| This Document Relates to: All Actions | **DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

I. NATURE OF THE ACTION ................................................................................................ 1

II. JURISDICTION AND VENUE ........................................................................................ 6

III. PARTIES ............................................................................................................................ 6

    A. Plaintiffs ....................................................................................................................... 6

    B. Defendant ...................................................................................................................... 8

IV. STATUTORY BACKGROUND ....................................................................................... 9

    A. The Sensitivity of Genetic Information Warrants Broad Statutory Protections ................ 9

    B. State Legislation Addresses the Risks of Transferring Genetic Information Without Consent ....................................................................................................................... 13

V. FACTUAL ALLEGATIONS .......................................................................................... 15

    A. Ambry Genetics Collected Genetic Information Under Promises of Confidentiality ...... 15

    B. Tempus AI Targets Ambry Genetics as a One-Stop Shop for Troves of Genetic Information ................................................................................................................... 19

    C. Tempus AI's Business Model Depends on Processing and Monetizing Massive Genetic Data Sets ..................................................................................................................... 22

        i. Tempus AI Actively Receives and Processes Identifiable Patient Data ..................... 22

        ii. Tempus's AI Platform Requires Massive Data to Function .......................................... 29

        iii. Tempus AI Monetizes Genetic Data by Licensing It to Third Parties ......................... 31

    D. Tempus AI Compelled Ambry Genetics to Disclose Plaintiffs' Genetic Information Without Authorization ................................................................................................. 33

    E. Tempus AI Re-Disclosed Plaintiffs' Genetic Information to Third Parties for Profit Without Authorization ................................................................................................. 36

    F. Plaintiffs Suffered Concrete and Continuing Injury from the Unauthorized Transfer and Disclosure of Their Genetic Information ........................................................................ 40

VI. PLAINTIFFS' INDIVIDUAL ALLEGATIONS ............................................................ 41

    A. Plaintiff Sandra Kreutter ............................................................................................. 41

    B. Plaintiff Michele Pascoe .............................................................................................. 42

    C. Plaintiff Eugenia Rukhin .............................................................................................. 43

    D. Plaintiff Lauren Barone ................................................................................................ 43

    E. Plaintiff Jennifer Nash and Minor Child E.S. ............................................................... 44

    F. Plaintiff Ariann Taglioli ............................................................................................... 46

    G. Plaintiff Maren Vargas ................................................................................................. 47

    H. Plaintiff Joanne Gray ................................................................................................... 48

    I. Plaintiff Caitlin Horan .................................................................................................. 49

    J.     Plaintiff Stephanie Bianco and Minor Child H.B. ............................................................. 50

VII.    CLASS ALLEGATIONS ................................................................................................. 52

VIII.    CAUSES OF ACTION ..................................................................................................... 60

IX.    PRAYER FOR RELIEF ................................................................................................... 89

X.    JURY TRIAL DEMANDED............................................................................................. 90

Plaintiffs Sandra Kreutter, Michele Pascoe, Eugenia Rukhin, Lauren Barone, Jennifer Nash and minor child E.S., Ariann Taglioli, Maren Vargas, Joanne Gray, Caitlin Horan, and Stephanie Bianco and minor child H.B., individually and on behalf of all other persons similarly situated (the "Classes"), by and through their undersigned attorneys, bring this consolidated class action against Defendant Tempus AI, Inc. ("Tempus AI" or "Defendant") and allege as follows:

## I.    NATURE OF THE ACTION

1.    Tempus AI is a precision-medicine technology company that uses artificial intelligence to analyze patients' genetic and clinical data—particularly in oncology—to inform diagnosis and treatment and to license that data to pharmaceutical and biotechnology companies for drug development. Tempus AI built its artificial-intelligence healthcare business on the genetic information of millions of patients—information it acquired without ever obtaining their consent. As a first-mover in the lucrative field of healthcare-related artificial intelligence, Tempus AI's competitive advantage depends on amassing enormous quantities of genetic data to train its algorithms. Rather than build that dataset lawfully—one consenting patient at a time—Tempus AI took a shortcut: it bought Ambry Genetics, a genetic-testing company, for access to its repository of patient genetic information. Tempus AI then compelled the transfer of that information to itself, integrated it into Tempus AI's own Genomics, Data, and AI products, and licensed access to that data to pharmaceutical and biotechnology partners. In doing so, Tempus AI violated the genetic-privacy and medical-confidentiality statutes of California, Illinois, Oregon, and New Hampshire; New York's consumer-protection statutes; and the common-law and consumer-protection duties it owed to Plaintiffs and the Classes.

2.    Genetic information is among the most sensitive categories of personal information and private health information because it is inherently uniquely identifying, immutable, and

1

revealing of an individual's health, ancestry, familial relationships, and disease risks—it cannot be changed, reissued, or anonymized like a password or account number. Beyond its identifying qualities, genetic information in particular reveals significant insights about a person's health—including cancer risk, reproductive health, predisposition to serious neurological and psychiatric conditions, drug response, carrier status for inherited recessive disorders, and the likelihood of passing genetic conditions to children. Genetic information also reveals sensitive facts about an individual's family and ancestry. Because genetic data is so personal and revealing, federal and state law treat it as among the most protected categories of information.

3. A broad consensus of state legislatures has translated that sensitivity into law, enacting genetic-privacy and medical-confidentiality statutes that share a common core: genetic information and the results of genetic testing are confidential, and they may not be disclosed—nor may their disclosure be compelled—absent the individual's informed, written authorization. The States whose residents' genetic-privacy claims are at issue here have each adopted that protection: California, Illinois, Oregon, and New Hampshire. Illinois' Genetic Information Privacy Act ("Illinois GIPA") is illustrative: it provides that genetic testing and the information derived from it "is confidential and privileged and may be released only to the individual tested and to persons specifically authorized, in writing . . . by that individual," 410 ILCS 513/15(a), and it prohibits any person from disclosing or compelling the disclosure of the identity of a test subject or a test result in a manner that identifies the subject, absent the patient's legal authorization, *id.* 513/30(a). The other States' statutes impose, in material respects, the same requirement of written consent before genetic information may be transferred.

4. To acquire genetic data and exploit it for profit, Tempus AI pursued a two-step strategy. The first step was its February 3, 2025 acquisition of Ambry Genetics Corporation

("Ambry Genetics") for $600 million—a transaction Tempus AI pursued not merely to own Ambry Genetics as a going concern, but to obtain and exploit its repository of genetic records belonging to Plaintiffs and Class members: genetic testing results and the medical histories attached to them. Acquiring that data was not an incident of the deal; it was its object. The parties' acquisition agreement expressly contemplated "the disclosure or transfer of Sensitive Data to Buyer [Tempus AI]," defined Sensitive Data to include regulated, confidential, and personal information, and represented that the disclosure or transfer would not require notice to or consent from any person—precisely the premise Plaintiffs challenge here. As Tempus AI told the market, "the acquisition of Ambry [Genetics] will complement Tempus' strategy of using data to advance clinical and scientific innovation."[1] Upon closing, Tempus AI did not leave those records where it found them—it took possession of them, migrated and integrated them into its own data platform, and put them to work training the commercial algorithms described below (the "Genetic Data Transfer").

5. Neither Tempus AI nor Ambry Genetics gave patients notice that their genetic information would be transferred to Tempus AI or used for Tempus AI's own commercial purposes. As a result, Plaintiffs and the Class members had no opportunity to (i) learn of the disclosures Tempus AI caused, (ii) grant or withhold the written authorization the law requires before their genetic information could be disclosed, or (iii) share in the profits Tempus AI now derives from the commercial use of their genetic information.

---

[1] *See* Press Release, *Tempus Reports Third Quarter 2024 Results and Agreement to Acquire Ambry Genetics*, Tempus AI (Nov. 4, 2024), https://www.tempus.com/news/pr/tempus-reports-third-quarter-2024-results-and-agreement-to-acquire-ambry-genetics/

6.     That failure is glaring given that Ambry Genetics told its patients that it "is committed to protecting your privacy,"[2] that it would "[m]aintain the confidentiality of your protected health information,"[3] that it is "committed to protecting the information you have entrusted to us,"[4] and that it acknowledges "genetic test results are intensely personal."[5]

7.     Tempus AI did not merely retain the genetic information it acquired. In a second wave of unauthorized disclosures, it sold access to Plaintiffs' genetic information to participants across the pharmaceutical industry, reaping an enormous profit. Within weeks of closing on the acquisition deal, Tempus AI reported "signed data agreements with over 70 customers, spanning both large and mid-sized pharma, including AstraZeneca, GlaxoSmithKline, Bristol Myers Squibb, Pfizer, Novartis, Merck, Abbvie, Daiichi Sankyo, Eli Lilly, Boehringer Ingelheim, and biotechs including Incyte, Servier, Aspera Biomedicines, and Whitehawk Therapeutics,"[6] generating substantial revenue from that data: Tempus AI reported preliminary 2025 revenue from its data and applications business of approximately $316 million—roughly 31% year-over-year growth—with its Insights data-licensing line growing 38%, and reported a record total contract

---

[2] *Policies and Notices: Privacy Notice*, Ambry Genetics (Sep. 10, 2024), https://www.ambrygen.com/legal/privacy-policy.

[3] *Policies and Notices: Notice of Privacy Practices*, Ambry Genetics (Mar. 19, 2025), https://www.ambrygen.com/legal/notice-of-privacy-practices.

[4] *Information Security Statement*, Ambry Genetics, https://www.ambrygen.com/legal/information-security-statement (last visited Mar. 25, 2026).

[5] Deepti Babu, *It's Complicated: Sharing Your Genetic Test Results (Original)*, Ambry Genetics (Mar. 10, 2016), https://blog.ambrygen.com/patient/post/131/it-s-complicated-sharing-your-genetic-test-results-original (Deepti Babu was a genetic counselor with Ambry Genetics at the time of publication).

[6] Press Release, *Tempus Achieves Record Total Contract Value Exceeding $1.1 Billion*, Tempus AI (Jan. 11, 2026), https://www.tempus.com/news/tempus-achieves-record-total-contract-value-exceeding-1-1-billion/.

value—the aggregate value of its signed data contracts—exceeding $1.1 billion as of December 31, 2025.[7]

8. The largest of those re-disclosures was a $200 million data licensing and modeling agreement with AstraZeneca and Pathos to "build the largest foundation model that's ever been built in oncology," providing access to "over 300 petabytes of data, which includes rich molecular data connected to outcomes."[8]

9. Through both disclosures—first by compelling Ambry Genetics to disclose patient genetic information to Tempus AI, and then by disclosing, licensing, or making that information available to pharmaceutical, biotechnology, and other third-party partners—Tempus AI violated the genetic-privacy, medical-confidentiality, consumer-protection, and common-law duties alleged below. Tempus AI also unjustly enriched itself by retaining the profits, revenues, contract value, AI-model benefits, and commercial advantages generated from genetic information it had no right to obtain or exploit without written authorization.

10. Plaintiffs and the Classes hold a statutory and common-law right to control the disclosure of their genetic information, and Tempus AI has overridden that right at scale. The harm is ongoing: Tempus AI continues to hold Plaintiffs' and proposed Class members' genetic information and to license access to it, and shows no intention of stopping. Plaintiffs bring this action to recover damages for the disclosures Tempus AI has already caused, to secure injunctive

---

[7] *Id.; see* Tempus AI, Inc., Current Report (Form 8-K), Ex. 99.2, at 1 (Jan. 11, 2026), https://www.sec.gov/Archives/edgar/data/1717115/000119312526009650/0001193125-26-009650-index.htm (reporting preliminary, unaudited 2025 data and applications revenue of approximately $316 million, representing approximately 31% year-over-year growth, with Insights (data licensing) growing 38%).
[8] *Q1 2025 Overview*, Tempus AI, https://investors.tempus.com/static-files/4862cc66-8cdd-4877-99ab-1f09f4753d39.

relief barring its continued disclosure and commercial exploitation of their genetic information, and to require Tempus AI to disgorge the profits it has reaped at Plaintiffs' expense.

## II.    JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. Section 1332(d), because: (1) this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs; (2) the proposed Classes contain more than 100 members; (3) minimal diversity exists because at least one proposed Class member is a citizen of a state different from Tempus AI's state of citizenship; and (4) no exceptions under Section 1332(d) apply.

12.    This Court has personal jurisdiction over Tempus AI because Tempus AI is headquartered in Chicago, Illinois, conducts substantial business within this District, and has therefore established sufficient minimum contacts with the State of Illinois.

13.    Venue is proper in this District under 28 U.S.C. Section 1391(b) because Tempus AI maintains its corporate headquarters in this District, Tempus AI conducts substantial business in this District, certain Plaintiffs reside in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## III.    PARTIES

### A. Plaintiffs

14.    Each Plaintiff is a former or current patient of Ambry Genetics who underwent genetic testing and provided his or her genetic information to Ambry Genetics. Plaintiffs' individual allegations are described in Section VI below. Each Plaintiff's genetic information was transferred to Tempus AI through the Genetic Data Transfer, and Tempus AI thereafter retained, used, commercialized, and disclosed or made available that genetic information to third parties without Plaintiffs' written authorization.

6

**California.**

15.     Plaintiff Sandra Kreutter is and was at all times relevant to the allegations in this Complaint, a resident and citizen of California.

16.     Plaintiff Michele Pascoe is and was at all times relevant to the allegations in this Complaint, a resident and citizen of California.

17.     Plaintiff Eugenia Rukhin is and was at all times relevant to the allegations in this Complaint, a resident and citizen of California.

**Illinois**.

18.     Plaintiff Lauren Barone is and was at all times relevant to the allegations in this Complaint, a resident and citizen of Illinois.

19.     Plaintiff Jennifer Nash and her minor child E.S. are and were at all times relevant to the allegations in this Complaint, residents and citizens of Illinois.

20.     Plaintiff Ariann Taglioli is and was at all times relevant to the allegations in this Complaint, a resident and citizen of Illinois.

21.     Plaintiff Maren Vargas is and was at all times relevant to the allegations in this Complaint, a resident and citizen of Illinois.

**Oregon.**

22.     Plaintiff Joanne Gray is and was at all times relevant to the allegations in this Complaint, a resident and citizen of Oregon.

**New Hampshire.**

23.     Plaintiff Caitlin Horan is and was at all times relevant to the allegations in this Complaint, a resident and citizen of New Hampshire.

**New York**.

24.     Plaintiff Stephanie Bianco and her minor child H.B. are and were at all times relevant to the allegations in this Complaint, residents and citizens of New York.

**B. Defendant**

25.     Defendant Tempus AI, Inc. is a healthcare technology company founded in 2015 and incorporated in the state of Nevada with its principal place of business at 600 West Chicago Avenue, Suite 510, Chicago, Illinois 60654. Tempus AI maintains offices and labs across the country but makes its business decisions at its headquarters in Chicago, Illinois. Tempus AI also operates a laboratory in Chicago, Illinois, where it conducts genomic and DNA sequencing.

26.     Tempus AI holds itself out as a leader in AI-enabled precision medicine, genetic testing, and clinical research. Its mission is to "build[] innovative tech solutions oriented around clinical care and research products"[9] and "bring[] data and AI to healthcare."[10] Tempus AI offers numerous AI-driven technologies to healthcare providers and is known as "a leading company at the forefront of the precision medicine revolution [that] unlock[s] the power of patient data"[11] and "a [r]ising [s]tar in AI-[d]riven [d]iagnostics" with "one of the world's largest libraries of clinical and molecular data."[12]

27.     Through the company's AI-enabled platform, Tempus AI analyzes genomic and molecular data alongside clinical data from providers to inform its clients (physicians, health systems) and creates clinical test reports that are customizable for those clients' individual patients

---

[9] *About Us*, Tempus AI, https://investors.tempus.com/ (last visited Mar. 26, 2026).

[10] *Bringing data and AI to healthcare*, Tempus AI, https://www.tempus.com/about-us/tempus-tech/ (last visited Mar. 25, 2026).

[11] *Transforming Healthcare with Tempus AI: A Comprehensive Overview*, Hyscaler (June 6, 2024), https://hyscaler.com/insights/tempus-ai-powered-precision-medicine/.

[12] *AI in Healthcare and Medical Robotics: Investment Opportunities*, Kavout, https://www.kavout.com/market-lens/ai-in-healthcare-and-medical-robotics-investment-opportunities (last visited Mar. 25, 2026).

seeking care in oncology, cardiology, neurology, radiology, or pathology. Tempus AI amasses enormous sets of genetic data to train its algorithms.

## IV.  STATUTORY BACKGROUND

### A.  The Sensitivity of Genetic Information Warrants Broad Statutory Protections

28.     Genetic information is derived from genes—the portions of DNA that comprise the basic physical and functional units of heredity. "Every person has two copies of each gene, one inherited from each parent." [13] Each person, even an "identical" twin, carries slight differences in their genes that make up their unique features.

29.     Because of these unique variations, genetic information contains an immense amount of valuable information concerning an individual's unique health and family history, including the likelihood of being diagnosed with hereditary conditions or passing on conditions to children.

30.     This valuable genetic data is generally obtained and analyzed through genetic screening, a process used to assess an individual's risk of disease and genetic makeup.

31.     Patients make the intimate health decision to undergo genetic testing to glean information like whether genetic conditions run in their family, whether they may have children with genetic conditions, or to learn about their likelihood of being diagnosed with cancer. This information is highly personal and sensitive.

32.     A genetic screening process typically involves (i) extracting DNA from an individual's blood, saliva, or tissue, (ii) analyzing the sample through molecular biology assessments, like DNA sequencing, and (iii) assessing the patient's health risks or predispositions.

---

[13] Genetic Alliance; The New York-Mid-Atlantic Consortium for Genetic and Newborn Screening Services, *Understanding Genetics: A New York, Mid-Atlantic Guide for Patients and Health Professionals*. Washington (DC), Appendix A, Basic Genetics Information, Genetic Alliance (July 8, 2009), https://www.ncbi.nlm.nih.gov/books/NBK115558/.

33. According to a 2025 review in the *International Journal of Medical Sciences*, "[g]enetic screening occupies an increasingly important position in modern medicine and personal health management."[14] Genetic screening has gained prominence, in large part, because of an individual's ability to learn critical information about their unique genetic makeup, family health history and its impact, and the likelihood of passing on genetic conditions before making reproductive health decisions.

34. In addition to arming patients with key information about their health, genetic testing information is highly valuable to pharmaceutical companies and research institutes (e.g., those run by the government or universities) for scientific research purposes. "The large amount of data generated by genetic screening provides valuable resources for scientific research. By analyzing these data, researchers can gain in-depth understanding of the genetic basis of diseases, discover new disease markers and therapeutic targets, and promote medical progress and innovation."[15]

35. The sensitivity of genetic data arises from several interrelated factors, including the following: (a) Genetic data can disclose actual or probable health traits and predispositions that individuals may wish to keep private from employers, insurers, data brokers, and the public; (b) Genetic data can enable discrimination in employment, housing, insurance underwriting, education, lending, and other critical contexts; (c) Genetic data is durable and persistent across time, making any breach or misuse effectively irreversible and capable of causing harm well into the future; (d) Genetic profiles can be linked or re-identified through reference databases, allowing

---

[14] Chung-Lin Lee et al., *Understanding Genetic Screening: Harnessing Health Information to Prevent Disease Risks*, Int'l J. Med. Sci. 22(4):903–919 (Jan. 21, 2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC11843151/.
[15] *Id.*

adversaries to connect de-identified genetic records to named individuals and their families; and (e) Genetic data can facilitate targeted scams, identity theft, extortion, stalking, and other personal security threats by exposing intimate family relationships and vulnerabilities.

36. Recognizing this sensitivity, Congress passed the Genetic Information Nondiscrimination Act in 2008 to protect individuals from discrimination in the contexts of employment and health insurance. See 42 U.S.C. § 2000ff, et seq.

37. States have moved in parallel. Numerous state legislatures have enacted statutes specifically tailored to protect genetic data, regulate its collection, use, and disclosure, and provide individuals with enforceable rights and remedies.

38. As explained further below, more than a dozen states have enacted statutes providing consumers with the right to request the deletion of their genetic information from companies—reflecting a broad legislative consensus that genetic data warrants heightened consent and deletion protections. Other states have general data privacy regulations that require companies to provide notice and obtain consent before disclosing or transmitting personal information.

39. Among these protections are the genetic-privacy and medical-confidentiality statutes under which Plaintiffs bring suit—Illinois, California, Oregon, and New Hampshire. Although these statutes differ in their particulars, each embodies the same core protection: an individual's genetic information and the results of genetic testing are confidential and may not be disclosed, or their disclosure compelled, without that individual's informed, written consent. And each affords the individual an enforceable remedy for its violation. The New York Plaintiffs, whose genetic information Tempus AI likewise acquired and disclosed, bring their claims under New York's consumer-protection statutes, which prohibit the deceptive acts and false advertising by which Ambry Genetics and Tempus AI obtained and exploited that information.

11

40.     These developments underscore the reasonableness and foreseeability of requiring notice, informed consent, and meaningful patient control before genetic information is transferred or repurposed in a corporate transaction.

41.     The risks of treating genetic data as a freely transferable corporate asset were thrown into sharp relief by the recent bankruptcy of 23andMe Inc. ("23andMe").

42.     One of 23andMe's most valuable assets was its enormous set of genetic data. The prospect of selling this asset as part of the bankruptcy proceedings raised serious privacy concerns and led to a Congressional hearing titled "Securing Americans' Genetic Information: Privacy and National Security Concerns Surrounding 23andMe's Bankruptcy Sale."[16]

43.     During the 2025 Congressional hearing, representatives, including Gary Palmer, questioned whether consumers "understood exactly what they were signing up for or who that data could be shared with" when it came to 23andMe. For this reason, lawmakers called for 23andMe to inform consumers precisely what entities had access to their genetic information.[17]

44.     The 23andMe controversy confirms what Tempus AI and Ambry Genetics already knew or should have known before the Genetic Data Transfer: genetic information is not an ordinary corporate asset that can be sold, transferred, or repurposed without meaningful patient notice and consent. The market, regulators, state attorneys general, and lawmakers have all recognized that the transfer of genetic information in corporate transactions presents unique

---

[16] Margaret Hu, *Securing Americans' Genetic Information: Privacy and National Security Concerns Surrounding 23andMe's Bankruptcy Sale*. Hearing before the House Committee on Oversight and Government Reform, United States House of Representatives, 119th Congress, First Session, William and Mary Law School (June 10, 2025), https://scholarship.law.wm.edu/testimony/9/.

[17] Press Release, *Wrap Up: Congress Taking Action to Ensure the Safety of Americans' Personal DNA Data*, Committee on Oversight (June 10, 2025), https://oversight.house.gov/release/wrap-up-congress-taking-action-to-ensure-the-safety-of-americans-personal-dna-data/.

privacy risks precisely because genetic information is immutable, identifying, familial, and commercially valuable.

**B.  State Legislation Addresses the Risks of Transferring Genetic Information Without Consent**

45.     To address the potential risks related to the transfer of genetic information, the Illinois legislature enacted Illinois GIPA in 2008. It provides in part that "genetic testing and information derived from genetic testing is confidential and privileged and may be released only to the individual tested and to persons specifically authorized, in writing …, by that individual to receive the information." 410 ILCS 513/15(a).

46.     In enacting Illinois GIPA, the Illinois General Assembly found that individuals are reluctant to pursue beneficial genetic testing for fear their results will be shared without consent or used to discriminate against them, and that protecting the voluntary, confidential, and non-discriminatory use of genetic information serves the public health. 410 ILCS 513/5. Consistent with those findings, any permitted disclosure of genetic information under Illinois GIPA must comply with HIPAA's minimum-necessary standard, which requires covered entities to limit the use and disclosure of protected health information to the minimum needed for the intended purpose. 410 ILCS 513/31.10.

47.     Illinois GIPA defines "genetic testing" as "an analysis of human DNA, RNA, chromosomes, proteins, or metabolites, if the analysis detects genotypes, mutations, or chromosomal changes." 410 ILCS 513/10 (referring to 45 C.F.R. § 160.103).[18] It broadly defines "genetic information" as "(i) [t]he individual's genetic tests; (ii) [t]he genetic tests of family members of the individual; (iii) [t]he manifestation of a disease or disorder in family members of such individual; or (iv) [a]ny request for, or receipt of, genetic services, or participation in clinical

---

[18] Illinois GIPA incorporates several terms and concepts from the Privacy Rule under HIPAA.

research which includes genetic services, by the individual or any family member of the individual." *Id.*

48. Disclosure of genetic information under Illinois GIPA is permitted only with the individual's written authorization given "in accordance with Section 30." 410 ILCS 513/15(a).

49. Section 30 prohibits any person from disclosing or compelling disclosure of "the identity of any person upon whom a genetic test is performed or the results of a genetic test in a manner that permits identification of the" test subject, except to the test subject, any person designated in a specific written legally effective release executed by the test subject, or the subject's legally authorized representative, and certain other individuals. 410 ILCS 513/30 ("Section 30").

50. Illinois GIPA also prohibits any person to whom test results have been disclosed from disclosing the results to another person except as the statute authorizes. 410 ILCS 513/35 ("Section 35").

51. Illinois GIPA provides "[a]ny person aggrieved by a violation of this Act . . . a right of action" for statutory damages ranging from $2,500 to $15,000 per violation, reasonable attorneys' fees and costs, and injunctive and other relief. 410 ILCS 513/40.

52. The other States whose residents are at issue protect genetic information to the same effect. California's Confidentiality of Medical Information Act ("CMIA") prohibits the disclosure of individually identifiable medical information, including genetic test results, without the patient's authorization, and affords a private right of action for damages. See Cal. Civ. Code §§ 56 et seq. Oregon law declares that "an individual's genetic information and DNA sample are private and must be protected," requires those who obtain or retain such information to guard against unauthorized disclosure, and provides a civil action for statutory damages. ORS 192.537; ORS

14

192.541. New Hampshire bars disclosing that an individual has undergone genetic testing, or the results of that testing, "without the prior written and informed consent of the individual." RSA 141-H:2. Like Illinois GIPA, these statutes required patient consent, written authorization, or other legally effective permission before Tempus AI could obtain, retain, use, or disclose protected genetic information in the manner alleged here.

53.     As alleged further herein, Tempus AI violated each of these statutes by unlawfully compelling Ambry Genetics to disclose identifiable genetic information belonging to hundreds of thousands, if not millions, of patients for Tempus AI's commercial gain, including to develop its medical research algorithms, and thereafter transmitting that genetic information to third parties, all without the consent each of those statutes requires.

## V.     FACTUAL ALLEGATIONS

### A. Ambry Genetics Collected Genetic Information Under Promises of Confidentiality

54.     Founded in 1999, Ambry Genetics has grown from a basic diagnostic laboratory into a global industry leader in clinical genetic testing and hereditary-disease diagnostics, offering diagnostic products across a range of hereditary disease research areas through its clinical genetic testing laboratory.

55.     The company has performed more than 1 million genetic tests and is an in-network provider for commercial health plans covering approximately 95% of insured lives in the United States.[19] Ambry Genetics's "highly-automated" lab operates 24/7 and performs "DNA fingerprinting of each specimen before and after testing."

---

[19] *Ambry CARE Program*, Ambry Genetics, https://www.ambrygen.com/partners/care (last visited June 3, 2026) ("Due to Ambry's extensive contracts with commercial payers (covering 95% of insured lives), testing is affordable and accessible for the majority of patients.").

56.     Ambry Genetics amasses its massive genetic data sets through its genetic testing services. Specifically, a patient consults with their doctor or healthcare provider, who orders the genetic test through Ambry Genetics's provider-facing online portal. Ambry Genetics does not sell its tests directly to patients. Instead, a patient orders through a healthcare provider or through Ambry's partner Genome Medical, a "nationwide specialty medical practice that focuses on providing expert genetic counseling," whose "team of genetic experts and primary care MDs will work with patients to determine whether genetic testing is right for them, and which Ambry test might be appropriate to order."[20] The provider may have an at-home saliva or buccal collection kit shipped directly to the patient, or the patient's blood or saliva sample may be collected at the provider's office or a designated laboratory. Once Ambry Genetics receives the sample, it analyzes the person's genetic material, including the genes or variants tested and determines whether the patient has inherited genes that predispose them to cancer, heart disease, rare diseases, or other conditions, and the results are delivered to the ordering provider for review with the patient.

57.     Ambry Genetics's extensive product offerings include hereditary cancer testing panels and rare disease testing. Additionally, Ambry Genetics promotes its collection of "Real World Data from over 2.5 million genetic tests" and operates AmbryShare, launched in 2016 as the largest structured collection of genetic information publicly available for download, containing "aggregated allele frequency data" encompassing "all 20,000+ genes in the human genome[.]"[21]

---

[20] *See* Ordering Process, Ambry Genetics, https://www.ambrygen.com/providers/ordering-process (last visited June 3, 2026); Order a Sample Kit, Ambry Genetics, https://www.ambrygen.com/providers/order-sample-kit (last visited June 3, 2026) ("this page is for healthcare professionals to order kits for their patients . . . [i]f you are a patient . . . please contact your doctor or healthcare provider"); *Take Action: Steps to Genetic Testing*, Ambry Genetics, https://www.ambrygen.com/patients/take-action (last visited June 3, 2026) (describing genetic consultations through Ambry's partner Genome Medical).

[21] Press Release, *Ambry Genetics' Big Data Sharing Program Now Available for Public Download*, Ambry Genetics (Jan. 16, 2017), https://www.ambrygen.com/company/press-

58.     Ambry Genetics's value to Tempus AI was not limited to its existing genetic testing business. Ambry Genetics also offered Tempus AI a continually replenishing source of genetic information. Each new Ambry Genetics test generated additional genetic information, variant interpretations, and linked clinical context that Tempus AI could incorporate into its own data products, AI applications, and pharmaceutical research offerings.

59.     Ambry Genetics performs these medical testing services subject to assurances that patients' medical information will remain protected, private, and secure. Indeed, Ambry Genetics promises that it "is committed to protecting your privacy"[22] and acknowledges that it is "required by law to: Maintain the confidentiality of your protected health information in accordance with [HIPAA]."[23] Ambry Genetics's Notice of Privacy Practices also assures patients that "[u]nless otherwise permitted by applicable law, we will not use or disclose your PHI for purposes not described in this Notice unless you give us written authorization to do so."[24] Ambry Genetics's privacy policies and public representations assured patients that the information entrusted to Ambry Genetics would be protected. For example Ambry Genetics stated it is "committed to protecting the information you have entrusted to us."[25] Moreover, Ambry Genetics's staff has assured its patients that Ambry Genetics understood "genetic test results are intensely personal."[26]

---

release/84/ambry-genetics-big-data-sharing-program-now-available-for-public-download; *Real World Data*, Ambry Genetics, https://www.ambrygen.com/partners/pharma-services/real-world-data-services (last visited Mar. 25, 2026).

[22] *Privacy Notice, supra* note 2.

[23] *Notice of Privacy Practices, supra* note 3.

[24] *Id.*

[25] *Information Security Statement, supra* note 4.

[26] Babu, *supra* note 5.

(Tempus AI's founder has similarly acknowledged: "Healthcare data singularly belongs—the ownership of that data—is with the patient and no one can ever take that away."[27])

60.     In recent years, Ambry Genetics has doubled down on these privacy assurances, particularly in the wake of a data breach of Ambry Genetics patient information in 2020. After the data breach, Ambry Genetics identified approximately 225,370 individuals whose data was breached and reached a settlement under which it agreed to implement "enhanced security measures that it will continue to implement."[28] These measures included "enhancing policies, procedures, and training to staff on how to appropriately manage PHI; continuing annual security-awareness training and individual training to certain employees and individuals handling PHI; enhancing restrictions in the company to access to PHI, and continuing to require that Ambry's Chief Compliance Officer or the Chief Compliance Officer's delegate(s) approve employee access to PHI by employee type and/or by employee . . . retaining vendors that ensure Ambry Genetics meets all SOC 2-certification requirements,"[29] and more. Such statements and commitments convey to the reasonable person that Ambry Genetics took patients' privacy seriously.

61.     Plaintiffs and Class members provided genetic samples and genetic information to Ambry Genetics in a medical-testing context, through healthcare providers, and for diagnosis, treatment, risk assessment, or other healthcare purposes. They did not provide that information so it could be transferred to a separate health-technology company, incorporated into commercial

---

[27] Halle Tecco, Michael Esquivel, Steve Kraus, *Precision Medicine is (Almost) Here | Tempus AI CEO Eric Lefkofsky*, The Heart of Healthcare | A Digital Health Podcast (Spotify Feb. 23, 2026) at 17:32.

[28] *Notice of Ambry Genetics Data Breach Class Action Settlement*, Ambrybreachsettlement.com, https://www.ambrybreachsettlement.com/ (last visited Mar. 25, 2026).

[29] Order Granting Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement, *In re Ambry Genetics Data Breach Litig.*, No. 8:20-cv-00791, ECF No. 145 (C.D. Cal. Oct. 5, 2022).

artificial-intelligence platforms, licensed to pharmaceutical and biotechnology companies, or used to build foundation models and other commercial data products.

**B. Tempus AI Targets Ambry Genetics as a One-Stop Shop for Troves of Genetic Information**

62.     Tempus AI is one of the country's leading health technology companies. It was founded in 2015 to develop artificial intelligence software for cancer care.[30]

63.     Tempus AI develops "innovative tech solutions oriented around clinical care and research products" with a mission to "[b]ring[] data and AI to healthcare."[31] The company provides healthcare providers with a suite of AI-driven technologies, including "Hub," "One," "Now," "Lens," "Pixel," "Next Pathways," "Next Trials," "Algos," and "Olivia," among others. These technologies improve as the data available to Tempus AI grows: the data trains its algorithms, and more data yields better-performing models—which in turn drives the company's appeal to its paying clients, healthcare providers and pharmaceutical partners. As set forth below, Tempus AI's business depends on actively receiving and processing patient data, using large datasets to develop AI applications, and monetizing data-derived products and datasets through third-party licensing.

64.     Ambry Genetics proved to be an attractive acquisition target for Tempus AI. As described above, Ambry Genetics had spent more than two decades amassing one of the country's largest troves of genetic data—collected through provider-ordered genetic testing, whether fulfilled by at-home collection kits or by samples drawn at a provider's office or a designated

---

[30] Our History, Tempus AI, https://www.tempus.com/about-us/our-history/ (last visited June 3, 2026) (Tempus "was founded in August of 2015 by Eric Lefkofsky… in an effort to bring the power of technology and artificial intelligence to cancer care"); see also Tempus AI, Inc., Annual Report (Form 10-K) 45 (filed Feb. 24, 2026) (for fiscal year ended Dec. 31, 2025), https://www.sec.gov/Archives/edgar/data/1717115/000119312526066961/0001193125-26-066961-index.htm ("We were founded by Eric Lefkofsky under the name Bioin, LLC in Delaware in August 2015… and [changed our name] to Tempus AI, Inc. in 2023").

[31] *Bringing data and AI to healthcare, supra* note 10.

19

laboratory. Tempus AI's own public statements confirm that Ambry Genetics's data was central to the acquisition: "With the acquisition of Ambry, we can leverage its vast amounts of data to augment our current data offerings."[32] Tempus AI's own accounting confirms the point. In allocating the purchase price for the acquisition, Tempus AI assigned $234 million—the largest identifiable intangible asset of the deal—to the "customer relationships" it acquired from Ambry Genetics, reflecting the value Tempus AI placed on Ambry Genetics's existing patient base and the data associated with them.[33]

65. On November 4, 2024, Tempus AI announced it would acquire Ambry Genetics for $375 million in cash and $225 million in shares.[34] In discussing the deal, Tempus AI touted the vast genetic dataset it would acquire. For example, Tempus AI's Chief Executive Officer and Founder stated, "This acquisition complements our strategy of leveraging diagnostics and data to drive innovation, further strengthening our ability to deliver cutting-edge solutions to clinicians, patients, and life sciences companies."[35] During the company's Q3 2024 Earnings Call, Tempus AI's Chief Executive Officer described the acquisition as "synergistic across all of our products," including "our Data business and our AI Applications business."[36] And during the same call, Tempus AI's Chief Financial Officer remarked, "[w]e have a large data business that we can kind of incorporate Ambry into."[37]

---

[32] Tempus AI, Inc., Annual Report (Form 10-K) (Feb. 24, 2025), at 10, https://www.sec.gov/Archives/edgar/data/1717115/000095017025025603/tem-20241231.htm.
[33] Tempus AI, Inc., Quarterly Report (Form 10-Q), at 16 (May 2026), https://www.sec.gov/Archives/edgar/data/1717115/000119312526206356/tem-20260331.htm.
[34] *Tempus Reports Third Quarter 2024 Results*, *supra* note 1.
[35] Press Release, *Tempus Completes Acquisition of Ambry Genetics*, Tempus AI (Feb. 3, 2025), https://investors.tempus.com/news-releases/news-release-details/tempus-completes-acquisition-ambry-genetics.
[36] Edited Transcript, *Q3 2024 Tempus AI, Inc. Earnings Call*, Refinitiv Street Events (Nov. 4, 2024).
[37] *Id.*

66.     On February 3, 2025, Tempus announced it had completed its acquisition of Ambry Genetics. As a result of the acquisition, highly sensitive genetic information that individuals had provided to Ambry Genetics was transferred or made available to Tempus AI. As alleged below, Tempus AI also obtained access to Ambry Genetics's genetic-data assets during pre-closing due diligence.

67.     Tempus AI then incorporated Ambry Genetics's genetic information into its own data set. For example, Tempus AI noted that "both legacy Ambry and the legacy Tempus sequencing business live within [Tempus AI's] Genomics offering."[38] Describing the acquisition, Ambry Genetics's CEO explained: "[w]e will be able to bring Ambry's 25-year history of leadership in variant interpretation together with Tempus's multimodal data and robust analytical systems to drive new insights for diagnosing and treating patients."[39] Tempus AI further assured its investors in February of 2025 that because "Ambry generates vast amounts of data across the ~400k patients it sequences each year," this would allow Tempus AI to "leverage this data and augment its current data offering."[40]

68.     Thus, by acquiring Ambry Genetics, Tempus AI acquired both a historical repository of genetic information and a continuing pipeline of future genetic information. That pipeline was particularly valuable to Tempus AI because Tempus AI's business model depends on scale: the more genetic and clinical data Tempus AI acquires, the more valuable its data products, AI models, clinical tools, and pharmaceutical partnerships become.

---

[38] *Q1 2025 Overview, supra* note 8.

[39] Press Release, *Letter from Tom Schoenherr, CEO: Definitive Agreement for Acquisition of Ambry Genetics by Tempus AI*, Tempus AI (Nov. 4, 2024), https://www.ambrygen.com/company/press-release/152/letter-from-tom-schoenherr.

[40] Presentation, *Tempus AI, Inc. Investor Presentation Q4 2024*, Tempus AI (Feb. 24, 2025), https://investors.tempus.com/static-files/7785f3fe-ccf4-4f86-935a-ad25a4d7f6e2.

69.     Tempus AI therefore did not target Ambry Genetics merely to offer hereditary cancer testing as a standalone clinical service. It targeted Ambry Genetics because Ambry Genetics had already collected, structured, and commercialized a massive volume of genetic information that Tempus AI could immediately fold into its existing data, AI, and pharmaceutical-licensing business.

70.     On October 9, 2025, Tempus AI announced that as a result of its acquisition of Ambry Genetics, it has "expanded [its] oncology dataset to include approximately 3 million genomic sequences from patients undergoing hereditary cancer testing."[41] This explicit acknowledgment confirms that Tempus AI acquired and incorporated Plaintiffs' genetic sequences into its commercial database.

71.     Tempus AI and Ambry Genetics engaged in the Genetic Data Transfer without providing notice to, or obtaining consent from, any patient who received Ambry Genetics services. The lawfulness of that conduct is addressed in the sections that follow.

### C. Tempus AI's Business Model Depends on Processing and Monetizing Massive Genetic Data Sets

### i. Tempus AI Actively Receives and Processes Identifiable Patient Data

72.     Tempus AI does not passively store data. Through its AI-enabled platform—which it first built for oncology—it analyzes molecular data alongside clinical data from providers and generates clinical test reports tailored to each client's patients.[42] "We have replicated this model beyond oncology, moving into disease areas and specialty areas such as cardiology, neurology, radiology, and pathology."[43]

---

[41] *Advancing the Frontier of AI in Healthcare*, Tempus AI (Oct. 9, 2025), https://www.tempus.com/resources/content/articles/advancing-the-frontier-of-ai-in-healthcare/.
[42] *Id.* (Tempus "marry[s] molecular data with clinical data pulled directly from a provider's EMR system, empowering physicians with a clinical test report that is contextualized to each patient").
[43] *Id.*

73.     Tempus AI is therefore not a passive repository of anonymous data but an active processor of identifiable patient medical information. A material portion of its business consists of physician-facing clinical products through which Tempus AI receives identifiable patient data, analyzes it, and returns individualized results to the ordering physician for that patient's care. Tempus AI acknowledges in its Registration Statement on Form S-1 that "[h]ealthcare institutions supply us with [medical] data in our capacity as a covered entity (for example, when we provide Next Generation Sequencing, or NGS, services on behalf of a patient)."[44] Tempus AI's Genomics product line "leverage[s] [Tempus AI's] laboratories to provide NGS diagnostics, molecular genotyping, and other anatomic and molecular pathology testing to healthcare providers,"[45] and its AI Applications product line is expressly directed at "building and deploying clinical decision support tools."[46]

74.     That active handling of identifiable patient information is concretely embodied in Tempus AI's flagship clinical application, Hub, which is, in Tempus AI's own words, "our clinical application for physicians and other healthcare providers … used primarily in our Genomics product line as an end-to-end application for healthcare providers who use our NGS tests."[47] Through Hub, a treating physician places an order for Tempus AI's laboratory tests on behalf of an individual patient; Tempus AI processes that order, sequences the patient's specimen, and returns the patient's individualized results through Hub, where the "treating physician can comprehensively view how a patient's disease has changed over time, including in response to

---

[44] Tempus AI, Inc., Registration Statement (Form S-1) at 145 (May 20, 2024),
https://www.sec.gov/Archives/edgar/data/1717115/000119312524142956/d221145ds1.htm.
[45] *Id.*
[46] *Id.*
[47] *Id.* at 155.

therapy"[48] and develop "treatment plans using the other information Tempus makes available."[49] Tempus AI accordingly maintains the medical information of each patient on whose behalf its tests are ordered, making that information available at the ordering physician's request for that patient's diagnosis and treatment.

75.    Although Tempus AI routinely receives and handles patient information in identifiable form, as alleged above, it represents that the genetic information it discloses is "de-identified." It is not. As a preliminary matter, Ambry Genetics worked directly with physicians for the diagnosis and treatment of their patients, which necessarily requires the identification of those individual patients. Furthermore, genetic information is inherently identifying biometric information that can permit re-identification even when direct identifiers are removed; the Ambry Genetics data sets at issue here were not, in fact, anonymized; and they do not qualify for the statutory de-identification exceptions on which Tempus AI relies.

76.    Genetic information cannot be de-identified because it contains biomarkers unique to each individual.[50] In other words, genetic information, such as DNA, is inherently identifiable. "DNA . . . [is] considered unique to the individual data subject, and regardless of whether the labels are stripped away, they still contain identifying information."[51] Indeed, "DNA is inherently

---

[48] *Id.*

[49] *Id.*

[50] *See Policy Statement of the Federal Trade Commission on Biometric Information and Section 5 of the Federal Trade Commission Act*, FTC, https://www.ftc.gov/system/files/ftc_gov/pdf/p225402biometricpolicystatement.pdf (noting "[b]iometric information includes . . . genetics.").

[51] *See* B. Malin and L. Sweeney, *Re-identification of DNA through an automated linkage process*, 2001 Proc AMIA Symp. 423-427 (2001), https://pmc.ncbi.nlm.nih.gov/articles/PMC2243547/ (explaining that "seemingly anonymous DNA database entries can be related to publicly available health information to uniquely and specifically identify the persons who are the subjects of the information even though the DNA information contains no accompanying explicit identifiers such as name, address, or Social Security number and contains no additional fields of personal information").

unique to the individual . . . . Even without a name or phenotype linkage, DNA includes many clues for narrowing the identity possibilities—and it can be obtained from objects as ubiquitous as discarded coffee cups."[52] According to the National Academies and The Petrie-Flom Center at Harvard Law School, even purportedly "de-identified" genomic data can easily be "re-identified."[53]

77.     The manner in which Tempus AI uses the genetic information further confirms that it is not de-identified. Tempus AI uses that data to train the artificial-intelligence foundation models at the core of Tempus AI's business. Such models are trained on broad, diverse datasets so that they can generalize across many downstream tasks, and in healthcare they are used to glean patterns from genomic data—including identifying disease-associated genes and predicting treatment response—drawing on inputs that range from medical imaging and clinical notes to structured electronic health records and genomic data itself.

78.     Genetic privacy experts have raised significant concerns about the use of genetic data in foundation models. "Several studies [have] show[n] that AI techniques often do not maintain data privacy."[54] For example, "attacks known as membership inference can be used to infer an individual's membership by querying over the dataset or the trained model," meaning that there are ways to draw inferences about the identities of the individuals whose genetic data is used within the model.[55] Moreover, researchers have demonstrated that an adversary "can use the

---

[52] *Translation of Genomics for Patient Care and Research*, Nat'l Academies of Scis., Eng'g, & Med. (2015), https://www.nationalacademies.org/read/21707/chapter/4#21.

[53] Elizabeth Pike, *Privacy and Progress and the Deidentification of Whole Genome Sequence Data*, Petrie-Flom Ctr. (May 10, 2013), https://petrieflom.law.harvard.edu/2013/05/10/privacy-and-progress-and-the-deidentification-of-whole-genome-sequence-data/.

[54] Reihaneh Torkzadehmahani et al., *Privacy-Preserving Artificial Intelligence Techniques in Biomedicine*, Methods of Info. in Med. (June 2022) at e13, https://www.thieme-connect.com/products/ejournals/pdf/10.1055/s-0041-1740630.pdf.

[55] *Id.*

25

statistics published as the result of genome-wide association studies (GWAS) to find out if an individual was a part of the study[,] . . . and the attacker could identify the relatives of those individuals and obtain sensitive disease information."[56] These risks have led institutions like the National Institutes of Health and hospitals to restrict access even to data that has already been pseudonymized.

79.     Researchers have proposed a range of privacy-preserving techniques—cryptographic methods, differential privacy, and federated learning, along with hybrid combinations of them—but each carries serious limitations when applied to data as vast and uniquely identifying as the human genome. Cryptographic methods "do not scale well to large biomedical datasets"; federated learning, standing alone, "does not provide privacy guarantees"; and applying differential privacy to genomic data requires adding so much statistical noise that, in the researchers' own words, "the results will not be meaningful anymore."[57]

80.     Neither Ambry Genetics nor Tempus AI applied privacy-preserving techniques sufficient to render the Ambry Genetics data non-identifiable under HIPAA, or the other statutes pleaded herein. Privacy-preserving methods may degrade model accuracy, and Tempus AI has continued to expand its licensing agreements and partnerships in the wake of the acquisition. Tempus AI likewise did not use synthetic data—artificially generated records that mimic the statistical patterns of real genetic data without being copied or derived from any actual patient. When generated with differential privacy, synthetic data is among the few privacy-preserving approaches that can offer a formal, mathematical guarantee of privacy, rather than merely

---

[56] *Id.*
[57] *Id.* at e14, e17.

protecting it under assumptions that may not hold in practice; and because the released records describe no real individual, sharing them does not expose any real patient's genome.[58]

81.     Against that backdrop, both Tempus AI and Ambry Genetics nonetheless claim to disclose only "de-identified" genetic information to third parties. These public statements cannot be reconciled with the companies' own documents, disclosures, and conduct, which repeatedly show that they hold and handle the data in identifiable form.

82.     For example, Ambry Genetics experienced a data breach in 2020, during which unauthorized actors gained access to 232,772 U.S. patients' PHI and PII. Ambry Genetics identified the patients whose information was stolen and subsequently notified its customers that the breach involved "[e]mails and attachments contain[ing] sensitive patient data such as names, diagnoses, and other medical information, with a subset of patients also having their Social Security numbers exposed."[59] This demonstrates that Ambry Genetics maintains health information in an identifiable form, not only because genetic information is inherently identifiable, but also because the records are linked to patient PII.

83.     Moreover, the data Tempus AI acquired was identifiable by the acquisition Agreement's own terms. The Agreement defines the "Sensitive Data" transferred to Tempus AI by reference to "Personal Data"—that is, information "relate[d] to an identified or identifiable natural person," expressly including any "biometric identifier or biometric information." Data that the parties themselves defined as relating to an identifiable person cannot have been "de-

---

[58] *See id.* at e17.
[59] Steve Adler, *Ambry Genetics Settles Class Action Data Breach Lawsuit for $12.25 Million*, HIPAA J. (Sep. 15, 2022), https://www.hipaajournal.com/ambry-genetics-settles-class-action-data-breach-lawsuit-for-12-25-million/.

identified."[60] Tempus AI's annual report confirms that it handles patient data in identifiable form: "Typically we receive identified data, either in our capacity as a covered entity under the Health Insurance Portability and Accountability Act, or HIPAA, or to the extent we have a business associate agreement with the provider."[61]

84.     Tempus AI's own marketing goes further still, openly contradicting its representation that the data it discloses is "structured and de-identified, prior to commercialization."[62] For example, Tempus AI informs its licensing partners that its services enable them to "[i]dentify[] patients and contextualize[] where they are in the care journey relative to clinical guidelines"[63] and promotes its capacity to deliver "precision medicine to improve patient outcomes" by "unraveling disease complexity from a complete, unified picture of the patient," capabilities that depend on patient-level data and are inconsistent with the notion that the information has been stripped of all identifying or re-identifying value.[64]

85.     The Ambry Genetics data also does not qualify for the statutory de-identification exceptions under any of the genetic-privacy statutes pleaded. Illinois GIPA, which incorporates the federal HIPAA standard, is representative: under 45 CFR 164.514(b)(2), a data set is considered de-identified only if the covered entity has removed each of 18 enumerated "identifiers of the individual" including "[b]iometric identifiers." HIPAA does not provide a comprehensive list of biometric identifiers, but the FTC has issued guidance on the subject: "[b]iometric information includes, but is not limited to, depictions, images, descriptions, or recordings of an

---

[60] Ex. 10.1, Securities Purchase Agreement, Tempus AI, Inc. Current Report (Form 8-K) (Nov. 5, 2024).

[61] Tempus 10-K (Feb. 24, 2025), *supra* note 32, at 10–11.

[62] Tempus AI, Inc., Prospectus Supplement (Aug. 27, 2025), https://www.sec.gov/Archives/edgar/data/1717115/000119312525189854/d14762d424b7.htm.

[63] *Bringing data and AI to healthcare, supra* note 10.

[64] *Tempus Investor Presentation Q4 2024*, *supra* note 40.

individual's facial features, iris or retina, finger or handprints, voice, genetics, or characteristic movements or gestures (e.g., gait or typing pattern)."[65] Genetic information is therefore itself a "biometric identifier" that Section 164.514(b)(2) requires be stripped before a data set can qualify as de-identified. Retaining genetic information and de-identifying the data set are thus mutually exclusive: any data set that includes genetic information cannot, by definition, satisfy the Safe Harbor method under Section 164.514(b)(2)—and therefore cannot be "de-identified" under HIPAA or, in turn, under Illinois GIPA and other similar statutes.

86.     The statutes at issue protect not only raw DNA or raw sequence files, but also genetic-test results and information derived from genetic testing. Tempus AI's business model depends on converting genetic-test results into commercially useful molecular profiles, clinical links, variant interpretations, trial-matching signals, therapeutic insights, and AI-model inputs. Those derived outputs remain information derived from genetic testing and remain protected.

## ii.     Tempus's AI Platform Requires Massive Data to Function

87.     Tempus AI's capacity to process patient data in this way depends on artificial intelligence that must be trained on vast quantities of data. Artificial intelligence, or "AI," refers to "the capability of computer systems or algorithms to imitate intelligent human behavior."[66]

88.     These algorithms are mathematical procedures that analyze data, discern patterns, and reach related conclusions. At their simplest, algorithms are "strand[s] of coded instructions for completing a task or solving a problem."[67] When used to power AI, however, they become far

---

[65] FTC Policy Statement on Biometric Information, *supra* note 50. *See also* NIST, *Biometrics*, https://www.nist.gov/programs-projects/biometrics (last visited June 10, 2026) (recognizing DNA as a biometric modality, alongside fingerprint, face, iris, and voice).
[66] *Artificial Intelligence*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/artificial%20intelligence (last visited Mar. 25, 2026).
[67] *See How do Algorithms Work?*, Univ. of York, https://online.york.ac.uk/how-do-algorithms-work/ (last visited Mar. 25, 2026).

29

more complex—analyzing billions of data points, finding patterns, and feeding each conclusion back into the next round of analysis to build what is often called "knowledge."[68]

89.     Machine learning, a sub-field of AI, trains algorithms through a repetitive "trial and error" process. It is generally understood that the more data a machine learning system has access to, the more powerful it becomes.

90.     A common type of machine learning system, called a "neural network," improves itself by repeatedly adjusting how much weight it gives to different pieces of input data until its predictions become accurate. Because neural networks process data through many internal steps that build on one another, such systems are widely criticized as non-transparent and not traceable by humans, because it is exceedingly difficult to trace how any single piece of input data shaped the final prediction—earning these systems the nickname "black box" models.[69] For companies building such systems, access to larger, more diverse datasets can materially improve model performance and commercial utility.

91.     Because artificial intelligence models such as those at the core of Tempus AI's business rely on massive data sets, Tempus AI must collect enormous amounts of health data. Without it, Tempus AI could not develop or improve its product offerings, compete in the health AI industry, or generate returns for its shareholders.

92.     As Tempus itself admits, it needs data to stay on top: "In the world of AI, foundation models are transforming industries. Most of today's foundation models are trained on the entire internet, learning from a vast but often unstructured and noisy sea of information. But when it

---

[68] *See id.*

[69] See Vanessa Buhrmester, David Münch & Michael Arens, *Analysis of Explainers of Black Box Deep Neural Networks for Computer Vision: A Survey*, 3 Mach. Learning & Knowledge Extraction 966, 966 (2021) (deep neural networks "are often criticized as being non-transparent and their predictions not traceable by humans").

comes to healthcare, the stakes are higher, the data is often siloed and not easily accessible, and the need for accuracy is paramount."[70] Tempus AI explains: "[r]ecent research from NYU shows that models trained exclusively on healthcare data are outperforming general-purpose models like ChatGPT on clinical tasks."[71] To feed that demand for healthcare data, Tempus AI's "[p]latform connects multiple stakeholders within the larger healthcare ecosystem, often in near real time"—continually drawing in the patient data on which its models depend.[72] Tempus AI candidly ties that data accumulation to its competitive position, admitting that "the compounding value of each data record in our database serves to enhance our competitive moat," and that "[t]he more data we collect, the smarter our tests become, the more applications we launch, the more physicians join our network, further growing our database."[73]

### iii. Tempus AI Monetizes Genetic Data by Licensing It to Third Parties

93. The data Tempus AI accumulates is not an end in itself; it is the raw material of a highly profitable enterprise. Tempus AI's development of artificial intelligence for health sciences is extremely lucrative. The "AI in diagnostics" industry is growing so rapidly that some have projected it will grow "from USD 10.12 billion in 2026 to USD 209.63 billion by 2034, exhibiting a CAGR [compound annual growth rate] of 46.06%"—that is, growing by an average of roughly 46% every year.[74]

94. Tempus AI is positioned to capture that growth through the data it holds. Its business model relies on its capacity to "license libraries of linked clinical, molecular, and imaging de-identified data," including genetic information like Ambry Genetics's, "and provide a suite of

---

[70] *Advancing the Frontier of AI in Healthcare*, *supra* note 41.
[71] *Id.*
[72] Tempus 10-K (Feb. 24, 2025), *supra* note 32, at 3.
[73] *Id.* at 4.
[74] *AI in Diagnostics Market Size, Share & Industry Analysis*, Fortune Business Insights (Mar. 9, 2026), https://www.fortunebusinessinsights.com/ai-in-medical-diagnostics-market-111351.

analytic and cloud-and-compute tools to pharmaceutical and biotechnology companies."[75] Tempus AI's data services include clinical trial matching and analysis. Tempus AI not only licenses its dataset of genetic information and testing to third parties, but also shares auxiliary information about each patient in its dataset which can be linked with the genetic information, easily allowing third parties to identify patients. Moreover, Tempus AI's models are not simply built *for* its third-party partners, but alongside the pharmaceutical and biotechnology companies Tempus AI partners with, which allows those companies to use model inversion or membership inference techniques to extract the genetic sequences that were used to train Tempus AI's model.

95.     Through its Insights product, Tempus AI monetizes the vast, purportedly de-identified multimodal dataset it has amassed by licensing it to pharmaceutical and biotechnology companies. Tempus AI also develops its model in partnership with these companies. These customers pay Tempus AI either on a per-file basis or through multi-year data licensing agreements to use its purportedly de-identified patient database. The model is particularly valuable because the data records have a "lifetime value" that grows over time as they are longitudinally updated with clinical outcomes and treatment-response data.[76] As of December 31, 2025, Tempus AI had signed data contracts with over $1.1 billion in remaining total contract value and demonstrated strong expansion, with "Net Revenue Retention" of approximately 126% year-over-year, reflecting existing customers' significantly increased data licensing purchases.[77]

---

[75] Tempus S-1, *supra* note 44.

[76] Tempus 10-K, *supra* note 30, at 21 (explaining that, because data profiles "regularly update with clinical outcome and response data over time," the company's files "behave as if they have a 'lifetime value' that has the potential to increase over time").

[77] *Id.* at 20–21 (reporting a Remaining TCV of "more than $1.1 billion" as of December 31, 2025, and Net Revenue Retention of "approximately 126%" for the year ended December 31, 2025 compared to the same cohort of customers for the period ended December 31, 2024).

**D. Tempus AI Compelled Ambry Genetics to Disclose Plaintiffs' Genetic Information Without Authorization**

96.     The Genetic Data Transfer was not incidental to the acquisition—it was its central purpose. Tempus AI compelled Ambry Genetics to disclose its enormous and continually growing cache of genetic information, including that of Plaintiffs and Class members, to Tempus AI for use in training its artificial intelligence algorithms. Tempus AI did so without first obtaining written authorization from each individual whose genetic information was disclosed.

97.     The parties' own agreement establishes that the transfer of genetic information to Tempus AI was a deliberate term of the transaction—not an incidental consequence of a change in corporate ownership. In the Securities Purchase Agreement, Ambry Genetics represented that "[t]he disclosure or transfer of Sensitive Data to Buyer [Tempus AI] in connection with the transactions contemplated by this Agreement will not violate any Privacy Requirements in any material respect, require notice to or consent from any Person, or result in any Order or Contract with any Governmental Entity becoming applicable to Buyer." Securities Purchase Agreement § 3.10(l).

98.     The agreement did not merely transfer ownership of Ambry Genetics; it expressly contemplated and provided for "the disclosure or transfer of Sensitive Data to Buyer"—that is, to Tempus AI. The agreement defines "Sensitive Data" to mean "all proprietary, sensitive, regulated, and confidential information (including Personal Data) Processed by any Group Company or any third party for or on behalf of any Group Company in connection with the operation of the Business," and defines "Personal Data" to include any information relating to "an identified or identifiable natural person," expressly including a "biometric identifier or biometric information." *Id.* § 1.1. Plaintiffs' and Class members' genetic information—regulated health information and a biometric identifier unique to each patient—falls squarely within both definitions. The "Sensitive

33

Data" the parties agreed to transfer to Tempus AI therefore included the very genetic information at issue in this action.

99. That same representation also reveals that the parties structured the transfer on the premise that no patient consent was required, warranting that the disclosure or transfer of Sensitive Data to Tempus AI would not "require notice to or consent from any Person." That premise cannot be squared with the law: the "Privacy Requirements" the parties invoked are defined to include compliance with "Privacy Laws," *id.* § 3.10(k), which include HIPAA and state genetic- and health-privacy statutes—each of which required the very patient authorization the parties represented was unnecessary. Consistent with this purpose, the agreement also gave Tempus AI early access to Ambry Genetics's operations, obligating the seller to furnish Tempus AI, before closing, with access to the "books and records" and "financial and operating data" of Ambry Genetics in furtherance of the transaction—access the parties expressly made "subject to applicable Law," underscoring their shared awareness that the transaction was supposed to comply with the very privacy laws that required patient authorization. *Id.* § 6.3(a). The parties, in short, negotiated for and effected the transfer of Plaintiffs' genetic information to Tempus AI as a term of their bargain, while representing to one another that they could do so without the consent the law in fact required.

100. Tempus AI also compelled disclosure of Ambry Genetics's genetic information before closing, including during due diligence. Because Tempus AI publicly described Ambry Genetics's data assets as central to the acquisition, Tempus AI needed to evaluate the scope, quality, completeness, commercial utility, and regulatory status of those assets before closing. Tempus AI could not meaningfully value Ambry Genetics, represent the transaction to investors, or determine whether Ambry Genetics's data could be incorporated into Tempus AI's existing data

34

and AI businesses without obtaining access to information about Ambry Genetics's genetic data assets.

101. That due diligence included access to Ambry Genetics's data systems, data dictionaries, sample records, patient-data fields, genomic-sequence information, variant-interpretation information, data-sharing practices, privacy and consent records, and customer and provider records sufficient for Tempus AI to evaluate whether Ambry Genetics's repository of genetic information could be used in Tempus AI's commercial data products and AI applications.

102. That pre-closing access was itself a disclosure of genetic information and information derived from genetic testing. It also confirms that the Genetic Data Transfer was not merely a passive consequence of corporate ownership after closing. Tempus AI affirmatively required Ambry Genetics to make patient genetic information available to Tempus AI as part of the acquisition process, before Plaintiffs or Class members had notice of the transaction or any opportunity to provide or withhold written authorization.

103. Tempus AI now maintains possession of Plaintiffs' and Class members' genetic information and has incorporated it into its own data sets. Tempus AI admits as much in its February 24, 2025 investor presentation (consistent with its sworn annual report, see *supra* ¶ 70), where it touts that "Tempus offers germline sequencing (xG) for inherited risk, using Ambry as its supplier[,]" "Ambry generates vast amounts of data across ~400k patients it sequences each year[, and] Tempus can leverage this data to augment its current data offering[,]" and "Ambry's product line allows Tempus to immediately expand into new categories."[78] In other words, Tempus AI did not merely become the corporate parent of a company that happened to possess genetic information; Tempus AI folded Ambry Genetics's genetic information into Tempus AI's own

---

[78] *Tempus Investor Presentation Q4 2024, supra* note 40.

commercial data infrastructure and used that information to expand the genetic and molecular data assets that Tempus AI markets to customers.

104. As alleged above, Tempus AI's statement that the Ambry acquisition expanded its oncology dataset to include approximately 3 million genomic sequences confirms that the Genetic Data Transfer involved actual genomic-sequence information, not merely administrative records.

105. Tempus AI did not stop there. As described below, Tempus AI further compounded its unauthorized acquisition of Plaintiffs' and Class members' genetic information—and its attendant violations of the genetic-privacy, medical-confidentiality, and consumer-protection laws set forth below—by re-disclosing that genetic information to third parties for financial gain.

### E. Tempus AI Re-Disclosed Plaintiffs' Genetic Information to Third Parties for Profit Without Authorization

106. Tempus AI's business model centers on providing third parties with access to its trove of genetic data—and after the Genetic Data Transfer, that trove included the genetic information of Plaintiffs and Class members.

107. Specifically, Tempus AI works by aggregating and collecting large amounts of health-related data, including genetic data, to commercialize the data for third parties and license it to them "to provide a series of data-related services to our life sciences customers, such as clinical trial matching, or Trials."[79]

108. Tempus also shares its data with third parties in real time: "Our Platform connects multiple stakeholders within the larger healthcare ecosystem, often in near real time."[80] In addition, Tempus AI's business model relies on its capacity to "license libraries of linked clinical,

---

[79] *See* Tempus S-1*, supra* note 44.
[80] *Id.*

molecular, and imaging de-identified data," including genetic information, "and provide a suite of analytic and cloud-and-compute tools to pharmaceutical and biotechnology companies."[81]

109. Tempus AI's provision of access to its database, data files, analytical platform, Lens platform, Insights products, foundation-model training data, and related data tools constitutes a disclosure of the genetic information contained in those systems. Tempus AI need not transmit a patient's entire raw genetic file to a third party for a disclosure to occur. By granting third parties access to datasets, records, derived variables, molecular profiles, genomic sequences, variant interpretations, clinical links, analytical outputs, and model-training inputs derived from Ambry Genetics's patient data, Tempus AI discloses Plaintiffs' and Class members' genetic information and information derived from genetic testing.

110. Those disclosures include, but are not limited to, disclosures through Tempus AI's data-licensing agreements, data subscriptions, per-file access arrangements, pharmaceutical collaborations, drug-development partnerships, AI-modeling agreements, and foundation-model development projects. Each of those arrangements monetizes access to the same category of information Tempus AI acquired from Ambry Genetics: patient-level genetic and molecular information linked to clinical context.

111. In 2025 alone, "Tempus signed data agreements with over 70 customers, spanning both large and mid-sized pharma, including AstraZeneca, GlaxoSmithKline, Bristol Myers Squibb, Pfizer, Novartis, Merck, Abbvie, Daiichi Sankyo, Eli Lilly, Boehringer Ingelheim, and biotechs including Incyte, Servier, Aspera Biomedicines, and Whitehawk Therapeutics, as an increasing number of biopharma companies are incorporating Tempus' unique, multimodal dataset

---

[81] *Id.*

into their drug discovery and development efforts."[82] Tempus AI made no secret of this, touting its $1.1 billion total contract value in 2025.

112. For example, Tempus AI announced on April 23, 2025, a "3 year, $200 million data licensing and modeling agreement with AstraZeneca and Pathos . . . to build the largest foundation model that's ever been built in oncology."[83] Under the agreement, AstraZeneca and Pathos had access to "over 300 petabytes of data, which includes rich molecular data connected to outcomes."[84] The agreement was "non-exclusive," meaning Tempus AI "is free to license its data and build other models with other biopharma companies," which it "expect[ed] to do in the future."[85] That non-exclusive structure gave Tempus AI a continuing financial incentive to license the same data, or information derived from it, to additional third parties.

113. On May 14, 2025, Tempus AI announced a "multi-year strategic collaboration with Boehringer Ingelheim" to "leverage[e] data and AI to further advance therapeutic research and development."[86] Under the Agreement, "Boehringer will have access to Tempus' de-identified database containing molecular, clinical, and imaging data and its analytical platform, Lens."[87]

114. On October 16, 2025, Tempus AI announced a "collaboration with Whitehawk Therapeutics" that would provide Whitehawk with Tempus' multimodal database.[88]

---

[82] Tempus AI, Inc., Current Report (Form 8-K), Ex. 99.1, *Tempus Achieves Record Total Contract Value Exceeding $1.1 Billion* (Jan. 11, 2026), https://investors.tempus.com/node/9566/html.

[83] *Q1 2025 Overview, supra* note 8.

[84] *Id.*

[85] *Id.*

[86] *Tempus Enters Multi-Year Strategic Collaboration with Boehringer Ingelheim to Advance its Cancer Pipeline*, Tempus, https://www.tempus.com/news/tempus-enters-multi-year-strategic-collaboration-with-boehringer-ingelheim-to-advance-its-cancer-pipeline/.

[87] *Id.*

[88] *Tempus Announces Collaboration with Whitehawk Therapeutics to Advance Biomarker-Driven Oncology Research*, Tempus, https://www.tempus.com/news/pr/tempus-announces-collaboration-with-whitehawk-therapeutics-to-advance-biomarker-driven-oncology-research/.

115. Tempus AI's data licensing extends beyond the pharmaceutical industry and is, by its own account, sold in discrete batches of patient records. In its quarterly report, Tempus AI disclosed that it granted SB Tempus—its joint venture with SoftBank Group Corporation—"a limited, non-exclusive, transferable license with a limited right to sublicense" its data, and that "SB Tempus paid the Company ¥7.5 billion ($47.9 million) in exchange for the license to an initial records batch."[89] That Tempus AI prices and sells access to its patient-record database by the "batch" underscores that the data—including the genetic information acquired from Ambry Genetics—is a commodity it monetizes through repeated disclosures to third parties.

116. Tempus AI's additional illegal transfers of Plaintiffs' and Class members' sensitive genetic information materially contributed to Tempus AI's data-licensing growth. As its CFO put it, "2025 was a record year for [Tempus AI's] Data and applications business."[90]

117. Indeed, in its summary for 2025, Tempus AI reported an 83.4% year-over-year increase in revenue, and its gross profit showed 109.4% growth year-over-year. Moreover, Tempus AI expects ~25% revenue growth in 2026. Tempus AI's Q1 2025 financial results showed that its Data and Services business grew 43.2% year-over-year, "largely driven by" strong growth in its data-licensing ("Insights") business, which grew 58.0% year-over-year.[91] The "Genomics"

---

[89] Tempus 10-Q, *supra* note 33, at 19.

[90] Tempus 8-K, *supra* note 82.

[91] Press Release, Tempus Reports First Quarter 2025 Results, Tempus AI (May 6, 2025), https://investors.tempus.com/news-releases/news-release-details/tempus-reports-first-quarter-2025-results ("Revenue from Data and services totaled $61.9 million in the first quarter of 2025, delivering 43.2% growth versus the first quarter of 2024, led by Insights (data licensing), which grew 58.0% year-over-year."); Tempus AI, Inc., *Q1 2025 Overview* (2025), https://investors.tempus.com/static-files/4862cc66-8cdd-4877-99ab-1f09f4753d39 (attributing the growth "largely" to "strong growth in our Insights (data licensing) business" and noting that the AstraZeneca and Pathos foundation-model agreement, "while not a contributor to Q1 revenues," increased Total Contract Value).

business—which now includes the Ambry Genetics hereditary testing operation—grew 88.9% year-over-year.

118. Tempus AI's record-breaking financial success is directly traceable to its illegal acquisition and subsequent disclosure of Plaintiffs' and Class members' sensitive genetic information—disclosed to its third-party pharmaceutical partners without the written authorization that the law requires.

### F. Plaintiffs Suffered Concrete and Continuing Injury from the Unauthorized Transfer and Disclosure of Their Genetic Information

119. By compelling disclosure of Plaintiffs' highly sensitive genetic testing and information derived from genetic testing, without their consent, written or otherwise, Tempus AI invaded Plaintiffs' statutorily protected right to privacy, in direct violation of Illinois GIPA and the other genetic-privacy statutes and common-law duties pleaded below.

120. Tempus AI also invaded Plaintiffs' right to privacy—and violated the statutes pleaded below—by disclosing information derived from Plaintiffs' genetic testing to unauthorized third parties, including businesses with whom Tempus AI licenses its data.

121. As a result of Tempus AI's conduct, each Plaintiff suffered loss of his or her privacy and property interest in his or her sensitive genetic information. Moreover, each Plaintiff faces ongoing injury because Tempus AI continues to use the Plaintiff's genetic information in its artificial intelligence algorithms. Each Plaintiff faces the ongoing risk that Tempus AI or other third parties will further disseminate his or her genetic information, exposing him or her to additional risk. Tempus AI deprived each Plaintiff of any opportunity to consent to or contest the illegal transfer and subsequent commercialization of his or her sensitive genetic information.

40

## VI.   PLAINTIFFS' INDIVIDUAL ALLEGATIONS

### A.  Plaintiff Sandra Kreutter

122.   Plaintiff Kreutter is, and at all relevant times has been, a resident and citizen of California. Plaintiff Kreutter became an Ambry Genetics patient in or around June 2024 when she underwent genetic testing ordered by her physician for certain health concerns. Plaintiff Kreutter's genetic information was transferred to Tempus AI as part of the Genetic Data Transfer and was subsequently disclosed by Tempus AI to third parties.

123.   Plaintiff Kreutter expected her genetic information to remain confidential and to be used only for the purposes for which she provided it, and to be protected in accordance with applicable laws, including HIPAA and the CMIA.

124.   Plaintiff Kreutter did not consent, agree, or grant permission—written or otherwise—to Ambry Genetics to disclose her genetic information to Tempus AI or any other third party, nor did she consent to having her genetic information used to train, develop, or commercialize artificial intelligence models or applications. Plaintiff Kreutter received no notice of, and no opportunity to contest or opt out of, the disclosure of her genetic information to Tempus AI or its further disclosure thereafter.

125.   As a result of Tempus AI's conduct, Plaintiff Kreutter suffered a loss of privacy, a loss of her property interest in her genetic information, emotional distress, and other injuries. Plaintiff Kreutter faces a continuing injury because Tempus AI continues to retain, use, and license her genetic information—including in its AI models—and has further disclosed it to third-party partners, and she faces the ongoing risk that Tempus AI or third parties may reidentify her purportedly de-identified data, without any opportunity to consent to or be compensated for such use.

### B. Plaintiff Michele Pascoe

126. Plaintiff Pascoe is, and at all relevant times has been, a resident and citizen of California. Plaintiff Pascoe became an Ambry Genetics patient in or around late 2019 when she underwent genetic testing ordered by her physician for certain health concerns. Plaintiff Pascoe's genetic information was transferred to Tempus AI as part of the Genetic Data Transfer and was subsequently disclosed by Tempus AI to third parties.

127. Plaintiff Pascoe expected her genetic information to remain confidential and to be used only for the purposes for which she provided it, and to be protected in accordance with applicable laws, including HIPAA and the CMIA.

128. Plaintiff Pascoe did not consent, agree, or grant permission—written or otherwise—to Ambry Genetics to disclose her genetic information to Tempus AI or any other third party, nor did she consent to having her genetic information used to train, develop, or commercialize artificial intelligence models or applications. Plaintiff Pascoe received no notice of, and no opportunity to contest or opt out of, the disclosure of her genetic information to Tempus AI or its further disclosure thereafter.

129. As a result of Tempus AI's conduct, Plaintiff Pascoe suffered a loss of privacy, a loss of her property interest in her genetic information, emotional distress, and other injuries. Plaintiff Pascoe faces a continuing injury because Tempus AI continues to retain, use, and license her genetic information—including in its AI models—and has further disclosed it to third-party partners, and she faces the ongoing risk that Tempus AI or third parties may reidentify her purportedly de-identified data, without any opportunity to consent to or be compensated for such use.

42

C. **Plaintiff Eugenia Rukhin**

130.    Plaintiff Rukhin is, and at all relevant times has been, a resident and citizen of California. Plaintiff Rukhin became an Ambry Genetics patient in or around February 2024, when she underwent genetic testing ordered by her physician for certain health concerns. Plaintiff Rukhin's genetic information was transferred to Tempus AI as part of the Genetic Data Transfer and was subsequently disclosed by Tempus AI to third parties.

131.    As a patient receiving medical services, Plaintiff Rukhin reasonably expected that her genetic information would remain private and would be protected in accordance with applicable laws.

132.    Plaintiff Rukhin did not consent, agree, or grant permission—written or otherwise—to Ambry Genetics to disclose her genetic information to Tempus AI or any other third party, nor did she consent to Tempus AI's commercialization, further disclosure, or use of her genetic information to train, develop, or improve artificial-intelligence models. Plaintiff Rukhin received no notice of, and no opportunity to contest or opt out of, the disclosure of her genetic information to Tempus AI or its further disclosure thereafter.

133.    As a result of Tempus AI's conduct, Plaintiff Rukhin suffered a loss of privacy, a loss of her property interest in her genetic information, emotional distress, and other injuries. Plaintiff Rukhin faces a continuing injury because Tempus AI continues to retain, use, and license her genetic information—including in its AI models—and she faces the ongoing risk that Tempus AI or third parties may reidentify her purportedly de-identified data, without any opportunity to consent to or be compensated for such use.

D. **Plaintiff Lauren Barone**

134.    Plaintiff Barone is, and at all relevant times has been, a resident and citizen of Illinois. Plaintiff Barone became an Ambry Genetics patient in the Fall of 2023, when she

43

underwent genetic testing at her physician's direction. Plaintiff Barone's genetic information, including the results of and information derived from her genetic testing, was transferred to Tempus AI as part of the Genetic Data Transfer and was subsequently disclosed by Tempus AI to third parties.

135.    As a patient receiving medical services, Plaintiff Barone reasonably expected that her personally identifiable information, including her highly sensitive medical and genetic information, would remain private. Plaintiff Barone also reasonably expected that her personally identifiable information, including her private medical and genetic information, would be protected in accordance with applicable laws.

136.    Plaintiff Barone did not consent, agree, or grant permission—written or otherwise—to Ambry Genetics to disclose her genetic information to Tempus AI or any other third party, nor did she consent to Tempus AI's commercialization, further disclosure, or use of her genetic information to train, develop, or improve artificial-intelligence models. Plaintiff Barone received no notice of, and no opportunity to contest or opt out of, the disclosure of her genetic information to Tempus AI or its further disclosure thereafter.

137.    As a result of Tempus AI's conduct, Plaintiff Barone suffered a loss of privacy, a loss of her property interest in her genetic information, emotional distress, and other injuries. Plaintiff Barone faces a continuing injury because Tempus AI continues to retain, use, and license her genetic information—including in its AI models—and she faces the ongoing risk that Tempus AI or third parties may reidentify her purportedly de-identified data, without any opportunity to consent to or be compensated for such use.

**E.  Plaintiff Jennifer Nash and Minor Child E.S.**

138.    Plaintiff Nash and her minor child, Plaintiff E.S., are, and at all relevant times have been, residents and citizens of Illinois. Plaintiff Nash became an Ambry Genetics patient in or

44

around September 2025, and Plaintiff E.S. became an Ambry Genetics patient in or around May 2025, when they both underwent genetic testing at E.S.'s physician's direction. Plaintiff Nash's and Plaintiff E.S.'s genetic information, including the results of and information derived from their genetic testing, was transferred to Tempus AI as part of the Genetic Data Transfer and was subsequently disclosed by Tempus AI to third parties.

139. As a patient receiving medical services, Plaintiff Nash reasonably expected that her personally identifiable information and that of Plaintiff E.S., including their highly sensitive medical and genetic information, would remain private and would be protected in accordance with applicable laws.

140. Neither Plaintiff Nash nor anyone acting on Plaintiff E.S.'s behalf consented, agreed, or granted permission—written or otherwise—to Ambry Genetics to disclose their genetic information to Tempus AI or any other third party, nor did they consent to Tempus AI's commercialization, further disclosure, or use of their genetic information to train, develop, or improve artificial-intelligence models. Plaintiff Nash received no notice of, and no opportunity to contest or opt out of, the disclosure of their genetic information to Tempus AI or its further disclosure thereafter.

141. As a result of Tempus AI's conduct, Plaintiff Nash and Plaintiff E.S. suffered a loss of privacy, a loss of their property interest in their genetic information, emotional distress, and other injuries. They face a continuing injury because Tempus AI continues to retain, use, and license their genetic information—including in its AI models—and they face the ongoing risk that Tempus AI or third parties may reidentify their purportedly de-identified data, without any opportunity to consent to or be compensated for such use.

### F. Plaintiff Ariann Taglioli

142.     Plaintiff Taglioli is, and at all relevant times has been, a resident and citizen of Illinois. Plaintiff Taglioli became an Ambry Genetics patient in or around March of 2016, when she underwent genetic testing at her physician's direction. Plaintiff Taglioli's genetic information, including the results of and information derived from her genetic testing, was transferred to Tempus AI as part of the Genetic Data Transfer and was subsequently disclosed by Tempus AI to third parties.

143.     As a patient receiving medical services, Plaintiff Taglioli reasonably expected that her personally identifiable information, including her highly sensitive medical and genetic information, would remain private and would be protected in accordance with applicable laws.

144.     Plaintiff Taglioli did not consent, agree, or grant permission—written or otherwise—to Ambry Genetics to disclose her genetic information to Tempus AI or any other third party, nor did she consent to Tempus AI's commercialization, further disclosure, or use of her genetic information to train, develop, or improve artificial-intelligence models. Plaintiff Taglioli received no notice of, and no opportunity to contest or opt out of, the disclosure of her genetic information to Tempus AI or its further disclosure thereafter.

145.     As a result of Tempus AI's conduct, Plaintiff Taglioli suffered a loss of privacy, a loss of her property interest in her genetic information, emotional distress, and other injuries. Plaintiff Taglioli faces a continuing injury because Tempus AI continues to retain, use, and license her genetic information—including in its AI models—and has further disclosed it to third-party partners, and she faces the ongoing risk that Tempus AI or third parties may reidentify her purportedly de-identified data, without any opportunity to consent to or be compensated for such use.

46

### G. Plaintiff Maren Vargas

146. Plaintiff Vargas is, and at all relevant times has been, a resident and citizen of Illinois. Plaintiff Vargas became an Ambry Genetics patient in or around August of 2013, when she underwent genetic testing at her physician's direction. Plaintiff Vargas's genetic information, including the results of and information derived from her genetic testing, was transferred to Tempus AI as part of the Genetic Data Transfer and was subsequently disclosed by Tempus AI to third parties.

147. As a patient receiving medical services, Plaintiff Vargas reasonably expected that her personally identifiable information, including her highly sensitive medical and genetic information, would remain private and would be protected in accordance with applicable laws.

148. Plaintiff Vargas did not consent, agree, or grant permission—written or otherwise—to Ambry Genetics to disclose her genetic information to Tempus AI or any other third party, nor did she consent to Tempus AI's commercialization, further disclosure, or use of her genetic information to train, develop, or improve artificial-intelligence models. Plaintiff Vargas received no notice of, and no opportunity to contest or opt out of, the disclosure of her genetic information to Tempus AI or its further disclosure thereafter.

149. As a result of Tempus AI's conduct, Plaintiff Vargas suffered a loss of privacy, a loss of her property interest in her genetic information, emotional distress, and other injuries. Plaintiff Vargas faces a continuing injury because Tempus AI continues to retain, use, and license her genetic information—including in its AI models—and she faces the ongoing risk that Tempus AI or third parties may reidentify her purportedly de-identified data, without any opportunity to consent to or be compensated for such use.

## H. Plaintiff Joanne Gray

150. Plaintiff Gray is, and at all relevant times has been, a resident and citizen of Oregon. Plaintiff Gray became an Ambry Genetics patient in or around December of 2025, when she underwent genetic testing at her physician's direction. Plaintiff Gray's genetic information, including the results of and information derived from her genetic testing, was transferred to Tempus AI as part of the Genetic Data Transfer and was subsequently disclosed by Tempus AI to third parties.

151. As a patient receiving medical services, Plaintiff Gray reasonably expected that her personally identifiable information, including her highly sensitive medical and genetic information, would remain private and would be protected in accordance with applicable laws.

152. Plaintiff Gray did not consent, agree, or grant permission—written or otherwise—to Ambry Genetics to disclose her genetic information to Tempus AI or any other third party, nor did she consent to Tempus AI's commercialization, further disclosure, or use of her genetic information to train, develop, or improve artificial-intelligence models. Plaintiff Gray received no notice of, and no opportunity to contest or opt out of, the disclosure of her genetic information to Tempus AI or its further disclosure thereafter.

153. As a result of Tempus AI's conduct, Plaintiff Gray suffered a loss of privacy, a loss of her property interest in her genetic information, emotional distress, and other injuries. Plaintiff Gray faces a continuing injury because Tempus AI continues to retain, use, and license her genetic information—including in its AI models—and has further disclosed it to third-party partners, and she faces the ongoing risk that Tempus AI or third parties may reidentify her purportedly de-identified data, without any opportunity to consent to or be compensated for such use.

48

### I. Plaintiff Caitlin Horan

154. Plaintiff Caitlin Horan is, and at all relevant times has been, a resident and citizen of New Hampshire. In or around November 2024, Plaintiff Horan underwent genetic testing performed by Ambry Genetics at the referral of her treating clinician for the diagnosis or treatment of a medical condition. Plaintiff Horan's genetic information was subsequently transferred to Tempus AI as part of the Genetic Data Transfer.

155. As a patient receiving medical services, Plaintiff Horan reasonably expected that her personally identifiable information, including her highly sensitive medical and genetic information, would remain private and would be protected in accordance with applicable laws. Plaintiff Horan did not consent, agree, or grant permission—written or otherwise—to Ambry Genetics to disclose her genetic information to Tempus AI or any other third party, nor did she give the prior written and informed consent for Tempus AI to disclose the fact of her genetic testing, or the results of that testing, to third parties, nor did she consent to Tempus AI's commercialization, further disclosure, or use of her genetic information to train, develop, or improve artificial-intelligence models. Plaintiff Horan received no notice of, and no opportunity to contest or opt out of, the disclosure of her genetic information to Tempus AI or its further disclosure thereafter.

156. As a result of Tempus AI's conduct, Plaintiff Horan suffered a loss of privacy, a loss of her property interest in her genetic information, emotional distress, and other injuries. Plaintiff Horan faces a continuing injury because Tempus AI continues to retain, use, and license her genetic information—including in its AI models—and she faces the ongoing risk that Tempus AI or third parties may reidentify her purportedly de-identified data, without any opportunity to consent to or be compensated for such use.

### J. Plaintiff Stephanie Bianco and Minor Child H.B.

157.   Plaintiff Stephanie Bianco and her minor child H.B. are, and have at all relevant times been, residents and citizens of New York. Plaintiff Bianco and Plaintiff H.B. became Ambry Genetics patients in November 2023 when, at the direction of her doctor, Plaintiff Bianco underwent genetic testing in connection with her pregnancy while Plaintiff H.B. was in utero.

158.   As a patient receiving prenatal medical services, Plaintiff Bianco reasonably expected that her personally identifiable information and the personally identifiable information of her minor child Plaintiff H.B., including their highly sensitive medical and genetic information, would remain private. Indeed, on the day of her Ambry Genetics test, Plaintiff Bianco signed an acknowledgement of having read her medical practice's "Notice of Privacy Practices." See Fig. 1. Plaintiff Bianco recalls that this privacy notice assured her that her data would be kept confidential and that the practice—including in its provision of services like medical genetic testing—would remain compliant with all applicable laws like the Health Insurance Portability and Accountability Act ("HIPAA").

50

**Figure 1**



159.    To Plaintiff Bianco's knowledge, and on information and belief, Ambry Genetics availed itself of the benefit of the privacy promises made on its behalf through its partner medical practices; it never provided Plaintiff Bianco's doctor with any Ambry-specific information for dissemination to patients that would have supplemented the practice's existing disclosures or put a reasonable consumer of medical genetic tests on alert that their sensitive and inherently identifiable genetic and health information could ever be sold to third parties or used in artificial intelligence applications, nor did Ambry Genetics ever ask Plaintiff Bianco for her consent to contribute her or her child's medical or genetic information to medical research. Unbeknownst to Plaintiff Bianco, Tempus AI compelled Ambry Genetics's disclosure of its repository of identifiable medical and genetic information to Tempus AI, which included Plaintiff Bianco's and Plaintiff H.B.'s personally identifying information and identifiable genetic testing results.

51

160.    Plaintiff Bianco does not recall ever receiving notice regarding the possibility of her or Plaintiff H.B.'s genetic information being shared with third parties, nor does she recall ever receiving notice of the disclosure of her or Plaintiff H.B.'s highly sensitive genetic information from Ambry to Tempus AI. To that end, Plaintiff Bianco and Plaintiff H.B. received no opportunity to contest or opt out of Tempus AI's illicit disclosures or monetization of consumer data.

161.    Had Plaintiff Bianco known the truth, she would not have submitted herself and her unborn child to the genetic test provided by Ambry Genetics. As a result of Ambry Genetics's and Tempus AI's deceptive conduct and the affirmative misrepresentations and omissions, including those they allowed Plaintiff Bianco's medical practice to make on their behalf, Plaintiff Bianco and Plaintiff H.B. suffered a loss of their privacy, a loss of their property interest in their genetic data, and emotional distress.

162.    Plaintiff Bianco and Plaintiff H.B. face a continuing injury because Tempus AI continues to use their allegedly de-identified data in its artificial intelligence models. Plaintiff Bianco and Plaintiff H.B. face the ongoing risk that Tempus AI or third parties may reidentify their allegedly de-identified data. Tempus AI deprived Plaintiff Bianco and Plaintiff H.B. of any opportunity to consent to or contest the use of their data, de-identified or otherwise, or to seek compensation for such use.

## VII.    CLASS ALLEGATIONS

163.    Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action under Rules 23(a), (b)(1), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure, on behalf of the following Nationwide Class and State Subclasses (collectively, the "Classes"):

52

164.    **Nationwide Class.** All United States residents whose genetic testing or information derived from genetic testing was transferred to Tempus AI in the Genetic Data Transfer, and/or whose information was subsequently disclosed, released, licensed, made available, or otherwise provided by Tempus AI to any third party.

165.    **California Subclass.** All California residents whose medical information, as defined by Cal. Civ. Code Section 56.05(j)(1), was transferred to Tempus AI in the Genetic Data Transfer and/or whose medical information was subsequently disclosed, released, licensed, made available, or otherwise provided by Tempus AI to third parties.

166.    **Illinois Subclass.** All Illinois residents whose genetic testing or information derived from genetic testing was transferred to Tempus AI in the Genetic Data Transfer, and/or whose information was subsequently disclosed, released, licensed, made available, or otherwise provided by Tempus AI to third parties.

167.    **Oregon Subclass.** All Oregon residents whose genetic information or DNA sample was transferred to Tempus AI in the Genetic Data Transfer and/or whose genetic information or DNA sample was disclosed, released, licensed, made available, or otherwise provided by Tempus AI to third parties.

168.    **New Hampshire Subclass**. All New Hampshire residents whose results of genetic testing were transferred to Tempus AI in the Genetic Data Transfer and/or whose results of genetic testing were subsequently disclosed, released, licensed, made available, or otherwise provided by Tempus AI to third parties.

169.    **New York Subclass**. All New York residents whose genetic information (including information derived from genetic testing) was transferred to Tempus AI in the Genetic Data

53

Transfer and/or whose genetic information was subsequently disclosed, released, licensed, made available, or otherwise provided by Tempus AI to third parties.

170.  Excluded from the Classes are Tempus AI and Ambry Genetics, their past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns, and any entity in which any of them have a controlling interest, as well as all judicial officers assigned to this case and their immediate families. Also excluded are all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out, and all federal, state, or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions.

171.  Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

172.  **Numerosity.** Members of the proposed Classes are so numerous and geographically dispersed that joinder of all members is impracticable. Based on publicly available information, Ambry Genetics has conducted genetic testing on over 2.5 million individuals. In a prior 2020 data-breach matter alone, Ambry Genetics notified more than 232,000 of its affected U.S. patients. Tempus AI has publicly stated that the acquisition expanded its oncology dataset to include "approximately 3 million genomic sequences from patients undergoing hereditary cancer testing"[92] and that "Ambry generates vast amounts of data across the ~400k patients it sequences each year."[93] Plaintiffs believe that tens of thousands, if not hundreds of thousands, of these individuals are members of the proposed Classes. The exact number of Class members is known to Tempus AI, whose records identify each individual whose genetic information was transferred

---

[92] *Advancing the Frontier of AI in Healthcare*, *supra* note 41.
[93] Presentation, *43rd Annual J.P. Morgan Healthcare Conference*, Tempus AI (Jan. 13, 2025), https://investors.tempus.com/static-files/80e049bc-5dac-4b68-b699-984cd28763f2.

in the Ambry Genetics acquisition and subsequently disclosed to third parties. It is, therefore, impractical to join each member as a named Plaintiff. Further, although the pleaded claims provide for meaningful statutory or actual damages, individual Class members have limited economic incentive to pursue separate actions against Tempus AI, thereby making joinder impractical. Accordingly, the class action mechanism is the most economically feasible means of determining and adjudicating the merits of the litigation.

173. **Typicality.** Plaintiffs' claims are typical of the claims of members of the proposed Classes. Like all Class members, Plaintiffs provided their genetic material to Ambry Genetics for hereditary testing. Like all Class members, Plaintiffs never provided written authorization for Ambry Genetics to disclose their genetic information to Tempus AI, nor did they authorize Tempus AI to obtain, use, or further disclose their genetic information to third parties. Plaintiffs and members of the proposed Classes were harmed by the same uniform course of wrongful conduct by Tempus AI: (i) Tempus AI compelled Ambry Genetics to disclose their genetic testing and identifiable information derived from genetic testing as part of the acquisition, without obtaining express written consent; and (ii) Tempus AI disclosed their genetic testing and identifiable information derived from genetic testing to third parties—including pharmaceutical companies such as AstraZeneca, GlaxoSmithKline, Bristol Myers Squibb, Pfizer, and others—without obtaining express written consent. Plaintiffs' claims arise from the same systematic violations of the statutes and common law at issue affecting every member of the proposed Classes. Their claims are based on the same legal theories as the claims of other proposed Class members. Plaintiffs do not assert any claims unique to themselves, and there are no defenses unique to Plaintiffs that would render their claims atypical.

174.   **Adequacy.** Plaintiffs will fairly and adequately protect and represent the interests of the members of the proposed Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the members of the proposed Classes. Plaintiffs share the same interest as all Class members in vindicating their statutory right to genetic privacy under Illinois GIPA, the CMIA, and other laws, and in obtaining redress for the unauthorized disclosure of their genetic information. Plaintiffs have no conflicts with other Class members and are not subject to any unique defenses that would detract from their ability to represent the Classes. Plaintiffs have raised viable statutory claims of the type reasonably expected to be raised by members of the proposed Classes and will vigorously pursue those claims to ensure Defendant Tempus AI is held accountable for its systematic privacy violations. Plaintiffs are represented by counsel with substantial experience in prosecuting complex class action litigation generally and in the emerging field of privacy and data breach litigation specifically. Plaintiffs' counsel have the resources, expertise, and commitment to prosecute this action vigorously on behalf of the Classes.

175.   **Commonality.** Questions of law and fact common to the members of the proposed Classes predominate over questions that may affect only individual members of the Classes because Defendant has acted on grounds generally applicable to the Classes. The central questions in this case are whether Tempus AI violated the statutes at issue by compelling disclosure of and subsequently disclosing Class members' genetic information without written authorization, whether Tempus AI's conduct deprived Plaintiffs and Class members of their statutory privacy rights, control over their genetic information, and the economic value of that information. These questions do not depend on individualized proof. Tempus AI acquired Ambry Genetics's database of genetic information through a single transaction, in violation of privacy promises and legal disclosure obligations, and subsequently made that data available to third parties through its data

56

licensing business model. Every Class member's genetic information was subject to the same unauthorized transfer and disclosure. None were properly notified, given the opportunity to opt out, or compensated. Such generally applicable conduct lends itself to common proof. Questions of law and fact common to the Classes include:

a. whether Tempus AI compelled disclosure of Plaintiffs' and the Classes' genetic testing and information derived from genetic testing without written authorization;

b. whether Tempus AI disclosed Plaintiffs' and the Classes' genetic testing and information derived from genetic testing to third parties without written authorization;

c. whether Tempus AI's conduct violated the genetic-privacy statutes at issue;

d. whether Tempus AI properly informed Plaintiffs and members of the proposed Classes that it obtained their genetic testing and information derived from genetic testing;

e. whether Tempus AI obtained the written release required by the statutes at issue to obtain Plaintiffs' and the members of the proposed Classes' genetic testing and information derived from genetic testing;

f. whether Tempus AI's violations of the statutes at issue were committed intentionally, recklessly, or negligently;

g. whether Tempus AI's purported de-identification practices, if any, satisfy the requirements of HIPAA or the statutes at issue;

h. whether Plaintiffs and Class members are entitled to statutory damages, actual damages, injunctive relief, restitution, disgorgement, or other equitable relief.

57

176. **Predominance**. Tempus AI engaged in a common course of conduct toward Plaintiffs and the Classes, whose genetic information was acquired from Ambry Genetics in the same Genetic Data Transfer and disclosed to third parties in the same manner, without written authorization. The common issues arising from that conduct predominate over any questions affecting only individual members of the Classes. Whether Tempus AI compelled the disclosure of genetic information without authorization, whether it further disclosed that information to third parties, and whether that conduct violated the statutes at issue can be resolved with common, classwide proof. Adjudication of these common issues in a single action will materially advance the litigation and conserve judicial resources.

177. **Superiority.** Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons—potentially numbering in the millions—to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. Given the cost and complexity of litigating genetic-privacy claims against a sophisticated health-technology company, individual Class members have limited practical ability or economic incentive to pursue separate actions, despite the significant privacy harm they have suffered. The benefits of proceeding through the class mechanism, including providing injured persons with a method for obtaining redress for claims that could not practicably be pursued individually, substantially outweigh the potential difficulties in managing this class action. Plaintiffs know of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action. Class-wide relief is essential to compliance with the statutes at issue and to vindicate the privacy rights of the thousands of individuals whose genetic information was unlawfully transferred and disclosed.

58

178. **Injunctive Relief Appropriate.** Injunctive relief is necessary to protect Plaintiffs and Class members, making certification pursuant to Rule 23(b)(2) appropriate. Defendant has acted and continues to act on grounds generally applicable to the Classes, thereby making final injunctive and declaratory relief appropriate with respect to the Classes as a whole. Defendant's uniform practice of acquiring, using, and disclosing Plaintiffs' and Class members' genetic information without notice or written authorization presents an ongoing and systemic violation of statutory and common law privacy rights that cannot be remedied through damages alone. Absent injunctive relief, Defendant will continue to retain, use, license, and further disclose this highly sensitive genetic information for commercial purposes. Declaratory relief is likewise warranted to establish that Defendant's conduct violates applicable law and to prevent future harm.

179. **Risk of Inconsistent or Varying Adjudications**. Certification is also appropriate under Rule 23(b)(1). The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Tempus AI. It would also create a risk of adjudications that, as a practical matter, would be dispositive of the interests of other Class members who are not parties to those adjudications, or would substantially impair or impede their ability to protect their interests.

180. **Certification of Particular Issues**. In the alternative, and to the extent any cause of action cannot be certified in its entirety, certification of particular issues is appropriate under Rule 23(c)(4). The claims of the Classes comprise common issues—including whether Tempus AI compelled the disclosure of Class members' genetic information without authorization, whether Tempus AI disclosed that information to third parties without authorization, and whether such conduct violated the statutes at issue—the resolution of which in a class trial would materially advance this litigation.

## VIII.   CAUSES OF ACTION

### COUNT I
**Violation of the California Confidentiality of Medical Information Act ("CMIA")**
**Cal. Civ. Code §§ 56, et seq.**
*(On behalf of Plaintiffs Kreutter, Rukhin, and Pascoe and the California Subclass)*

181.    Plaintiffs Kreutter, Rukhin, and Pascoe (collectively, the "California Plaintiffs" for purposes of this Count) incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

182.    "Medical information" means "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care… regarding a patient's medical history, mental health application information, reproductive or sexual health application information, mental or physical condition, or treatment." Cal. Civ. Code § 56.05(j)(1). Medical information is "individually identifiable" when it contains "any element of personal identifying information sufficient to allow identification of the individual." *Id.*

183.    The genetic information of the California Plaintiffs and the California Subclass— their genetic-testing results and the information derived from those tests—constitutes "medical information" within the meaning of Cal. Civ. Code Section 56.05(j)(1). That information was in the possession of, and derived from, a provider of health care, and it concerns each patient's medical history and physical condition, including inherited genetic characteristics and predisposition to disease. It is "individually identifiable" because it contains, and is linked to, elements of personal identifying information sufficient to allow identification of the individual to whom it pertains.

184.    Ambry Genetics is a "provider of health care" within the meaning of Cal. Civ. Code Section 56.05(p). Ambry Genetics is a clinical genetic-testing laboratory licensed pursuant to Division 2 (commencing with Section 500) of the California Business and Professions Code, and

60

it collected, generated, and maintained the California Plaintiffs' and the California Subclass members' genetic information in that capacity, for the screening, diagnosis, and treatment of hereditary disease. The genetic information at issue was therefore obtained and derived from a provider of health care.

185.    Tempus AI is also a "provider of health care" within the meaning of Cal. Civ. Code Section 56.06(a) because it is a "business organized for the purpose of maintaining medical information in order to make the information available to an individual or to a provider of health care at the request of the individual or a provider of health care, for purposes of allowing the individual to manage the individual's information, or for the diagnosis and treatment of the individual."

186.    First, Tempus AI is a business organized for the purpose of maintaining medical information. As alleged above, Tempus AI is built on maintaining multimodal patient medical information, including genetic testing results and derived insights, which it integrates into a unified database and incorporates into its Genomics, Data, and AI Applications product lines. The genetic information of the California Plaintiffs and the California Subclass—their genetic testing results and information derived from those tests—is maintained in that database.

187.    Second, Tempus AI maintains that information to make it available to health care providers at those providers' request. As alleged above, Tempus AI itself acknowledges that healthcare institutions supply patient data to it "in [its] capacity as a covered entity," and its Hub clinical application allows treating physicians to place orders for its laboratory tests on behalf of their patients and to receive each patient's individualized results back through Hub.

188.    Third, Tempus AI makes that information available for the diagnosis and treatment of the individual patient. As alleged above, Tempus AI's Hub application enables the ordering

61

physician to "comprehensively view how a patient's disease has changed over time, including in response to therapy" and to "develop treatment plans using the other information Tempus makes available," and Tempus AI's AI Applications product line is expressly devoted to "building and deploying clinical decision support tools."

189. Tempus AI returns each patient's individualized genomic and clinical-test results to the ordering physician through Hub for use in selecting therapy and managing the patient's ongoing care.

190. Thus, Tempus AI is a provider of healthcare within the meaning of Cal. Civ. Code Section 56.06(a) and maintains medical information as defined by Cal. Civ. Code Section 56.05.

191. California Plaintiffs and California Subclass members are "patients" within the meaning of Cal. Civ. Code Section 56.05(m) because their medical information was maintained by Ambry Genetics and, after the Genetic Data Transfer, by Tempus AI for purposes of diagnosis, treatment, genetic testing, and related health services.

192. California Plaintiffs and the California Subclass provided their personal medical information in the form of genetic information to Ambry Genetics, Defendant Tempus AI's subsidiary.

193. As a provider of health care within the meaning of Cal. Civ. Code Section 56.06(a), Tempus AI is "subject to the requirements of this part," including Cal. Civ. Code § 56.10. Section 56.10(a) prohibits a provider of health care from disclosing a patient's medical information "without first obtaining an authorization," except as provided in subdivisions (b) or (c).

194. Tempus AI disclosed the medical information of the California Plaintiffs and the California Subclass—including their genetic-testing results and the information derived from those tests—to third parties, including pharmaceutical and biotechnology companies such as

62

AstraZeneca, GlaxoSmithKline, Bristol Myers Squibb, and Pfizer, without first obtaining the authorization required by Section 56.10(a).

195.    The medical information Tempus AI disclosed was individually identifiable within the meaning of Section 56.05. It consisted of each patient's genetic-testing results and the information derived from those tests—data that are inherently identifying—and, as alleged above, Tempus AI did not validly de-identify that information before disclosing it, leaving the recipients able to re-identify the individuals to whom it pertained.

196.    None of the exceptions in Section 56.10(b) or (c) applies. The disclosures were not compelled by law under Section 56.10(b), and they do not qualify as any permitted disclosure under Section 56.10(c). The limited research exception in Section 56.10(c)(7) authorizes disclosure only to "public agencies, clinical investigators, including investigators conducting epidemiologic studies, health care research organizations, and accredited public or private nonprofit educational or health care institutions," and only "for bona fide research purposes," and it bars any further disclosure that would reveal a patient's identity. Tempus AI's disclosures satisfy none of these requirements: they were made to further Tempus AI's commercial data-licensing business rather than for bona fide research, and the genetic information remained identifiable, leaving the recipients able to re-identify the patients to whom it pertained.

197.    Each unauthorized disclosure of a California Plaintiff's or California Subclass member's medical information constitutes a separate violation of Section 56.10.

198.    Tempus AI's disclosures were knowing and willful. Tempus AI acquired Ambry Genetics to obtain and monetize patient data, and it disclosed that data to third parties through deliberate, negotiated data-licensing agreements, knowing that it had not obtained the authorizations required under Section 56.10(a).

63

199. Having sustained economic loss and injury as a result of these unauthorized disclosures, the California Plaintiffs and the California Subclass are entitled under Civil Code Section 56.35 to compensatory damages, punitive damages, attorneys' fees, and the costs of litigation. They are further entitled, under Section 56.36(b), to nominal damages of one thousand dollars ($1,000) for each negligent release of their medical information, without any requirement to prove actual damages.

200. Separately and in the alternative, Tempus AI violated Section 56.101(a) by failing to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information because it disclosed to third parties the California Plaintiffs' and California Subclass members' intimate health data without consent, including genetic information containing the results of their genetic testing or insights derived therefrom.

201. Tempus AI's failure to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information was willful or knowing or, at least, negligent, and thus constitutes a negligent release of medical information for which Tempus AI is liable under Section 56.36(b).

202. On behalf of themselves and the California Subclass, the California Plaintiffs seek declaratory, injunctive, and equitable relief; actual, consequential, statutory, and punitive damages; and reasonable attorneys' fees, costs, and other litigation expenses.

## COUNT II
### Violation of California's Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200, et seq.
*(On behalf of the California Subclass)*

203. Plaintiffs Kreutter, Rukhin, and Pascoe (collectively, the "California Plaintiffs" for purposes of this Count) repeat and reallege the foregoing allegations as if fully set forth herein.

204. The California Plaintiffs bring this Count on behalf of the California Subclass.

64

205. California's Unfair Competition Law (the "UCL") prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Tempus AI is a "person" within the meaning of California Business & Professions Code Section 17201, and its acquisition, retention, use, disclosure, and commercialization of genetic information are "business acts or practices" within the meaning of the UCL. Cal. Bus. & Prof. Code § 17200.

206. **Unlawful Prong**. Tempus AI committed unlawful business acts and practices. Tempus AI acquired, retained, used, and disclosed the genetic information of the California Plaintiffs and the California Subclass without the authorization required by the CMIA, as alleged above. That conduct independently violates the CMIA, and each such violation constitutes an unlawful business practice actionable under the UCL.

207. **Unfair Prong**. Tempus AI committed unfair business acts and practices. Tempus AI's acquisition and commercial exploitation of the California Plaintiffs' and the California Subclass's genetic information without consent offends the public policy—embodied in the CMIA and California's constitutional right to privacy—of protecting the confidentiality of patients' medical and genetic information and conditioning its disclosure on informed written consent. The conduct is immoral, unethical, oppressive, unscrupulous, and substantially injurious, and the gravity of the harm it causes—the permanent loss of control over immutable, uniquely identifying genetic information—outweighs any legitimate business utility, particularly because reasonably available lawful alternatives, including obtaining patient authorization, existed. The injury to the California Subclass is substantial, is not outweighed by any countervailing benefit to consumers or competition, and is not one that the California Plaintiffs and California Subclass could reasonably have avoided.

208. As a result of Tempus AI's unlawful and unfair business practices, the California Plaintiffs and the California Subclass have suffered injury in fact and lost money or property within the meaning of California Business & Professions Code Section 17204. Genetic information has ascertainable economic value, and the California Plaintiffs and the California Subclass were deprived of the value of, and their right to control, their genetic information while Tempus AI acquired and profited from it. The California Plaintiffs and the California Subclass retain a vested interest in their genetic information and in the proceeds Tempus AI derived from it.

209. California Plaintiffs and the California Subclass are entitled to restitution of the money or property Tempus AI acquired through its unlawful and unfair business practices, including disgorgement of the profits, revenues, and other benefits Tempus AI obtained from the unauthorized acquisition, use, disclosure, and commercialization of their genetic information, and to an order enjoining Tempus AI from continuing those practices. The California Plaintiffs and the California Subclass further seek their reasonable attorneys' fees and costs.

### COUNT III
### Violation of the Illinois Genetic Information Privacy Act ("Illinois GIPA")
### 410 ILCS 513/1, et seq.
*(On behalf of Plaintiffs, the Nationwide Class, and the Illinois Subclass)*

210. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

211. Tempus AI is a public corporation and thus qualifies as a "person" under Illinois GIPA. *See* 410 ILCS 513/10.

212. Tempus AI is also a "health care provider" under Illinois GIPA. *See* 410 ILCS 513/10 (indicating the term "has the meaning ascribed to it under HIPAA, as specified in 45 CFR 160.103"). Under HIPAA, a health care provider is "a provider of services (as defined in section

66

1861 of the Act, 42 U.S.C. 1395x(u)),[94] a provider of medical or health services (as defined in section 1861(s) of the Act, 42 U.S.C. 1395x(s)),[95] and any other person or organization who furnishes, bills, or is paid for health care in the normal course of business."[96] Tempus AI qualifies as a health care provider because it furnishes, bills for, or is paid for health care in the normal course of business through its own Genomics offerings and, following the acquisition, through Ambry Genetics's laboratory operations. Moreover, Tempus AI provides medical and other health services as defined by the relevant statute, including diagnostic services and additional preventive services that identify medical conditions or risk factors.

213.    Tempus AI is also a "covered entity" under Illinois GIPA, which "has the meaning ascribed to it under HIPAA, as specified in 45 CFR 160.103." *See* 410 ILCS 513/10. Under 45 C.F.R. Section 160.103, a "covered entity" can refer to "[a] health care provider who transmits any health information in electronic form in connection with a transaction," like Tempus AI.

214.    Plaintiffs' and the Illinois Subclass members' genetic testing, genetic-test results, genetic information, and information derived from genetic testing are confidential and privileged under 410 ILCS 513/15(a).

---

[94] "The term 'provider of services' means a hospital, critical access hospital, rural emergency hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, hospice program, or, for purposes of section 1395f(g) and section 1395n(e) of this title, a fund." 42 U.S.C. § 1395x(u).

[95] "The term 'medical and other health services' means any of the following items or services: (1) physicians' services; . . . [(2)](C) diagnostic services which are—(i) furnished to an individual as an outpatient by a hospital or by others under arrangements with them made by a hospital, and (ii) ordinarily furnished by such hospital (or by others under such arrangements) to its outpatients for the purpose of diagnostic study; . . . [and] (BB) additional preventive services." 42 U.S.C. § 1395x(s). "The term 'additional preventive services' means services . . . that identify medical conditions or risk factors and that the Secretary determines are—(A) reasonable and necessary for the prevention or early detection of an illness or disability…" 42 USC § 1395x(ddd)(1).

[96] 45 CFR 160.103.

215.     Section 15 of Illinois GIPA mandates that "genetic testing and information derived from genetic testing is confidential and privileged and may be released only to the individual tested and to persons specifically authorized, in writing in accordance with Section 30, by that individual to receive the information." *See* 410 ILCS 513/15(a).

216.     Tempus AI violated 410 ILCS 513/15(a) because the genetic testing and information derived from genetic testing was released to persons who were not specifically authorized in writing by Plaintiffs or Illinois Subclass members to receive that information.

217.     Section 30 of Illinois GIPA provides that "[n]o person may disclose or be compelled to disclose the identity of any person upon whom a genetic test is performed or the results of a genetic test in a manner that permits identification of the subject of the test, except to" (i) the subject of the test or the subject's legally authorized representative, (ii) any person designated in a specific written legally effective authorization for release of the test results and certain other persons not relevant here. *See* 410 ILCS 513/30.

218.     Tempus AI violated 410 ILCS 513/30(a) by compelling Ambry Genetics to disclose the identity of persons upon whom genetic tests were performed and the results of those genetic tests in a manner that permitted identification of the test subjects, including through due diligence, the acquisition, and the Genetic Data Transfer, without a specific written legally effective release executed by Plaintiffs or Illinois Subclass members.

219.     Section 35 of Illinois GIPA prohibits any "person to whom the results of a test have been disclosed [from disclosing] the test results to another person except as authorized under this Act." *See* 410 ILCS 513/35.

68

220.    Tempus AI violated 410 ILCS 513/35 by further disclosing genetic-test results and information derived from genetic testing to third parties, including pharmaceutical, biotechnology, research, and commercial data partners, after that information had been disclosed to Tempus AI.

221.    Tempus AI failed to comply with Illinois GIPA's mandates in Sections 15, 30, and 35 to keep Plaintiffs' and members of the proposed Classes' genetic tests, and information derived from those tests, confidential without express authorization. Tempus AI also failed to comply with Illinois GIPA's Section 30 prohibition against compelling the disclosure of genetic tests and information derived from those tests.

222.    Plaintiffs and the members of the proposed Nationwide Class and Illinois Subclass are individuals who provided genetic testing and information derived from genetic testing to Ambry Genetics. Illinois-headquartered Tempus AI, through its acquisition of Ambry Genetics, compelled disclosure and obtained Plaintiffs' and members of the proposed Classes' genetic testing, and information derived from genetic testing, as explained in detail above. Defendant Tempus AI also violated Illinois GIPA by disclosing Plaintiffs' and members of the proposed Classes' identities and/or genetic testing and information to third parties. Defendant Tempus AI failed to obtain written authorization from Plaintiffs or members of the proposed Classes to obtain their genetic testing and information derived from genetic testing, as required by Illinois GIPA. This harmful conduct emanated from the state of Illinois, harming Ambry Genetics patients nationwide.

223.    Tempus AI's violations of Illinois GIPA, as set forth herein, were knowing and willful, or were at least in reckless disregard of the statutory requirements. Alternatively, Tempus AI negligently failed to comply with Illinois GIPA.

69

224. On behalf of themselves and the Classes, Plaintiffs seek: (1) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and members of the proposed Classes by requiring Tempus AI to comply with Illinois GIPA's requirements; (2) statutory damages of $15,000 for each intentional and/or reckless violation of Illinois GIPA pursuant to 410 ILCS 513/40(a)(2) or, in the alternative, statutory damages of $2,500 for each negligent violation of Illinois GIPA pursuant to 410 ILCS 513/40(a)(1); (3) reasonable attorneys' fees and costs and other litigation expenses pursuant to 410 ILCS 513/40(a)(3); and (4) any other relief, including an injunction, as the Court may deem appropriate pursuant to 410 ILCS 513/40(a)(4).

**COUNT IV**
**Violation of Oregon Genetic Privacy Act ("Oregon GPA")**
**ORS 192.531, et seq.**
*(On behalf of Plaintiff Gray and the Oregon Subclass)*

225. Plaintiff Gray (the "Oregon Plaintiff" for purposes of this Count) incorporates the foregoing allegations as if fully set forth herein.

226. Tempus AI is also a "person" under Oregon GPA, which "has the meaning given in ORS 433.045." *See* ORS 192.531. Under ORS 433.045, which relates to HIV testing, "a person may not disclose or be compelled to disclose the identity of any individual upon whom an HIV-related test is performed, or the results of such a test in a manner that permits identification of the subject of the test, except as required or permitted by federal law, the law of this state or any rule, including any authority rule considered necessary for public health or health care purposes, or as authorized by the individual whose blood is tested."

227. As required by the Oregon GPA, "A person may not obtain genetic information from an individual, or from an individual's DNA sample, without first obtaining informed consent of the individual or the individual's representative" with some exceptions. *See* ORS 192.535(1).

228. In addition, "Any person authorized by law or by an individual or an individual's representative to obtain, retain or use an individual's genetic information or any DNA sample must maintain the confidentiality of the information or sample and protect the information or sample from unauthorized disclosure or misuse." ORS 192.537.

229. Oregon GPA also provides that "a person may not disclose or be compelled, by subpoena or any other means, to disclose the identity of an individual upon whom a genetic test has been performed or the identity of a blood relative of the individual, or to disclose genetic information about the individual or a blood relative of the individual in a manner that permits identification of the individual" with some narrow exceptions. *See* ORS 192.539.

230. Tempus AI violated the Oregon GPA by obtaining the Oregon Plaintiff's and Oregon Subclass members' genetic information without first obtaining their informed consent. Tempus also violated the Oregon Plaintiff's and the Oregon Subclass members' rights by failing to keep their genetic tests, and information derived from those tests, confidential without express authorization to disclose those genetic tests and information. Tempus AI also disclosed the genetic testing information of individuals, including the Oregon Plaintiff, in a manner that permits third parties to re-identify those individuals.

231. Tempus AI also failed to comply with Oregon GPA's prohibition against compelling the disclosure of genetic tests and information derived from those tests.

232. The Oregon Plaintiff and members of the Oregon Subclass are individuals who provided genetic testing and information derived from genetic testing to Ambry Genetics. Illinois-headquartered Tempus AI, through its acquisition of Ambry Genetics, compelled disclosure and obtained the Oregon Plaintiff's and the Oregon Subclass members' genetic testing, and information derived from genetic testing, as explained in detail above. Defendant Tempus AI also

71

violated Oregon GPA by disclosing the Oregon Plaintiff's and the Oregon Subclass members' identities and/or genetic testing and information to third parties. Defendant Tempus AI failed to obtain written authorization from the Oregon Plaintiff or members of the Oregon Subclass to obtain their genetic testing and information derived from genetic testing, as required by Oregon GPA. This harmful conduct affected Ambry Genetics patients in Oregon and was directed at and caused harm within the state of Oregon.

233. Tempus AI's violations of Oregon GPA, as set forth herein, were knowing and willful, or were at least in reckless disregard of the statutory requirements. Alternatively, Tempus AI failed to comply with Oregon GPA.

234. On behalf of herself and the Oregon Subclass, the Oregon Plaintiff seeks: (1) injunctive and equitable relief as is necessary to protect the interests of the Oregon Plaintiff and members of the Oregon Subclass by requiring Tempus AI to comply with Oregon GPA's requirements; (2) statutory damages of $25,000 for each knowing violation committed with intent to sell, transfer, or use for commercial advantage, personal gain, or malicious harm pursuant to ORS 192.541(2)(e); or, in the alternative, statutory damages of $10,000 for each knowing or reckless violation pursuant to ORS 192.541(2)(c); or, alternatively, statutory damages of $15,000 per violation for each knowing violation based on a fraudulent misrepresentation pursuant to ORS 192.541(2)(d); or, alternatively, $500 for each negligent violation pursuant to ORS 192.541(2)(b); or, alternatively, statutory damages of $100 for each inadvertent violation that does not arise out of the negligence of the defendant pursuant to ORS 192.541(2)(a); and, for each violation of ORS 192.535 or ORS 192.539, by obtaining and disclosing the Oregon Plaintiff's and the Oregon Subclass members' genetic information without authorization, the greater of actual damages or statutory damages of $250,000 for each knowing violation committed with intent to sell, transfer,

72

or use for commercial advantage, personal gain, or malicious harm pursuant to ORS 192.541(3)(e); $100,000 for each knowing or reckless violation pursuant to ORS 192.541(3)(c); $5,000 for each negligent violation pursuant to ORS 192.541(3)(b); or $1,000 for each inadvertent violation that does not arise out of the negligence of the defendant pursuant to ORS 192.541(3)(a); and (3) reasonable attorneys' fees pursuant to ORS 192.541(6), costs, and other litigation expenses pursuant to ORS 192.541 and any other applicable statute, common law, or rule.

**COUNT V**
**Violation of the New Hampshire Genetic Testing and Privacy Act**
**RSA 141-H:1, et seq.**
*(On behalf of Plaintiff Caitlin Horan and the New Hampshire Subclass)*

235.    Plaintiff Horan (the "New Hampshire Plaintiff" for purposes of this Count) repeats and realleges the foregoing allegations as if fully set forth herein.

236.    Tempus AI is a "person" subject to RSA 141-H:1. *See* RSA 141-H:1(XI).

237.    RSA 141-H:2(III) provides that, except as authorized by RSA 141-J or under the narrow exceptions in RSA 141-H:2(II), "no person shall disclose to any other person that an individual has undergone genetic testing, and no person shall disclose the results of such testing to any other person, without the prior written and informed consent of the individual …."

238.    The RSA 141-H:2(IV)(a) clinical-laboratory carve-out permits genetic testing and analysis used for the diagnosis and treatment of a consenting patient by a clinical laboratory that has received a specimen referral from the individual's treating physician, genetic counselor, or another clinical laboratory. That carve-out authorizes the clinical testing itself; it does not authorize the secondary disclosure of clinically-derived genetic test results to third parties for commercial purposes unrelated to the patient's diagnosis and treatment.

239.     The New Hampshire Plaintiff and members of the New Hampshire Subclass underwent genetic testing at Ambry Genetics on referral from their treating clinicians, for the diagnosis or treatment of a medical condition.

240.     Neither the New Hampshire Plaintiff nor any member of the New Hampshire Subclass gave prior written and informed consent for Tempus AI to disclose the fact of their genetic testing, or the results of that testing, to third parties for commercial research, drug-development licensing, or AI-model training.

241.     Tempus AI disclosed the fact of, and the results of, the New Hampshire Plaintiff's and the New Hampshire Subclass's genetic testing to third parties without the prior written and informed consent required by RSA 141-H:2(III).

242.     Tempus AI's violations of RSA 141-H:2 were knowing and willful, or were at least in reckless disregard of the statute's requirements; alternatively, Tempus AI negligently failed to comply with RSA 141-H:2.

243.     Under RSA 141-H:6, the New Hampshire Plaintiff and the New Hampshire Subclass are entitled to bring a civil action and, if successful, to be awarded special or general damages of not less than $1,000 for each violation, together with costs and reasonable legal fees. The New Hampshire Plaintiff and the New Hampshire Subclass also seek injunctive relief sufficient to require Tempus AI to comply with RSA 141-H.

**COUNT VI**
**Violation of the New York General Business Law § 349**
*(On behalf of Plaintiff Bianco, individually and on behalf of H.B., and the New York Subclass)*

244.     Plaintiffs Bianco and H.B. (collectively, the "New York Plaintiffs" for purposes of this Count) incorporate the foregoing allegations as if fully set forth herein.

74

245. New York General Business Law ("N.Y. Gen. Bus. Law") Section 349(a) declares that "[u]nfair, deceptive, or abusive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state" are unlawful.

246. The New York Plaintiffs and members of the New York Subclass are "person[s]" within the meaning of N.Y. Gen. Bus. Law Section 349(h).

247. Defendant Tempus AI is an "individual, firm, corporation or association" within the meaning of N.Y. Gen. Bus. Law Section 349(b).

248. Defendant Tempus AI is engaged in consumer-oriented conduct as described herein.

249. Tempus AI and Ambry Genetics engaged in consumer-oriented deceptive practices by obtaining consumers' genetic and health information through materially incomplete and misleading privacy representations that failed to disclose that the information could be transferred, acquired, monetized, commercialized, or shared in the manner alleged herein.

250. This consumer-oriented conduct is misleading, in addition to deceptive, because neither Ambry Genetics's nor Defendant Tempus AI's Terms of Service nor any of its Privacy Policies discloses the acquisition of health information or consumer genetic information in the manner alleged here, although different data sources and forms of data collection are disclosed.

251. The New York Plaintiffs and members of the New York Subclass could not reasonably discover the omitted facts because Tempus AI's acquisition plans, post-acquisition data practices, and third-party commercialization arrangements were not disclosed to consumers at or before the time they submitted their genetic information.

252. As a result of Tempus AI's conduct, the New York Plaintiffs have suffered a privacy injury, a loss of the benefit of their bargain with Ambry Genetics, the loss of the

commercial value of their data, and emotional damage resulting from the worry of ongoing risk of harm stemming from the misuse or breach by a malicious actor of their sensitive, inherently identifiable, health and genetic information. Had the New York Plaintiffs known that their genetic and health information could be transferred to Tempus AI, used as a data asset in connection with Tempus AI's commercial business, shared with commercial partners, or otherwise monetized without separate notice or consent, they would not have submitted their samples or health information to Ambry, would have sought testing from a different provider, or would have paid less for Ambry's services.

253. In other words, the conduct alleged herein constitutes "unlawful" deceptive acts and practices—through both affirmative misrepresentations and the material omission and concealment of Tempus AI's acquisition, transfer, and commercialization of the New York Plaintiffs' genetic information—in violation of N.Y. Gen. Bus. Law Section 349. As such, the New York Plaintiffs and the New York Subclass seek monetary damages and the entry of preliminary and permanent injunctive relief against Tempus AI, enjoining it from transferring the New York Plaintiffs' genetic data without proper notice and/or consent again and seeking the destruction of any foundation model or data set containing their genetic information.

254. Tempus AI's monetization of the New York Plaintiffs' genetic information further demonstrates the economic value of the information that Plaintiffs lost and the benefit Tempus obtained through the deceptive practices alleged herein.

255. Tempus AI had a duty to the New York Plaintiffs and members of the New York Subclass to refrain from unfair and deceptive practices. Specifically, Ambry Genetics (now a part of Tempus AI) had a duty to disclose to its patients, whether directly or through their doctors, prior to accepting these patients' genetic information, that it was possible that this genetic information

could be sold to another company not subject to HIPAA. Moreover, Tempus AI owed the New York Plaintiffs and members of the New York Subclass a duty to disclose to them, in the proper manner, that Tempus AI acquired Ambry Genetics and, with it, all of Ambry Genetics's patient data. Tempus AI also had an obligation to seek consent for the acquisition of the New York Plaintiffs' genetic information, and for its dissemination to third parties. Defendant took none of these actions.

256. The omitted facts were material because a reasonable consumer deciding whether to undergo genetic testing would consider it important that her genetic and health information could be retained, transferred to a successor company, used for commercial AI or data-product development, shared with pharmaceutical or other commercial partners, or otherwise monetized without separate, express consent.

257. Tempus AI thus violated N.Y. Gen. Bus. Law Section 349 through its unfair and deceptive acts that harmed the New York Plaintiffs. Defendant knows or should have known that its conduct violated N.Y. Gen. Bus. Law Section 349.

258. Tempus AI's unlawful acts and practices complained of herein affect the public interest because anyone in the market for a medical genetic test would have potentially become an Ambry Genetics customer.

259. As a result of Tempus AI's unlawful deceptive acts and practices, the New York Plaintiffs and members of the New York Subclass are entitled to statutory, monetary, compensatory, and punitive damages, injunctive relief, restitution, and disgorgement of all moneys obtained by means of Tempus AI's unlawful conduct, interest, attorneys' fees and costs, and an order enjoining Tempus AI's deceptive and unfair conduct, and all other just and appropriate relief available under the statute.

77

## COUNT VII
### Violation of the New York General Business Law § 350
*(On behalf of Plaintiff Bianco, individually and on behalf of H.B., and the New York Subclass)*

260.     Plaintiffs Bianco and H.B. (collectively, the "New York Plaintiffs" for purposes of this Count) incorporate the foregoing allegations as if fully set forth herein.

261.     N.Y. Gen. Bus. Law Section 350 declares that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

262.     The New York Plaintiffs and members of the New York Subclass are "person[s] who ha[ve] been injured" within the meaning of N.Y. Gen. Bus. Law Section 350.

263.     Defendant Tempus AI is engaged in consumer-oriented business conduct as described herein.

264.     Ambry Genetics and Tempus AI engaged in false advertising within the meaning of N.Y. Gen. Bus. Law §§ 350 and 350-a by advertising and promoting Ambry Genetics's testing services through websites, privacy policies, patient-facing materials, consent materials, and materials distributed through healthcare-provider partners.

265.     These advertisements and promotional materials were misleading in a material respect because they failed to disclose that the information could be transferred, acquired, monetized, commercialized, or shared in the manner alleged herein.

266.     This consumer-oriented conduct is misleading, in addition to deceptive, because neither Ambry Genetics's nor Defendant Tempus AI's Terms of Service nor any of its Privacy Policies discloses the acquisition of health information or consumer genetic information in the manner alleged here, although different data sources and forms of data collection are disclosed.

78

267. In fact, Ambry Genetics (now a part of Tempus AI) makes false and misleading privacy promises to its consumers on its website and through the medical practices with which it partners. These promises would mislead the reasonable consumer.

268. Indeed, Ambry Genetics partners with medical service providers who foreseeably present misleading privacy notices to their patients. These privacy notices, such as the ones presented to Plaintiff Bianco in November 2023 by her doctor and on which she relied to her detriment, assure patients that their information will be kept confidential and that the practice must comply with HIPAA. Plaintiff Bianco understood these promises, which she read on the day of her Ambry Genetics test, to apply to Ambry Genetics—and Ambry Genetics did nothing to disabuse her of that belief. In fact, Ambry Genetics benefits from the comfort and false sense of safety that these promises provide to patients.

269. The omitted facts were material in light of the privacy representations made. A reasonable consumer exposed to those representations would understand that Ambry Genetics's testing services included meaningful privacy protections and would not expect that her genetic and health information could be transferred to Tempus AI, used as a commercial data asset, shared with commercial partners, or monetized in the manner alleged herein without separate notice or consent.

270. The New York Plaintiffs and members of the New York Subclass could not reasonably discover the omitted facts because Tempus AI's acquisition plans, post-acquisition data practices, and third-party commercialization arrangements were not disclosed to consumers at or before the time they submitted their genetic information.

271. As a result of Tempus AI's conduct, the New York Plaintiffs have suffered a privacy injury, a loss of the benefit of their bargain with Ambry Genetics, the loss of the

79

commercial value of their data, and emotional damage resulting from the worry of ongoing risk of harm stemming from the misuse or breach by a malicious actor of their sensitive, inherently identifiable, health and genetic information. Had the New York Plaintiffs known that their genetic and health information could be transferred to Tempus AI, used as a data asset in connection with Tempus AI's commercial business, shared with commercial partners, or otherwise monetized without separate notice or consent, they would not have submitted their samples or health information to Ambry, would have sought testing from a different provider, or would have paid less for Ambry's services.

272.    In other words, the conduct alleged herein consists of "unlawful" misstatements and material omissions in violation of N.Y. Gen. Bus. Law Section 350. As such, the New York Plaintiffs and the New York Subclass seek monetary damages and the entry of preliminary and permanent injunctive relief against Tempus AI, enjoining it from transferring the New York Plaintiffs' genetic data without proper notice and/or consent again and seeking the destruction of any foundation model or data set containing their genetic information.

273.    Tempus AI's monetization of the New York Plaintiffs' genetic information further demonstrates the economic value of the information that Plaintiffs lost and the benefit Tempus obtained through the deceptive practices alleged herein.

274.    Tempus AI had a duty to the New York Plaintiffs and members of the New York Subclass to refrain from unfair and deceptive practices. Specifically, Ambry Genetics (now a part of Tempus AI) had a duty to disclose to its patients, whether directly or through their doctors, prior to accepting these patients' genetic information, that it was possible that this genetic information could be sold to another company not subject to HIPAA. Moreover, Tempus AI owed the New York Plaintiffs and members of the New York Subclass a duty to disclose to them, in the proper

80

manner, that Tempus AI acquired Ambry Genetics and, with it, all of Ambry Genetics's patient data. Tempus AI also had an obligation to seek consent for the acquisition of the New York Plaintiffs' genetic information, and for its dissemination to third parties. Defendant took none of these actions.

275. Tempus AI thus violated N.Y. Gen. Bus. Law Section 350 through its misleading acts that harmed the New York Plaintiffs. Defendant knows or should have known that its conduct violated N.Y. Gen. Bus. Law Section 350.

276. Tempus AI's unlawful acts and practices complained of herein affect the public interest because anyone in the market for a medical genetic test would have potentially become an Ambry Genetics customer and could have relied to their detriment on promises like the ones on which Plaintiff Bianco relied.

277. As a result of Tempus AI's misstatements, Plaintiffs and members of the Class are entitled to monetary, compensatory, and punitive damages, injunctive relief, restitution, and disgorgement of all moneys obtained by means of Tempus AI's unlawful conduct, interest, attorneys' fees and costs, and an order enjoining Tempus AI's misleading conduct, and all other just and appropriate relief available under the statute.

## COUNT VIII
### Negligence
*(On behalf of all Plaintiffs and the Nationwide Class)*

278. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

279. In exchange for receiving Ambry Genetics's genetic testing services, Plaintiffs were required to provide Ambry Genetics with their sensitive genetic information. Plaintiffs and Class members entrusted their genetic information to Ambry Genetics with the understanding that Ambry Genetics would safeguard it.

81

280. Tempus AI had full knowledge of the sensitivity of Plaintiffs' and Class members' genetic information at the time it acquired and compelled Ambry Genetics to disclose it. Tempus AI's own conduct created a foreseeable risk of harm to Plaintiffs and Class members from the unauthorized acquisition and disclosure of that information.

281. Tempus AI knew, or should have known, that it must obtain the express written consent of Plaintiffs and Class members before causing the transfer of their sensitive genetic information.

282. Tempus AI, as well as its subsidiary Ambry Genetics, had a duty to exercise reasonable care in safeguarding, securing, and protecting Plaintiffs' and Class members' genetic information from being disclosed to unauthorized parties. This duty includes, among other things, obtaining the express written consent of Plaintiffs and Class members before causing their genetic information to be transferred to Tempus AI or by Tempus AI.

283. Plaintiffs and Class members had no ability to protect their genetic information that was in the possession of Tempus AI and its subsidiary, Ambry Genetics. Tempus AI had a duty to put proper procedures in place to prevent the unauthorized dissemination of Plaintiffs' and Class members' genetic information.

284. The standard of care for entities handling sensitive genetic information is defined by, among other sources, HHS guidance on the safeguarding of protected health information under the HIPAA Security Rule, 45 C.F.R. §§ 164.302–.318; the National Institute of Standards and Technology Cybersecurity Framework and Special Publication 800-66 (Implementing the HIPAA Security Rule); ISO/IEC 27001 and 27799; and the HITRUST Common Security Framework. These authorities, individually and collectively, require entities in possession of clinical genetic data to obtain express written authorization before secondary use or disclosure, to limit

82

downstream disclosures to the minimum necessary, and to implement administrative, physical, and technical safeguards against unauthorized acquisition or use of such data.

285. Tempus AI improperly and inadequately safeguarded Plaintiffs' and Class members' genetic information in deviation of these industry rules, regulations, practices, and various state statutes at the time of the Genetic Data Transfer.

286. Tempus AI, including its subsidiary Ambry Genetics, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class members by failing to obtain their express written consent before compelling Ambry Genetics to transfer their sensitive genetic information. Tempus AI, through its actions and/or omissions, further unlawfully breached its duty to Plaintiffs and Class members by failing to obtain their express written consent before disclosing their sensitive genetic information as part of data agreements it made with third-party partners.

287. Tempus AI's misconduct included, but was not limited to, its failure to obtain the express written consent of Plaintiffs and Class members prior to (1) compelling Ambry Genetics to disclose genetic information as part of its acquisition of Ambry Genetics, and (2) disclosing that information to third-party partners as part of a series of data-sharing agreements.

288. But for Tempus AI's wrongful and negligent breach of duties owed to Plaintiffs and Class members, Plaintiffs' and Class members' genetic information would not have been unlawfully disclosed, compromised, and monetized by Tempus AI.

289. There is a temporal and close causal connection between Tempus AI's failure to secure and safeguard Plaintiffs' and Class members' genetic information and the harm, or risk of imminent harm, suffered by Plaintiffs and Class members as a result of the unauthorized disclosure and subsequent monetization of their genetic information.

290. As a result of Tempus AI's negligence, Tempus AI and its third-party partners acquired, used, and monetized Plaintiffs' and Class members' genetic information without authorization, and Tempus AI will continue to do so absent relief. As a further result of Tempus AI's negligence, Plaintiffs and Class members have suffered and will continue to suffer damages and injury including, but not limited to, (a) an increased risk of identity theft, fraud, and/or misuse of their genetic information; (b) the loss of control over how their genetic information is used; (c) the unauthorized disclosure, use, and commercialization of their genetic information; (d) diminished value of their genetic information; (e) the continued risk to their genetic information, which remains in Tempus AI's possession and is subject to further unauthorized disclosures so long as Tempus AI fails to comply with its duty and applicable law; and (f) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the genetic information compromised as a result of Tempus AI's acquisition of Ambry Genetics and its subsequent data sharing agreements with its third-party partners.

291. Violations of statutes which establish a duty to take precautions to protect a particular class of persons from a particular injury or type of injury may constitute negligence per se.

292. Statutes, regulations, agency guidance, and industry standards governing the handling of protected health information and genetic information inform the standard of reasonable care applicable to Tempus AI. Plaintiffs do not assert a standalone private cause of action under HIPAA or the FTC Act. Rather, HIPAA, FTC guidance, state genetic-privacy statutes, Ambry Genetics's privacy representations, industry standards governing health-data transactions, and Tempus AI's own public statements concerning patient data demonstrate that a reasonably prudent health-technology company would not acquire, retain, use, or disclose patient genetic information

for secondary commercial purposes without confirming that legally effective authorization had been obtained.

293. HIPAA and its implementing regulations were enacted with the objective of protecting the confidentiality of patients' healthcare information, including genetic information, and set forth the conditions under which such information may be used and to whom it may be disclosed. HIPAA's Privacy Rule applies not only to healthcare providers and the organizations they work for, but to any covered entity or business associate that may have access to healthcare information about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the patient's finances, reputation, or personal autonomy. Plaintiffs and Class members are within the class of persons that HIPAA was intended to protect.

294. Tempus AI violated HIPAA by, among other things, using and disclosing Plaintiffs' and Class members' genetic information for commercial purposes without first obtaining the written authorization required by 45 C.F.R. Section 164.508. Tempus AI's violation of HIPAA constitutes negligence per se: the harm that occurred is the type of harm HIPAA was intended to guard against, and Plaintiffs and Class members are within the protected class.

295. Section 5 of the FTC Act independently prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Tempus AI, of failing to obtain written consent before disclosing Plaintiffs' and Class members' genetic information. The FTC's publications and orders also form part of the basis of Tempus AI's duty in this regard.

296. Tempus AI violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiffs' and Class members' genetic information and not complying with applicable

industry standards, as described in detail herein. Tempus AI's conduct was particularly unreasonable given the nature and amount of genetic information it obtained and stored.

297. Tempus AI's violation of Section 5 of the FTC Act independently constitutes negligence per se. Plaintiffs and Class members are within the class of persons that the FTC Act was intended to protect, and the harm that occurred is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses that, as a result of their failure to employ reasonable data-security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class members.

298. A reasonably prudent health-technology company acquiring a genetic testing laboratory would have conducted a patient-consent and privacy-law review before compelling or accepting the transfer of patient genetic information; segregated genetic information for which patient authorization was absent; provided notice to affected patients; obtained written authorization where required; contractually limited any use of the information to authorized purposes; and refrained from licensing, commercializing, or incorporating the information into AI models or data products absent legal authorization. Tempus AI did none of those things.

299. As a direct and proximate result of Tempus AI's negligence per se, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages including, but not limited to, an increased risk of identity theft, fraud, and/or misuse of their genetic information. Additionally, Plaintiffs and Class members have suffered and will suffer the continued risks of exposure of their genetic information, which remains in Tempus AI's possession and is subject to further unauthorized disclosures so long as Tempus AI fails to comply with its duty to Plaintiffs and Class members as well as applicable law.

86

## COUNT IX
## Unjust Enrichment

*(On behalf of Plaintiffs and the Nationwide Class, or in the alternative, the Illinois, California, Oregon, New Hampshire, and New York Subclasses)*

300. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

301. This Count is pled in the alternative to, and without prejudice to, the statutory and common-law claims asserted in Counts I through XI. To the extent the Court determines that any of those claims do not provide Plaintiffs and the Classes a complete remedy for Tempus AI's conduct, Plaintiffs and the Classes are entitled to relief under the equitable doctrine of unjust enrichment.

302. Plaintiffs and members of the Classes conferred a benefit on Tempus AI in the form of their genetic information — including the results of their genetic testing and information derived from that testing — which Tempus AI acquired through its acquisition of Ambry Genetics and the Genetic Data Transfer without the written authorization or informed consent that the law and the parties' understandings required.

303. Tempus AI knew of and appreciated the benefit conferred. As alleged above, Tempus AI specifically targeted Ambry Genetics because of the volume, quality, and commercial value of the genetic information Ambry Genetics had collected from Plaintiffs and the Classes, and Tempus AI proceeded with the acquisition and the Genetic Data Transfer for the express purpose of monetizing that genetic information through pharmaceutical licensing, drug-development partnerships, and the training and commercialization of artificial-intelligence models.

304. Tempus AI has accepted and retained the benefit conferred by Plaintiffs and the Classes, and has used and continues to use Plaintiffs' and Class members' genetic information to generate revenue, including the contractual opt-ins and multi-year licensing commitments

87

described above, and to develop, train, and commercialize its AI platform and related products and services.

305. Tempus AI's retention of the benefit conferred is unjust under the circumstances. Plaintiffs and Class members did not authorize Tempus AI to obtain, retain, use, disclose, license, or otherwise commercialize their genetic information; they expected their genetic information to remain confidential and to be used only for the diagnostic and treatment purposes for which Ambry Genetics had originally collected it; and Tempus AI obtained and exploited the genetic information in violation of the statutes pled in Counts I through X and the common-law duties pled in Count XI.

306. Tempus AI's own accounting confirms the value of the benefit it obtained. In connection with the Ambry Genetics acquisition, Tempus AI attributed substantial value to Ambry Genetics's customer relationships, data-generating operations, and genetic-testing business. That value was inseparable from the genetic information Ambry Genetics had collected and would continue collecting from patients. Tempus AI therefore obtained not only Ambry Genetics as a corporate entity, but the commercial benefit of Plaintiffs' and Class members' genetic information, which Tempus AI could not lawfully acquire, use, or commercialize without patient authorization.

307. Plaintiffs and the Classes have no adequate remedy at law for the full measure of Tempus AI's unjust gains. Tempus AI's revenues attributable to Plaintiffs' and Class members' genetic information exceed the actual damages each individual Plaintiff or Class member can prove, and a significant portion of those gains is embedded in Tempus AI's AI models and licensing arrangements in a manner that cannot be remedied by statutory or compensatory damages alone.

88

308.    Plaintiffs and the Classes are entitled in equity to restitution and disgorgement of all profits, revenues, and other benefits Tempus AI has obtained as a result of its unauthorized acquisition, retention, use, disclosure, and commercialization of their genetic information, together with an accounting, the imposition of a constructive trust over those amounts, and such other equitable relief as the Court deems appropriate.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all members of the Classes, respectfully request that this Court enter an Order:

A.  Certifying this case as a class action on behalf of the Classes defined above, appointing the named Plaintiffs as representatives of the Classes and their respective Subclasses, and appointing their counsel as Class Counsel;

B.  Declaring that Defendant's conduct, as alleged herein, violates the statutory and common-law duties pleaded;

C.  Awarding Plaintiffs and the Classes all damages available under the statutes and common-law theories pleaded, including actual, compensatory, consequential, statutory, nominal, and punitive damages, in amounts to be proven at trial or established by statute;

D.  Awarding injunctive and other equitable relief, including (i) enjoining Tempus AI from further unauthorized use, disclosure, transfer, or commercialization of Plaintiffs' and Class members' genetic information; (ii) requiring Tempus AI to delete, return, and/or cease use of that information; and (iii) requiring Tempus AI to implement proper notice and written-consent procedures going forward;

89

E.  Awarding restitution, disgorgement, and an accounting of all profits, revenues, and benefits Tempus AI obtained through its wrongful conduct, and imposing a constructive trust over those amounts;

F.  Awarding Plaintiffs and the Classes their reasonable attorneys' fees, costs, and litigation expenses;

G.  Awarding Plaintiffs and the Classes pre- and post-judgment interest to the extent allowable; and

H.  Awarding such other and further relief as the Court deems just and proper.

## X.  JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury for all issues so triable.

Dated: June 22, 2026

Respectfully submitted,

By: /s/ *Adam E. Polk*
Adam E. Polk (CA273000)
Kyle P. Quackenbush (CA322401)
Fatima Z. Ladha (CA353675)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (415) 981-4800
apolk@girardsharp.com
kquackenbush@girardsharp.com
fladha@girardsharp.com

By: /s/ *Gary M. Klinger*
Gary M. Klinger (ARDC# 6303726)
William J. Edelman (ARDC # 6332368)
Michael A. Acciavatti (ARDC # 6352082)
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: (866) 525-0878
gklinger@milberg.com
wedelman@milberg.com
macciavatti@milberg.com

*Interim Co-Lead Counsel for Plaintiffs and the Proposed Class*

David M. Berger
**GIBBS MURA LLP**
1111 Broadway, Suite 2100
Oakland, California 94607
Telephone: (510) 350-9700
dmb@classlawgroup.com

Stuart A. Davidson
**ROBBINS GELLER RUDMAN & DOWD LLP**
225 NE Mizner Boulevard, Suite 720
Boca Raton, Florida 33432
Telephone: (561) 750-3000
sdavidson@rgrdlaw.com

90

Amy Keller                                   Michael P. Canty
**DICELLO LEVITT**                           **LABATON KELLER SUCHAROW LLP**
Ten North Dearborn Street, Sixth Floor       140 Broadway
Chicago, Illinois 60602                      New York, New York 10005
Telephone: (312) 214-7900                    Telephone: (212) 907-0700
akeller@dicellolevitt.com                    mcanty@labaton.com

*Plaintiffs' Steering Committee*

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2026, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using CM/ECF. Copies of the foregoing document will be served upon counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

Dated: June 22, 2026                         Respectfully submitted,

                                             */s/ Gary M. Klinger*
                                             Gary M. Klinger

91