**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| *In re Tempus AI, Inc. Genetic Privacy Litigation* | Case No. 1:26-cv-1525 |
| | District Judge Andrea R. Wood |
| This Document Relates to: All Actions | |

**<u>DEFENDANT TEMPUS AI, INC.'S MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ...........................................................................................1

II.  BACKGROUND ............................................................................................4

    A.   Tempus's Mission and Products ..........................................................4

    B.   Tempus's Acquisition of Ambry .........................................................5

    C.   The Consolidated Complaint ...............................................................6

III. LEGAL STANDARD......................................................................................7

IV.  ARGUMENT..................................................................................................8

    A.   Plaintiffs Do Not State a Claim Based on Tempus's Alleged *Disclosure* of Genetic Data to Third Parties.............................................................8

        1.   As a Matter of Law, Genetic Data Is Not Inherently Identifiable ..............9

        2.   Plaintiffs Do Not Plausibly Allege That Tempus Disclosed Individually Identifiable Information to Third Parties.............................13

    B.   Tempus Is Not Liable Under the State Medical-Privacy Statutes Based on Its Alleged *Receipt* of Genetic Data from Ambry .................................16

        1.   GIPA Does Not Prohibit Tempus from Receiving Genetic Data ..............16

            a.   Tempus's Alleged Receipt of Genetic Testing Data from Ambry Was Authorized Under HIPAA's and GIPA's Permitted Use for "Health Care Operations".................................16

            b.   Section 30(a) Does Not Regulate the Receipt of Genetic Data ...................................................................................17

            c.   Tempus Did Not "Compel" Ambry to Disclose Genetic Data ...................................................................................19

        2.   The CMIA Does Not Prohibit Tempus's Receipt of Genetic Data ...........20

        3.   The New Hampshire Genetic Testing Law Does Not Prohibit Tempus's Receipt of Genetic Data .........................................................21

        4.   The Oregon Genetic Privacy Act Does Not Prohibit Tempus's Receipt of Genetic Data.........................................................................21

    C.   Plaintiffs' Consumer Protection and Common Law Claims Fail .........................23

        1.   The California Plaintiffs' UCL Claims Fail..............................................23

a. The California Plaintiffs Did Not Lose Money or Property As Required to State a UCL Claim...............................................23

b. The California Plaintiffs Do Not Allege an "Unlawful" or "Unfair" Practice.........................................................................25

2. The New York Plaintiffs' GBL Claims Fail............................................26

3. Plaintiffs' Negligence Claims Fail........................................................28

4. Plaintiffs' Unjust Enrichment Claims Fail............................................29

V. CONCLUSION....................................................................................................30

**Page(s)**

**CASES**

*Ahringer v. LoanDepot, Inc.*,
715 F. Supp. 3d 1274 (C.D. Cal. 2024) ...................................................................................24

*Alvarez v. Chevron Corp.*,
656 F.3d 925 (9th Cir. 2011) ..................................................................................................25

*Archer v. United Rentals, Inc.*,
126 Cal. Rptr. 3d 118 (Ct. App. 2011)....................................................................................23

*Benson v. Fannie May Confections Brands, Inc.*,
944 F.3d 639 (7th Cir. 2019) ..................................................................................................29

*Berryman v. Merit Prop. Mgmt., Inc.*,
62 Cal. Rptr. 3d 177 (Ct. App. 2007)......................................................................................23

*Birdsong v. Apple, Inc.*,
590 F.3d 955 (9th Cir. 2009) ..................................................................................................25

*Bridges v. Blackstone Grp., Inc.*,
2022 WL 2643968 (S.D. Ill. July 8, 2022), *aff'd*, 66 F.4th 687 (7th Cir. 2023)......................13

*Bridges v. Blackstone, Inc.*,
66 F.4th 687 (7th Cir. 2023) .........................................................................................3, 20, 22

*Brucker v. Mercola*,
886 N.E.2d 306 (Ill. 2007) ......................................................................................................18

*Buffalo Xerographix, Inc. v. Hartford Ins. Grp.*,
2021 WL 2003110 (W.D.N.Y. May 19, 2021), *aff'd*, 2022 WL 4241191 (2d
Cir. Sep. 15, 2022) ..................................................................................................................27

*Cancelmo v. S. N.H. Med. Ctr.*,
2025 WL 2783652 (D.N.H. Sep. 30, 2025)..............................................................................13

*Capicotto v. W. N.Y. Med. Mgmt., LLC*,
254 N.Y.S.3d 773 (App. Div. 2026)........................................................................................29

*Capito v. San Jose Healthcare Sys., LP*,
561 P.3d 380 (Cal. 2024) .................................................................................................25, 26

*Carter v. SSC Odin Operating Co., LLC*,
976 N.E.2d 344 (Ill. App. 2012) .............................................................................................18

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
    973 P.2d 527 (Cal. 1999) ............................................................................25

*City of New York v. Smokes-Spirits.Com, Inc.*,
    911 N.E.2d 834 (N.Y. 2009) ........................................................................26

*Cnty. of San Diego v. Mason*,
    147 Cal. Rptr. 3d 135 (Ct. App. 2012) ........................................................26

*Cohen v. Frank Devs., Inc.*,
    389 A.2d 933 (N.H. 1978) ...........................................................................29

*Concrete Constructors, Inc. v. Harry Shapiro & Sons, Inc.*,
    436 A.2d 77 (N.H. 1981) .............................................................................30

*Corsello v. Verizon N.Y., Inc.*,
    967 N.E.2d 1177 (N.Y. 2012) ......................................................................30

*Cousin v. Sharp Healthcare*,
    681 F. Supp. 3d 1117 (S.D. Cal. 2023) .......................................................13

*Cuevas v. Berrios*,
    78 N.E.3d 457 (Ill. App. 2017) ....................................................................29

*Dinerstein v. Google, LLC*,
    73 F.4th 502 (7th Cir. 2023) ........................................................................13

*Durell v. Sharp Healthcare*,
    108 Cal. Rptr. 3d 682 (Ct. App. 2010) ........................................................29

*Dwyer v. Allbirds, Inc.*,
    598 F. Supp. 3d 137 (S.D.N.Y. 2022) .........................................................27

*Edelman v. Starwood Cap. Grp., LLC*,
    892 N.Y.S.2d 37 (App. Div. 2009) ..............................................................30

*Embassy LLC v. City of Santa Monica*,
    110 Cal. Rptr. 3d 579 (Ct. App. 2010) ........................................................20

*Fink v. Time Warner Cable*,
    714 F.3d 739 (2d Cir. 2013) ........................................................................26

*Franco v. Chobani, LLC*,
    789 F. Supp. 3d 584 (N.D. Ill. 2025) ............................................................9

*G.T. v. Samsung Elecs. Am. Inc.*,
    742 F. Supp. 3d 788 (N.D. Ill. 2024) ..........................................................11

*Gale v. IBM Corp.*,
781 N.Y.S.2d 45 (App. Div. 2004) ........................................................................27

*Gen. Insulation Co. v. Eckman Const.*,
992 A.2d 613 (N.H. 2010) .....................................................................................29

*Georgia Malone & Co. v. Rieder*,
973 N.E.2d 743 (N.Y. 2012) ..................................................................................30

*Goshen v. Mut. Life Ins. Co. of N.Y.*,
774 N.E.2d 1190 (N.Y. 2002) ...........................................................................26, 28

*Green v. Leibowitz*,
108 F.4th 530 (7th Cir. 2024) ................................................................................17

*Greenley v. Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023) ..................................................................24

*Grimstad v. Knudsen*,
386 P.3d 649 (Or. App. 2016) ................................................................................30

*Hart v. TWC Prod. & Tech. LLC*,
526 F. Supp. 3d 592 (N.D. Cal. 2021) ...................................................................24

*Hill v. Roll Int'l Corp.*,
128 Cal. Rptr. 3d 109 (Ct. App. 2011) ...................................................................29

*In re Berg*,
886 A.2d 980 (N.H. 2005) .....................................................................................21

*In re Facebook Priv. Litig.*,
791 F. Supp. 2d 705 (N.D. Cal. 2011), *aff'd*, 572 F. App'x 494 (9th Cir. 2014) ....................24

*In re Facebook, Inc., Consumer Priv. User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) ...................................................................24

*In re Marriage of Daniels*,
607 N.E.2d 1255 (Ill. App. 1992) ..........................................................................18

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) ...................................................................24

*Khan v. Deutsche Bank AG*,
978 N.E.2d 1020 (Ill. 2012) ...................................................................................19

*Kurowski v. Rush Sys. for Health*,
683 F. Supp. 3d 836 (N.D. Ill. 2023) .....................................................................13

*London v. New Albertson's, Inc.*,
2008 WL 4492642 (S.D. Cal. Sep. 30, 2008) ...........................................................13

*Mandarin Trading Ltd. v. Wildenstein*,
944 N.E.2d 1104 (N.Y. 2011) ...................................................................................30

*McAllister Constr. Co. v. Liu*,
578 P.3d 190 (Or. App. 2025) ...................................................................................29

*McCauley v. City of Chicago*,
671 F.3d 611 (7th Cir. 2011) .......................................................................................7

*Negron v. City of Chicago*,
55 N.E.3d 109 (Ill. App. 2016) .................................................................................28

*Nienaber v. Overlake Hosp. Med. Ctr.*,
733 F. Supp. 3d 1072 (W.D. Wash. 2024) ...........................................................13, 28

*O'Boyle v. Real Time Resols., Inc.*,
910 F.3d 338 (7th Cir. 2018) .......................................................................................7

*Oregon v. Gardner-Rolph*,
584 P.3d 270 (Or. App. 2025) ...................................................................................23

*People v. Marshall*,
950 N.E.2d 668 (Ill. 2011) ........................................................................................17

*Perez v. Comcast*,
2011 WL 5237577 (N.D. Ill. Nov. 1, 2011) ................................................................5

*Peterson v. Cellco P'ship*,
80 Cal. Rptr. 3d 316 (Ct. App. 2008) ........................................................................30

*Ramirez v. LexisNexis Risk Sols.*,
729 F. Supp. 3d 838 (N.D. Ill. 2024) .........................................................................30

*Rincon Band of Luiseño Mission Indians v. Flynt*,
286 Cal. Rptr. 3d 29 (Ct. App. 2021) ........................................................................23

*Rodriguez v. ByteDance, Inc.*,
2025 WL 672951 (N.D. Ill. Mar. 3, 2025) .................................................................24

*Scripps Clinic v. Superior Ct.*,
134 Cal. Rptr. 2d 101 (Ct. App. 2003) ......................................................................25

*Shah v. Cap. One Fin. Corp.*,
768 F. Supp. 3d 1033 (N.D. Cal. 2025) .....................................................................24

*State v. Clemente-Perez,*
359 P.3d 232 (Or. 2015) ........................................................................22

*Steinberg v. CVS Caremark Corp.,*
899 F. Supp. 2d 331 (E.D. Pa. 2012) .....................................................15

*Taylor v. Union Pac. R.R. Co.,*
2024 WL 3425751 (N.D. Ill. July 16, 2024).........................................18

*Woods v. Maytag Co.,*
807 F. Supp. 2d 112 (E.D.N.Y. 2011) ...................................................27

*Y.C. v. Superior Ct.,*
286 Cal. Rptr. 3d 436 (Ct. App. 2021)..................................20, 21, 25

*Zellmer v. Meta Platforms, Inc.,*
104 F.4th 1117 (9th Cir. 2024) ..............................................................11

## STATUTES

410 ILCS
513/10 ............................................................................10, 13, 17
513/20(a)....................................................................................18
513/25($i$).....................................................................................18
513/25(c)(1) ..........................................................................18, 19
513/30(a)..............................................................................17, 19
513/31(1)....................................................................................17
513/31(2)....................................................................................14
513/31.7(b)..............................................................................8, 10
513/31.7(c).................................................................................10

740 ILCS
14/5(c) ........................................................................................11
14/10 ..........................................................................................12
14/15(b)......................................................................................19

Cal. Bus. & Prof. Code
§ 17200 *et seq.* ...........................................................................2
§ 17204......................................................................................23

Cal. Civ. Code

§ 56 *et seq.* ...........................................................................................................1

§ 56.05(j)(1) ...........................................................................................................8

§ 56.10(c)(1) ...........................................................................................................14

§ 56.10(c)(14) ...........................................................................................................21

§ 56.18(b)(7)(B) ...........................................................................................................10

§ 56.18(b)(7)(B)(ii) ...........................................................................................................10

§ 56.18(b)(7)(B)(iii) ...........................................................................................................10

§ 56.36(b) ...........................................................................................................20

N.H. Rev. Stat.

§ 141-H:2(III) ...........................................................................................................8, 10, 21

§ 141-H:2(IV)(a) ...........................................................................................................14

§ 141-H:2(IV)(b) ...........................................................................................................14

§ 507-H:1 *et seq.* ...........................................................................................................10

Or. Rev. Stat.

§ 192.531(6) ...........................................................................................................10

§ 192.531(11) ...........................................................................................................8

§ 192.531 *et seq.* ...........................................................................................................2

§ 192.535(1) ...........................................................................................................22, 23

§ 192.537(1) ...........................................................................................................22

§ 192.539(1) ...........................................................................................................21, 22, 23

§ 192.558(3) ...........................................................................................................14

§ 192.581(2) ...........................................................................................................14

Tex. Bus. & Com. Code § 503.001(a)(2) ...........................................................................................................12

**RULES**

Federal Rule of Civil Procedure 12(b)(6) ...........................................................................................................2, 7

**REGULATIONS**

45 C.F.R.

§ 160.103.................................................................................................................11, 13

§ 164.302.........................................................................................................................28

§ 164.318.........................................................................................................................28

§ 164.500 *et seq.*............................................................................................................5

§ 164.501....................................................................................................................16, 17

§ 164.502(a)(1)(ii)..........................................................................................................16

§ 164.502(d)(2).................................................................................................................5

§ 164.506(a).....................................................................................................................14

§ 164.514(a)...................................................................................................................5, 9

§ 164.514(b).......................................................................................................................5

§ 164.514(b)(1)............................................................................................................9, 11

§ 164.514(b)(2)............................................................................................................9, 11

§ 164.514(b)(2)(P)..........................................................................................................11

Standards for Privacy of Individually Identifiable Health Information, 64 Fed. Reg. 59918 (Nov. 3, 1999).................................................................................................5

Standards for Privacy of Individually Identifiable Health Information, 65 Fed. Reg. 82462 (Dec. 28, 2000)..............................................................................................17

**OTHER AUTHORITIES**

Black's Law Dictionary (12th ed. 2024)..................................................................12, 19

FDA, *FDA Eliminates Major Barrier to Using Real-World Evidence in Drug and Device Application Reviews*, https://www.fda.gov/news-events/press-announcements/fda-eliminates-major-barrier-using-real-world-evidence-drug-and-device-application-reviews ...........................................................................................5

FTC, *Policy Statement of the FTC on Biometric Information and Section 5 of the FTC Act*, https://www.ftc.gov/system/files/ftc_gov/pdf/p225402biometricpolicystatement.pdf .............................................................................................................................12

U.S. Dep't of Health & Hum. Servs., *Does the HIPAA Privacy Rule Protect Genetic Information* (Dec. 20, 2002), https://www.hhs.gov/hipaa/for-professionals/faq/354/does-hipaa-protect-genetic-information/index.html.............................9

## I.  INTRODUCTION

For decades, federal and state law have provided a framework for the use of healthcare data that balances the critical goals of safeguarding patient privacy with advancing healthcare research and innovation. The Health Insurance Portability and Accountability Act ("HIPAA") expressly authorizes the de-identification of health data, including genetic data, so that it can be used to facilitate medical and drug research. State medical-privacy statutes, like those Plaintiffs invoke here, similarly permit the transfer and use of de-identified genetic data. Disregarding these long-established frameworks, Plaintiffs attempt to manufacture causes of action where none exists and, in the process, threaten to undermine socially beneficial uses of health data permitted under HIPAA and state law. The Court should reject Plaintiffs' misguided invocation of these laws.

Tempus is a healthcare technology company whose mission is to harness artificial intelligence ("AI") to ensure that all patients benefit from the power of data-driven medicine. Tempus has multiple lines of business. In one, Tempus licenses de-identified data to life sciences companies—as encouraged by HIPAA and state privacy laws—which use such data to identify and develop innovative new drugs. In another, Tempus provides advanced diagnostic tests called comprehensive genomic profiling to physicians treating patients with cancer and other diseases.

In February 2025, Tempus became the parent company of non-party Ambry Genetics Corp. ("Ambry"), which provides its own genetic testing services to treating healthcare providers. Plaintiffs are twelve persons whose healthcare providers ordered genetic testing services from Ambry—not from Tempus. Plaintiffs claim that Tempus (i) wrongfully obtained their genetic data when it acquired Ambry and then (ii) wrongfully disclosed that data to pharmaceutical and biotechnology companies for research purposes. In their Consolidated Complaint, Dkt. 32 ("CC"), Plaintiffs allege violations of four state medical-privacy statutes: the Illinois Genetic Information Privacy Act ("GIPA"), 410 ILCS 513/1 *et seq.*, the California Confidentiality of Medical

Information Act ("CMIA"), Cal. Civ. Code § 56 *et seq.*, the New Hampshire Genetic Testing Law, N.H. Rev. Stat. § 141-H:1 *et seq.*, and the Oregon Genetic Privacy Act, Or. Rev. Stat. § 192.531 *et seq.* CC ¶¶ 181-202, 210-243. Plaintiffs also assert consumer protection claims under the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, and the New York General Business Law ("GBL") §§ 349, 350, and common law claims for negligence and unjust enrichment. CC ¶¶ 203-209, 244-308.

Plaintiffs' claims threaten long-established uses of health information that drive critical medical innovation. As Plaintiffs' allegations make clear, Tempus acted consistently with HIPAA and the state medical-privacy statutes in its alleged handling of their data. These laws permit and encourage the disclosure and use of de-identified data for drug research and other socially beneficial purposes. Further, HIPAA expressly permits companies to share patient data in healthcare mergers. If permitted to proceed, Plaintiffs' claims would subject other companies, hospitals, and researchers who utilize de-identified health data or engage in routine healthcare mergers to lawsuits based on conclusory assertions of misuse, chilling medical innovation and upending the carefully balanced privacy schemes embodied in HIPAA and state law. Fortunately, the law does not permit Plaintiffs' claims, and the CC should be dismissed under Rule 12(b)(6).

*First*, Plaintiffs cannot state a claim under the state medical-privacy statutes based on Tempus's alleged *disclosures* of genetic data to third parties. Like HIPAA, the state statutes regulate the disclosure of individually identifiable—not de-identified—information. Recognizing this fact, Plaintiffs contend that genetic data is "inherently identifiable" due to a theoretical risk that "biomarkers" could be used to "re-identify" de-identified data. CC ¶¶ 76, 125. This contention fails as a matter of law. Like HIPAA, the state statutes expressly contemplate that genetic data is de-identifiable, and they recognize that the hypothetical possibility of "re-identification" does not

2

(as Plaintiffs contend) make data individually or "inherently" identifiable.

With the law defeating their central allegation that genetic data is inherently identifiable, Plaintiffs attempt to save their claims by implausibly asserting that Tempus disclosed their data to third parties in identifiable form. As the CC makes clear, this assertion rests on facts immaterial to Tempus's purported transfers of *Plaintiffs'* data to third parties. For example, Plaintiffs allege that physicians who order genetic testing from *Tempus* know the identity of the patient tested. CC ¶ 74. While a treating physician obviously knows the identity of her patients, that is irrelevant here because no named Plaintiffs received genetic testing from *Tempus*. Plaintiffs thus fail to state a claim under the state medical-privacy statutes based on Tempus's alleged disclosures to others.

*Second*, Plaintiffs cannot state a claim under the medical-privacy statutes based on Tempus's alleged *receipt* of their genetic data from Ambry. The statutes generally do not regulate the receipt—as opposed to the disclosure—of genetic data. Moreover, by incorporating HIPAA regulations allowing data sharing for healthcare mergers, the Illinois and California statutes expressly authorized Tempus's alleged receipt of Plaintiffs' data. Further, the Seventh Circuit held in *Bridges v. Blackstone, Inc.*, 66 F.4th 687 (7th Cir. 2023), that GIPA does not prohibit a company's receipt of data in a corporate acquisition, a holding that logically extends to the Oregon Genetic Privacy Act, whose language is materially similar to GIPA in relevant part.

*Third*, dismissal of Plaintiffs' consumer protection and common law claims flows directly from their failure to state claims under the medical-privacy statutes. The UCL and GBL claims should be dismissed because their allegations of deceptive and unfair conduct rest on the incorrect premise that Tempus violated applicable privacy laws. For the same reason, Plaintiffs do not allege a breach of duty for their negligence claim, nor do they allege that Tempus unjustly received any benefit at their expense for their unjust enrichment claim. And the consumer protection and

3

common law claims fail on additional, independent grounds as well.

## II. BACKGROUND

This background is drawn from the CC and assumed true only for purposes of this motion.

### A. Tempus's Mission and Products

Tempus is a Chicago-based clinical laboratory and technology company founded in 2015 "to develop artificial intelligence software for cancer care." CC ¶¶ 25, 62. Since its founding, Tempus has expanded its mission "beyond oncology, moving into disease areas and specialty areas such as cardiology, neurology, radiology, and pathology." *Id.* ¶ 72. Tempus's technologies "use[] artificial intelligence to analyze patients' genetic and clinical data … to inform diagnosis and treatment." *Id.* ¶ 1. Tempus "offers numerous AI-driven technologies to healthcare providers" and is "a leading company at the forefront of the precision medicine revolution [that] unlock[s] the power of patient data." *Id.* ¶ 26. Tempus also licenses certain healthcare data to "pharmaceutical and biotechnology companies" for purposes of developing innovative new drugs. *Id.* ¶ 1.

The CC makes allegations about two distinct lines of Tempus's business. First, Tempus is a clinical laboratory that provides "physician-facing" genetic testing services—"NGS [Next Generation Sequencing] diagnostics, molecular genotyping, and other anatomic and molecular pathology testing to healthcare providers"—for individual patient care. *Id.* ¶ 73. These services include "Tempus AI's flagship clinical application, Hub," through which "a treating physician places an order for Tempus AI's laboratory tests on behalf of an individual patient" and "Tempus AI processes that order, sequences the patient's specimen, and returns the patient's individualized results." *Id.* ¶ 74. Significantly, no Plaintiff alleges that he or she was the subject of Tempus's genetic testing services, making this business line immaterial to this case. *See infra* Section II.C.

Second, Tempus licenses de-identified data to pharmaceutical and biotechnology companies for purposes of research and drug development. CC ¶¶ 1, 95, 113. As the CC alleges,

4

Tempus "license[s] libraries of linked clinical, molecular, and imaging de-identified data" and "provide[s] a suite of analytic and cloud-and-compute tools to pharmaceutical and biotechnology companies." *Id.* ¶ 94. This second business line is the sole focus of Plaintiffs' complaint.

Tempus's licensing of de-identified data is specifically contemplated and encouraged by the HIPAA Privacy Rule, which establishes standards for the privacy of patients' protected health information. *See* 45 C.F.R. § 164.500 *et seq.* In particular, the Privacy Rule permits covered entities like Tempus to use and disclose de-identified health information—meaning data that is not individually identifiable. *See* 45 C.F.R. §§ 164.502(d)(2), 164.514(a)-(b).

In formulating the HIPAA Privacy Rule a quarter century ago, the U.S. Department of Health and Human Services ("HHS") expressed its hope that "covered entities, their business partners, and others would make greater use of de-identified health information than they do today, when it is sufficient for … research purpose[s]." Standards for Privacy of Individually Identifiable Health Information, 64 Fed. Reg. 59918, 59947 (Nov. 3, 1999). Particularly relevant here, HHS stated that "providing de-identified information to a pharmaceutical manufacturer to use in determining patterns of use of a particular pharmaceutical by general geographic location would be appropriate, even if the information were sold to the manufacturer." *Id.*[1]

### B. Tempus's Acquisition of Ambry

Ambry is a clinical genetic testing laboratory and a "global industry leader in clinical

---

[1] Recognizing the importance of de-identified data in innovation, the Food & Drug Administration ("FDA") recently began allowing medical device applications to rely on "de-identified databases containing millions of patient records," with potential plans to do the same for "drug[] and biologic[]" applications. FDA, *FDA Eliminates Major Barrier to Using Real-World Evidence in Drug and Device Application Reviews*, https://www.fda.gov/news-events/press-announcements/fda-eliminates-major-barrier-using-real-world-evidence-drug-and-device-application-reviews; *see Perez v. Comcast*, 2011 WL 5237577, at *2 (N.D. Ill. Nov. 1, 2011) (taking judicial notice of government agency press release).

genetic testing and hereditary-disease diagnostics, offering diagnostic products across a range of hereditary disease research areas." CC ¶ 54. Like Tempus, Ambry does not sell testing services directly to patients. *Id.* ¶ 56. Rather, healthcare providers order Ambry's genetic tests "through Ambry Genetics's provider-facing online portal." *Id.*

In February 2025, Tempus acquired Ambry, which remains a Tempus subsidiary and distinct legal entity. *Id.* ¶¶ 66, 192, 282, 286. The acquisition has allowed Tempus to further its mission of using AI to advance medical diagnosis and treatment by improving its AI models and healthcare products, *id.* ¶¶ 27, 63, thereby "strengthening [its] ability to deliver cutting-edge solutions to clinicians, patients, and life sciences companies," *id.* ¶ 65. As the CC itself acknowledges, the acquisition allowed Tempus "to bring Ambry's 25-year history of leadership in variant interpretation together with Tempus's multimodal data and robust analytical systems to drive new insights for diagnosing and treating patients." *Id.* ¶ 67.

## C. The Consolidated Complaint

Plaintiffs are twelve persons from five states—California, Illinois, New Hampshire, New York, and Oregon—who underwent genetic testing ordered by their physicians. *Id.* ¶¶ 14-24. Plaintiffs' physicians ordered genetic testing from Ambry—not Tempus—"in a medical-testing context." *Id.* ¶ 61; *see also id.* ¶¶ 122, 126, 130, 134, 138, 142, 146, 150, 154, 157. No Plaintiff had a direct commercial relationship with Ambry; rather, they provided their genetic samples to Ambry "through [their] healthcare providers." *Id.* ¶ 61; *see id.* ¶ 56 ("[A] patient consults with their doctor or healthcare provider, who orders the genetic test through Ambry Genetics's provider-facing online portal. Ambry Genetics does not sell its tests directly to patients."). Nor did Plaintiffs have a commercial relationship with Tempus, and neither Plaintiffs nor their physicians provided their genetic samples to Tempus.

The CC alleges two distinct data transfers. First, it alleges that "[e]ach Plaintiff's genetic

6

information was transferred to Tempus" in connection with its acquisition of Ambry. CC ¶¶ 14, 100. Second, it alleges that Tempus, after receiving their genetic information from Ambry, licensed it to non-party pharmaceutical and biotechnology companies for the purpose of developing new medications. *E.g.*, *id.* ¶¶ 1, 122. Significantly, the CC does *not* allege that Tempus disclosed any *identifying* information—such as names or contact information—along with Plaintiffs' genetic data. Rather, Plaintiffs acknowledge that Tempus markets licenses only for "de-identified" data. *Id.* ¶ 95. Plaintiffs nonetheless allege that their data is "inherently identifiable," *id.* ¶ 76, because there is a "risk" that third parties might "reidentify" their "purportedly de-identified data," *e.g.*, *id.* ¶ 125. This allegation rests on the supposition—rejected by HIPAA and the state medical-privacy statutes, as noted above and shown below—that it is impossible to de-identify genetic data.

As noted, Plaintiffs bring claims under the medical-privacy statutes of four states. All Plaintiffs assert claims under GIPA; the California Plaintiffs under the CMIA; the New Hampshire Plaintiff under the New Hampshire Genetic Testing Law; and the Oregon Plaintiff under the Oregon Genetic Privacy Act. *Id.* ¶¶ 181-202, 210-243. In addition, all Plaintiffs assert common law claims for negligence and unjust enrichment, the California Plaintiffs assert claims under the UCL, and the New York Plaintiffs assert claims under the GBL. *Id.* ¶¶ 203-209, 244-308.

## III.  LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *O'Boyle v. Real Time Resols., Inc.*, 910 F.3d 338, 342 (7th Cir. 2018). In deciding a Rule 12(b)(6) motion, a court "accept[s] the well-pleaded facts in the complaint as true," but disregards "legal conclusions and conclusory allegations merely reciting the elements of [a] claim." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).

## IV. ARGUMENT

### A. Plaintiffs Do Not State a Claim Based on Tempus's Alleged *Disclosure* of Genetic Data to Third Parties

Plaintiffs do not state a claim based on Tempus's alleged disclosure of their genetic data because the CC does not plausibly allege that Tempus disclosed individually identifiable—as opposed to de-identified—data to any third party. A key feature of the medical-privacy statutes is that, consistent with HIPAA, they regulate the disclosure of only identifiable data. For example, GIPA provides that "[a] covered entity may, without a genetic information test subject's consent, create, use, and disclose *de-identified information* using information subject to [GIPA]." 410 ILCS 513/31.7(b) (emphasis added); *see also id.* ("A covered entity or a business associate may disclose information that is de-identified in accordance with HIPAA."). The other state statutes likewise limit their scope to identifiable data. *See* Cal. Civ. Code § 56.05(j)(1) (limiting "medical information" to "individually identifiable information"); N.H. Rev. Stat. § 141-H:2(III) ("[N]o person shall disclose to any other person that an *individual* has undergone genetic testing, and no person shall disclose the results of such testing to any other person." (emphasis added)); Or. Rev. Stat. § 192.531(11) (defining "genetic information" as "information about *an individual* or *the individual's* blood relatives obtained from a genetic test" (emphasis added)).

Recognizing that the statutes regulate only identifiable data, Plaintiffs attempt to plead that Tempus's disclosures were not de-identified. *E.g.,* CC ¶¶ 72-86, 175(g). Their principal contention is that genetic data is "inherently identifiable" and cannot be de-identified. This argument fails as a matter of law: like HIPAA, the state statutes expressly contemplate the de-identification of genetic data to drive medical innovation. No doubt recognizing this, Plaintiffs make a handful of factual allegations about identifiable data used in Tempus's and Ambry's patient-testing services. But these allegations do not save Plaintiffs' claims because, as the CC makes clear, they are

8

immaterial to whether Tempus disclosed *Plaintiffs'* data to third-party life sciences companies.

### 1. As a Matter of Law, Genetic Data Is Not Inherently Identifiable

Plaintiffs submit that genetic information is "inherently identifiable" because it contains "biomarkers unique to each individual," CC ¶ 76, presenting the risk that "third parties" can "reidentify" "de-identified data," *e.g.*, *id.* ¶ 125. Accepting this premise would violate statutory text and upend the law's careful balance established between privacy and medical innovation.

HIPAA expressly contemplates the de-identification of genetic data. Under HIPAA, a covered entity may de-identify individually identifiable health information using one of two methods. *See* 45 CFR § 164.514(a). First, a covered entity may obtain an expert determination that "the risk is very small" that a person could use the information "alone or in combination with other reasonably available information" to "identify an individual who is a subject of the information." 45 C.F.R. § 164.514(b)(1) ("Expert Determination Method"). Second, a covered entity can remove 18 enumerated data elements (such as names and contact information). *Id.* § 164.514(b)(2) ("Safe Harbor Method"). Genetic information is eligible for de-identification under this regime, as HHS guidance recognizes that "genetic information" is protected health information only when "individually identifiable." U.S. Dep't of Health & Hum. Servs., *Does the HIPAA Privacy Rule Protect Genetic Information* (Dec. 20, 2002), https://www.hhs.gov/hipaa/for-professionals/faq/354/does-hipaa-protect-genetic-information/index.html; *see Franco v. Chobani, LLC*, 789 F. Supp. 3d 584, 593 & n.11 (N.D. Ill. 2025) (taking judicial notice of agency guidance).

The state medical-privacy statutes likewise recognize that genetic data is de-identifiable, and thus not "inherently identifiable." The statutes expressly permit the de-identification of genetic information—which would make no sense if genetic data could not be de-identified. For example, GIPA—which the CC describes as "illustrative" of the other state statutes, CC ¶ 3—provides that "[a] covered entity may, without a genetic information test subject's consent, create, use, and

disclose de-identified information using information subject to [GIPA]," 410 ILCS 513/31.7(b), and "may disclose information that is de-identified in accordance with HIPAA," *id.* Like GIPA, the Oregon Genetic Privacy Act defines "de-identified" data with reference to HIPAA's identification regime. *See* Or. Rev. Stat. § 192.531(6); 410 ILCS 513/10. The CMIA defines "genetic data" to exclude "deidentified data." Cal. Civ. Code § 56.18(b)(7)(B).[2]

Plaintiffs' conclusory assertion that "third parties may reidentify" their "de-identified data" does not save their claims. CC ¶ 125. The medical-privacy statutes themselves recognize that data may be de-identified even though the possibility of re-identification exists. GIPA provides that "[t]he recipient of de-identified information shall not re-identify de-identified information using any public or private data source." 410 ILCS 513/31.7(c). The CMIA states that a business in possession of "genetic data" may not "attempt to reidentify the information" and must obligate any recipient of genetic data "not to reidentify the information." Cal. Civ. Code § 56.18(b)(7)(B)(ii), (iii). And the Oregon Genetic Privacy Act defines "deidentified" data with respect to HIPAA's de-identification regime, which, as explained, recognizes that genetic information is de-identifiable. *See* Or. Rev. Stat. § 192.531(6). The statutes thus acknowledge that data may be "de-identified" even if re-identification is possible.[3]

---

[2] While the New Hampshire Genetic Testing Law does not expressly address de-identification, it contains no indication that genetic data is inherently identifiable. The statute's failure to explicitly address de-identified data is unsurprising. Unlike the other statutes, it does not regulate genetic or medical information as a general matter; rather, it regulates only the disclosure of the fact that an individual has undergone genetic testing or the individual's test results, such as whether the individual's test was positive or negative for "the presence, absence, or alteration of any gene or chromosome." N.H. Rev. Stat. § 141-H:2(III); *see id.* § 141-H:1(IV) (defining "genetic testing").

[3] As with de-identification, the New Hampshire Genetic Testing Law does not expressly address the re-identification of data. But New Hampshire law—in particular, the state's Data Privacy Act, N.H. Rev. Stat. § 507-H:1 *et seq.*—elsewhere recognizes that data is de-identifiable even if there exists a possibility of re-identification. *See id.* § 507-H:9(I)(b) (providing that a "controller in possession of de-identified data shall … [p]ublicly commit to maintaining and using de-identified data without attempting to reidentify the data").

Precedent under the analogous Biometric Information Privacy Act ("BIPA") further undermines Plaintiffs' "re-identification" argument. BIPA recognizes that biometric identifiers "are biologically unique to the individual." 740 ILCS 14/5(c). Nonetheless, biometric data is subject to BIPA only if it can be used to "identify a person"—say, because the data is associated with identifying information. *Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1123 (9th Cir. 2024); *see also G.T. v. Samsung Elecs. Am. Inc.*, 742 F. Supp. 3d 788, 800 (N.D. Ill. 2024) (BIPA applies only to biometric data "capable of identifying an individual"). These holdings would make no sense if the possibility of re-identification made biometric identifiers inherently identifiable.

Plaintiffs contend that genetic data is "inherently identifiable" because it is a "biometric identifier" that cannot be removed under HIPAA's "Safe Harbor" de-identification method. CC ¶ 85 (citing 45 C.F.R. § 164.514(b)(2)). Plaintiffs' contention ignores that, as noted above, HIPAA provides two independent pathways for de-identification: the Safe Harbor Method (removing 18 enumerated data elements) and the Expert Determination Method (obtaining an expert opinion that identification risk is "very small"). *See* 45 C.F.R. § 164.514(b)(1)-(2). Thus, even under the premise that genetic data is a "biometric identifier" ineligible for the Safe Harbor Method, it can nonetheless be de-identified through the Expert Determination Method.

Regardless, genetic data is also de-identifiable under the Safe Harbor Method. Plaintiffs' contrary argument assumes that genetic information is a "biometric identifier" under HIPAA. But HIPAA's examples of "biometric identifiers" are "finger and voice prints"—not genetic material. 45 C.F.R. § 164.514(b)(2)(P). Further, HIPAA defines "health information" to include "genetic information," *see id.* § 160.103—thus conveying that "genetic information" is distinct from "biometric identifiers." Consistent with HIPAA's text and structure, the ordinary meaning of "biometric identification" is "authenticating someone's identity by using technology to confirm

physical or behavioral characteristics, such as facial features, fingerprints, retinal patterns, or handwriting"—physically observable phenotypes, not genetic testing. *Biometric Identification*, Black's Law Dictionary (12th ed. 2024). State schemes regulating biometric identifiers, including BIPA, similarly define biometric identifiers as distinct from genetic data. *E.g.*, 740 ILCS 14/10 ("'Biometric identifier' means a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry" and "do[es] not include biological materials regulated under [GIPA]" or "information captured from a patient in a health care setting or information collected, used, or stored for health care treatment, payment, or operations under" HIPAA); Tex. Bus. & Com. Code § 503.001(a)(2) ("'Biometric identifier' means a retina or iris scan, fingerprint, voiceprint, or record of hand or face geometry."). This separate regulation of biometric and genetic data would be unnecessary if biometric identifiers and genetic data were one and the same.[4]

Finally, even if Plaintiffs were correct that unique "biomarkers" make genetic information "inherently identifiable," their claims still fail because they do not plausibly allege that Tempus disclosed "genetic information" that contained their unique "biomarkers." CC ¶ 76. Instead, Plaintiffs vaguely allege that Tempus disclosed their "genetic information" without specifying what that information was, let alone that it included biomarkers. *E.g.*, *id.* ¶ 122. This shortcoming is fatal because the term "genetic information" is broad enough to include categories of data that cannot possibly contain "biomarkers," such as (under GIPA) a request for genetic education or genetic counseling, a family member's participation in clinical research that includes genetic

---

[4] Plaintiffs assert that a Federal Trade Commission ("FTC") "Policy Statement" "has issued guidance on the subject" of biometric identifiers and genetics. CC ¶ 85 & n.65. That overreads the Policy Statement, which addresses unfair trade practices with respect to biometric information generally and merely states in passing that biometric information includes "genetics." *See* FTC, *Policy Statement of the FTC on Biometric Information and Section 5 of the FTC Act*, https://www.ftc.gov/system/files/ftc_gov/pdf/p225402biometricpolicystatement.pdf. The FTC Policy Statement does not interpret or enforce any HIPAA regulation or state privacy statute.

services, and the manifestation of any disorder in a family member. *See* 410 ILCS 513/10 (adopting

the definition of "genetic information" in 45 C.F.R. § 160.103).

### 2. Plaintiffs Do Not Plausibly Allege That Tempus Disclosed Individually Identifiable Information to Third Parties

Because Plaintiffs are wrong as a matter of law that genetic information is "inherently

identifiable," their disclosure claims can survive dismissal only if they allege facts plausibly

showing that Tempus disclosed their personally identifying information. But the CC contains no

factual allegations that Tempus disclosed Plaintiffs' genetic data along with their names, contact

details, or other identifying information. Given this failure to allege identifiable disclosures of their

data, Plaintiffs' claims should be dismissed. *See Dinerstein v. Google, LLC*, 73 F.4th 502, 514 (7th

Cir. 2023) (plaintiff failed to allege that defendant had not "adequately discharged its

de-identification obligation" where he "d[id] not pinpoint any information within the records that

he thinks should have been redacted and was not"); *Bridges v. Blackstone Grp., Inc.*, 2022 WL

2643968, at *5 (S.D. Ill. July 8, 2022) (dismissing GIPA claim based on "conclusory statements"

that data was not de-identified), *aff'd*, 66 F.4th 687 (7th Cir. 2023); *London v. New Albertson's,

Inc.*, 2008 WL 4492642, at *4 (S.D. Cal. Sep. 30, 2008) (rejecting plaintiffs' "conclusory"

allegations that defendant "inadequately de-identif[ied] prescription data" under the CMIA).[5]

---

[5] *See also Kurowski v. Rush Sys. for Health*, 683 F. Supp. 3d 836, 843 (N.D. Ill. 2023) ("[Plaintiffs'] allegations are far too vague to allow an inference to be drawn that [the defendant] was actually disclosing [individually identifiable health information] as it is unambiguously defined by HIPAA, rather than just metadata."); *Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1129 (S.D. Cal. 2023) (dismissing CMIA claim where plaintiff's allegation that defendant "shared her data with [a third party] for use in targeted advertisements" was "a conclusion without sufficient factual support"); *Cancelmo v. S. N.H. Med. Ctr.*, 2025 WL 2783652, at *3 (D.N.H. Sep. 30, 2025) (dismissing claim where plaintiff failed to plausibly allege that defendant disclosed any personally identifying information); *Nienaber v. Overlake Hosp. Med. Ctr.*, 733 F. Supp. 3d 1072, 1084 (W.D. Wash. 2024) (dismissing complaint where plaintiff failed to allege that the defendant disclosed "any information identifying [her] as a patient").

Lacking factual allegations that Tempus disclosed identifiable data, Plaintiffs grasp at straws in an attempt to raise an inference of such disclosure. To start, Plaintiffs rely on allegations about Tempus's unrelated "physician-facing clinical products," CC ¶ 73, which, as explained, necessarily and uncontroversially identify individual patients. *See supra* Section II.A. For example, Plaintiffs claim that Hub—"Tempus AI's flagship clinical application"—allows a "treating physician" to "place[] an order for Tempus AI's laboratory tests on behalf of an individual patient," adding that "Tempus AI processes [such] order[s], sequences the patient's specimen, and returns the patient's individualized results" to the physician "through Hub." CC ¶ 74. Plaintiffs further allege that Tempus's physician-facing products allow physicians to "[i]dentify[] patients and contextualize[] where they are in the[ir] care journey" and "deliver 'precision medicine to improve patient outcomes.'" *Id.* ¶ 84. Such disclosures to a patient's healthcare provider are plainly permissible. *See* 45 C.F.R. § 164.506(a); 410 ILCS 513/31(2); Cal. Civ. Code § 56.10(c)(1); N.H. Rev. Stat. § 141-H:2(IV)(a)-(b); Or. Rev. Stat. §§ 192.558(3), 192.581(2). Regardless, because *Plaintiffs* were not the subject of *Tempus's* physician-facing clinical products, *see supra* Section II.C; CC ¶ 61, Tempus's alleged disclosures to treating physicians are not relevant to the allegations underlying Plaintiffs' claims—the alleged disclosures of genetic data to third-party pharmaceutical and biotechnology companies.

Plaintiffs offer a smattering of other similarly irrelevant allegations. They note that Ambry experienced a data breach in 2020 resulting in unauthorized access to some patients' personally identifying information. CC ¶¶ 4, 82. But as Plaintiffs recognize, this data breach demonstrates only that "Ambry"—not Tempus—"maintains health information in an identifiable form"—five years before Tempus acquired Ambry, no less. *Id.* ¶ 82; *see id.* ¶ 75 ("[T]he *Ambry Genetics* data sets at issue here were not, in fact, anonymized." (emphasis added)). The 2020 Ambry data breach

has no plausible link to Tempus's alleged disclosures to third parties.

Plaintiffs next claim that "the data Tempus AI acquired" from Ambry "was identifiable by the acquisition [a]greement's own terms." *Id.* ¶ 83. But the agreement merely defines the term "Sensitive Data" to include data "relate[d] to an identified or identifiable natural person," *id.*; it does not say that Tempus would or did receive from Ambry any particular "Sensitive Data," much less *Plaintiffs'* genetic data specifically. Regardless, whether Tempus *received* identifiable information from Ambry raises no inference as to whether Tempus *disclosed* any—let alone Plaintiffs'—identifiable information to third parties. (And as discussed below, *infra* Section IV.B.1.a, HIPAA authorizes the transfer of identifiable health data in healthcare mergers.)

Finally, Plaintiffs shift to speculative theories about AI by citing "privacy experts" stating that "AI techniques often do not maintain data privacy" because, in theory, "there are ways to draw inferences about the identities of … individuals whose genetic data is used" in AI models. CC ¶ 78. But Plaintiffs do not identify any "AI techniques" pertinent to Tempus's disclosures to third parties. Further, Plaintiffs allege only that AI techniques "often do not" maintain privacy and that "there are ways" to "draw inferences" about identities. *Id.*; *see also id.* ¶ 76 (suggesting that genetic data "can easily be" re-identified). But this hypothetical "risk" of "re-identification" for "de-identified information generally" does not mean that such a risk is present for "the plaintiffs *in this case*." *Steinberg v. CVS Caremark Corp.*, 899 F. Supp. 2d 331, 339 (E.D. Pa. 2012) (emphasis added) (dismissing claim for failure to plausibly allege the disclosure of de-identified information under HIPAA). And, as explained, *supra* Section IV.A.1, data is not identifiable merely because there is a risk of re-identification.

In sum, Plaintiffs do not plausibly allege that Tempus disclosed their individually identifiable data to third parties, warranting dismissal of their disclosure-based claims.

**B.** **Tempus Is Not Liable Under the State Medical-Privacy Statutes Based on Its Alleged *Receipt* of Genetic Data from Ambry**

Plaintiffs also do not state claims under the state medical-privacy statutes based on Tempus's alleged *receipt* of genetic data from Ambry. In relevant part, the statutes do not regulate receiving—as opposed to disclosing—genetic data. Moreover, Illinois and California law expressly permit covered entities—consistent with HIPAA—to use health data for "health care operations," independently authorizing Tempus's alleged receipt of Plaintiffs' genetic testing data from Ambry. And the GIPA and Oregon law claims are further foreclosed by *Bridges*.

**1.** **GIPA Does Not Prohibit Tempus from Receiving Genetic Data**

Plaintiffs claim that Tempus's alleged receipt of their genetic testing data from Ambry violated Section 30(a) of GIPA. CC ¶ 218. This claim fails on three independent grounds.

**a.** **Tempus's Alleged Receipt of Genetic Testing Data from Ambry Was Authorized Under HIPAA's and GIPA's Permitted Use for "Health Care Operations"**

Plaintiffs allege that Ambry shared genetic data with Tempus in connection with the Ambry acquisition, including during due diligence, because Tempus "needed to evaluate the scope, quality, completeness, commercial utility, and regulatory status of those assets before closing." *Id.* ¶ 100. HIPAA, which GIPA incorporates in relevant part, permitted this alleged data sharing under its allowance for transfers of health data in healthcare mergers and acquisitions.

Tempus and Ambry are covered entities under HIPAA. *Id.* ¶ 213; *see id.* ¶¶ 54-57 (describing Ambry's transmission of health information in connection with transactions covered under HIPAA). Under HIPAA, "[a] covered entity is permitted to use or disclose protected health information" for purposes of "health care operations." 45 C.F.R. § 164.502(a)(1)(ii). "Health care operations," in turn, is defined to include "[b]usiness management and general administrative activities of the entity, including, but not limited to … [t]he sale, transfer, merger, or consolidation

16

of all or part of the covered entity with another covered entity … and due diligence related to such activity." *Id.* § 164.501. As HHS has explained, these provisions authorize the disclosure and use of protected health information in connection with "the sale of a covered entity's business as a going concern, mergers, acquisitions, consolidations, and other similar types of corporate restructuring between covered entities," including during "due diligence." Standards for Privacy of Individually Identifiable Health Information, 65 Fed. Reg. 82462, 82491 (Dec. 28, 2000); *see also id.* at 82652 ("[A] covered entity may sell or transfer its assets, including protected health information, to a successor in interest that is or will become a covered entity.").

GIPA likewise authorizes the disclosure and use of genetic data in healthcare mergers. GIPA provides that "a covered entity may, without a patient's consent … use or disclose genetic information for its own … health care operations," 410 ILCS 513/31(1), and defines "health care operations" to have "the meaning ascribed to it under HIPAA, as specified in 45 CFR 164.501," 410 ILCS 513/10. GIPA thus authorized Tempus's alleged receipt of Plaintiffs' genetic data, defeating Plaintiffs' effort to transform a routine healthcare merger into a privacy claim.

### b. Section 30(a) Does Not Regulate the Receipt of Genetic Data

Even putting its allowance for healthcare mergers aside, GIPA Section 30(a) does not regulate a person receiving genetic data to begin with. This is clear from GIPA's text and structure. When interpreting an Illinois statute, a court should "ascertain and give effect to the intention of the legislature," *Green v. Leibowitz*, 108 F.4th 530, 533 (7th Cir. 2024), and "construe the statute as a whole and afford the language of the statute its plain and ordinary meaning," *People v. Marshall*, 950 N.E.2d 668, 673 (Ill. 2011).

As for text, Section 30(a) states that, except in circumstances immaterial here, "[n]o person may disclose or be compelled to disclose the identity of any person upon whom a genetic test is performed or the results of a genetic test in a manner that permits identification of the subject of

17

the test." 410 ILCS 513/30(a). This language does two things: it prohibits a person from "disclosing" genetic testing data to others, and it prevents the same person from being "compelled to disclose" such data. The former is a limitation on what a person in possession of genetic testing data may do with it, while the latter is a defense against compelled disclosure (say, in response to a subpoena). *Cf. In re Marriage of Daniels*, 607 N.E.2d 1255, 1261 (Ill. App. 1992) (recognizing that a court may not "compel disclosure" of information protected from disclosure "by statute").

Absent from Section 30(a) is any language regulating the *recipient* of genetic testing data. If the General Assembly had intended Section 30(a) to regulate recipients, it would have written Section 30(a) differently—for example, by stating that "no person may disclose or receive" genetic testing data. But that is not what the General Assembly wrote.

This reading of Section 30(a) is confirmed by other GIPA provisions showing that the General Assembly "knows how to" regulate the receipt of genetic data when it "wants to" do so. *Brucker v. Mercola*, 886 N.E.2d 306, 323 (Ill. 2007). For example, Section 25(c) provides that employers may not "*solicit*, *request*, *require* or *purchase*" genetic information. 410 ILCS 513/25(c)(1) (emphasis added). Section 25(*i*) provides that "[n]othing in this Act shall be construed to prohibit an employer from *requesting* or *requiring* genetic information to be used for genetic monitoring of the biological effects of toxic substances in the workplace." 410 ILCS 513/25(*i*) (emphasis added). And Section 20(a) provides that "[a]n insurer may not *seek* information derived from genetic testing for use in connection with a policy of accident and health insurance." 410 ILCS 513/20(a) (emphasis added). Unlike these provisions, Section 30(a) does not address soliciting, requesting, requiring, purchasing, or seeking genetic data.

Beyond GIPA, BIPA shows that the General Assembly knows how to regulate the receipt of information when it wants to do so. GIPA is "construed in conjunction" with BIPA because

BIPA "touch[es] on the same or related subject[]" of privacy. *Carter v. SSC Odin Operating Co., LLC*, 976 N.E.2d 344, 355 (Ill. App. 2012); *see also Taylor v. Union Pac. R.R. Co.*, 2024 WL 3425751, at *2-3, 8-9 (N.D. Ill. July 16, 2024) (interpreting GIPA's standing requirements and statute of limitations in light of BIPA). Unlike GIPA Section 30(a), BIPA Section 15(b) specifically regulates the receipt of data, providing that a person may not "collect, capture, purchase, receive through trade, or otherwise obtain" an individual's biometric data. 740 ILCS 14/15(b). Because Section 30(a) does not regulate the receipt of genetic information, Tempus cannot be liable under GIPA based on its alleged receipt of genetic testing data from Ambry.

### c. Tempus Did Not "Compel" Ambry to Disclose Genetic Data

Finally, even if Section 30(a) regulated the compelled *receipt* of genetic testing data, Plaintiffs still fail to state a claim because Tempus did not "compel" Ambry to disclose genetic information. GIPA's text and Seventh Circuit precedent require this conclusion.

Section 30(a)'s direction that "[n]o person may disclose *or be compelled* to disclose the identity of any person upon whom a genetic test is performed," 410 ILCS 513/30(a) (emphasis added), "must be given its plain and ordinary meaning," *Khan v. Deutsche Bank AG*, 978 N.E.2d 1020, 1043 (Ill. 2012). The ordinary meaning of "compel" is "[t]o cause or bring about by force, threats, or overwhelming pressure." *Compel*, Black's Law Dictionary (12th ed. 2024). Section 30(a) thus requires Plaintiffs to allege that Tempus used force, threats, or overwhelming pressure to cause Ambry to disclose their genetic information to Tempus.

Plaintiffs fail to allege a compulsory disclosure. At most, they allege that Tempus acquired Ambry to obtain data to use to advance its healthcare mission. CC ¶¶ 53, 96. But making an arms' length purchase is not an acquisition by force, threats, or overwhelming pressure. Had the legislature intended Section 30(a) to prohibit such purchases, it would have done so. After all, GIPA Section 25(c) specifically prohibits "solicit[ing]" or "purchas[ing]" genetic information in

certain circumstances, 410 ILCS 513/25(c)(1), and BIPA specifically regulates "receiv[ing]" biometric information "through trade," 740 ILCS 14/15(b).

*Bridges* supports, and in fact requires, this conclusion.[6] The plaintiffs in *Bridges* alleged that the defendant, Blackstone, had "compelled" the disclosure of genetic data by acquiring Ancestry, a genealogy testing company. 66 F.4th at 688. Affirming dismissal, the Seventh Circuit held that "a run-of-the-mill corporate acquisition, without more alleged about that transaction," does not "result[] in a compulsory disclosure within the meaning of Section 30." *Id.* at 689. It did not matter that "Blackstone may have pursued the deal, at least in part, to obtain Ancestry's genetic information" or that Blackstone reportedly planned to sell that information. *Id.* at 689-90. As the Seventh Circuit held, those allegations failed to establish that Blackstone "forced or pressured Ancestry to disclose protected information." *Id.* at 689. Plaintiffs' allegations here likewise do not plausibly allege that Tempus "compelled" Ambry to disclose Plaintiffs' genetic information.

### 2. The CMIA Does Not Prohibit Tempus's Receipt of Genetic Data

The CMIA "is intended to protect the confidentiality of individually identifiable medical information obtained from a patient by a health care provider, while at the same time setting forth limited circumstances in which the release of such information to specified entities or individuals is permissible." *Y.C. v. Superior Ct.*, 286 Cal. Rptr. 3d 436, 448 (Ct. App. 2021). For two reasons, Plaintiffs fail to state a CMIA claim related to Tempus's alleged receipt of data from Ambry.

First, the CMIA does not provide a private cause of action against a defendant who *receives* a plaintiff's medical information. Rather, the CMIA provides that "an individual may bring an action against a person or entity who has negligently *released* confidential information or records

---

[6] *Bridges* left open the question whether Section 30(a) regulates a person that "receives protected information, rather than discloses that information." 66 F.4th at 689. The court declined to reach that issue because the plaintiffs did not allege a compulsory disclosure of genetic information. *Id.*

concerning him or her in violation of this part." Cal. Civ. Code § 56.36(b) (emphasis added). Under its "plain and commonsense meaning," *Embassy LLC v. City of Santa Monica*, 110 Cal. Rptr. 3d 579, 582 (Ct. App. 2010), the CMIA does not permit a plaintiff to sue for the alleged receipt of data. On this ground alone, the CMIA claim based on the receipt of data should be dismissed.

Second, like GIPA, the CMIA authorized Tempus's receipt of data from Ambry. Under California Civil Code § 56.10(c)(14), an individual's medical information "may be disclosed when the disclosure is otherwise specifically authorized by law." This provision authorizes disclosures in "a myriad of situations the Legislature may not have cared to spell out." *Y.C.*, 286 Cal. Rptr. 3d at 450. As explained, HIPAA authorized Tempus's receipt of data from Ambry under its allowance for health data transfers in healthcare acquisitions. *Supra* Section IV.B.1.a. The receipt-based CMIA claim thus should be dismissed on this independent ground.

### 3. The New Hampshire Genetic Testing Law Does Not Prohibit Tempus's Receipt of Genetic Data

The New Hampshire Genetic Testing Law also does not regulate the receipt of genetic data. Under N.H. Rev. Stat. § 141-H:2(III), a person may not "disclose to any other person that an individual has undergone genetic testing, and no person shall disclose the results of such testing to any other person" without first obtaining consent. By its "plain and ordinary meaning," *In re Berg*, 886 A.2d 980, 984 (N.H. 2005), the statute limits the disclosure—not the receipt—of certain information. Thus, the receipt-based New Hampshire law claim should be dismissed.

### 4. The Oregon Genetic Privacy Act Does Not Prohibit Tempus's Receipt of Genetic Data

The CC invokes three provisions of Oregon's Genetic Privacy Act: §§ 192.535(1), 192.537(1), and 192.539(1). CC ¶¶ 227-229. These provisions do not prohibit Tempus from receiving genetic information from Ambry.

Section 192.539(1) does not regulate the receipt of data. It provides in relevant part that,

except in certain enumerated circumstances and "[r]egardless of the manner of receipt or the source of genetic information," "a person may not disclose or be compelled, by subpoena or any other means, to disclose the identity of an individual upon whom a genetic test has been performed … or to disclose genetic information about the individual or a blood relative of the individual in a manner that permits identification of the individual." Or. Rev. Stat. 192.539(1). Like GIPA Section 30(a), Section 192.539(1) provides that a person may not disclose or "be compelled" to disclose genetic information, *supra* Section IV.B.1.b—adding explicitly that the defense to disclosure applies to coercion "by subpoena or any other means." Section 192.539(1) thus regulates a person that possesses and discloses genetic information—not the recipient of genetic information. Further, § 192.529(1) could not apply here because, under *Bridges*, Tempus did not "compel" a disclosure from Tempus. *See* 66 F.4th at 689; *supra* Section IV.B.1.c.

Nor does Section 192.537(1) apply to the receipt of data. It provides in relevant part that a person "must maintain the confidentiality of [genetic] information or sample and protect the information or sample from unauthorized disclosure or misuse." Or. Rev. Stat. § 192.537(1). By its plain terms, § 192.537(1) prohibits an entity's "unauthorized disclosure or misuse" of genetic information—not receipt of genetic information.

Finally, Section 192.535 provides that "[a] person may not obtain genetic information from an individual, or from an individual's DNA sample, without first obtaining informed consent of the individual or the individual's representative." Or. Rev. Stat. § 192.535(1). Section 192.535(1) thus applies only when a defendant obtains genetic data "from an individual" or "from an individual's DNA sample"—not from a third party. Section 192.535(1)'s express bar on obtaining data "from an individual's DNA sample" confirms this reading. If § 192.535(1) governed the receipt of genetic data no matter the source, the express prohibition on obtaining data "from an

individual's DNA sample" would be "meaningless surplusage." *State v. Clemente-Perez*, 359 P.3d 232, 239 (Or. 2015). Further confirming this reading, and as noted, the neighboring § 192.539(1) applies "[r]egardless of the manner of receipt or the source of genetic information." Or. Rev. Stat. § 192.539(1). Because the "legislature use[d] different terms in" §§ 192.535(1) and 192.539(1), the court should infer that it "intend[ed] different meanings." *Oregon v. Gardner-Rolph*, 584 P.3d 270, 276 (Or. App. 2025). Here, Tempus allegedly received Plaintiffs' genetic information from Ambry—not from Plaintiffs or from their DNA samples—and thus § 192.535(1) does not apply.

In sum, the CC does not and cannot state a receipt-based claim under Oregon law.

### C. Plaintiffs' Consumer Protection and Common Law Claims Fail

Plaintiffs also fail to state claims under the UCL, the GBL, and the common law.

#### 1. The California Plaintiffs' UCL Claims Fail

The UCL prohibits "unlawful, unfair or fraudulent business act[s] or practice[s]." *Berryman v. Merit Prop. Mgmt., Inc.*, 62 Cal. Rptr. 3d 177, 185 (Ct. App. 2007). Plaintiffs fail to plead UCL claims for allegedly "unlawful" and "unfair" practices. CC ¶¶ 203-207. As a threshold matter, Plaintiffs do not allege an economic injury, as required to bring a UCL claim. And as an independent ground for dismissal, Plaintiffs fail to allege an unlawful or unfair practice.

##### a. The California Plaintiffs Did Not Lose Money or Property As Required to State a UCL Claim

To have statutory standing to bring a UCL claim, a plaintiff must have "lost money or property" as a result of a UCL violation. Cal. Bus. & Prof. Code § 17204. This standing limitation requires a plaintiff to plead an "economic injury." *Rincon Band of Luiseño Mission Indians v. Flynt*, 286 Cal. Rptr. 3d 29, 56 (Ct. App. 2021). Although the California Plaintiffs allege that Tempus obtained their "genetic-testing results" and disclosed those results to third parties, CC ¶ 194, they "fail[] to demonstrate how [this alleged] privacy violation translates into a loss of

23

money or property," *Archer v. United Rentals, Inc.*, 126 Cal. Rptr. 3d 118, 124 (Ct. App. 2011).

To start, Tempus did not cause Plaintiffs to lose "property." As the "weight of the authority" holds, personal information is not "property" under the UCL. *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 943 (N.D. Cal. 2023); *see also Shah v. Cap. One Fin. Corp.*, 768 F. Supp. 3d 1033, 1048 (N.D. Cal. 2025) (rejecting argument that plaintiffs "lost money and property when Defendant disclosed their personal information with third parties"); *In re Facebook Priv. Litig.*, 791 F. Supp. 2d 705, 714 (N.D. Cal. 2011) ("A plaintiff's 'personal information' does not constitute property under the UCL."), *aff'd*, 572 F. App'x 494 (9th Cir. 2014).

Nor did the California Plaintiffs lose "money." They allege that "[g]enetic information has ascertainable economic value," CC ¶ 208, suggesting that Tempus deprived them of that value. But Tempus did not deprive Plaintiffs of *money* because Tempus and Plaintiffs never transacted. *See Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1054-55 (S.D. Cal. 2023) ("When a plaintiff never transacted with a defendant, there can be no benefit-of-the-bargain injury under the UCL.").

The California Plaintiffs also cannot rely on allegations that data has economic value to others: a plaintiff bringing a UCL claim based on the loss of information must, at a minimum, allege that the information has "economic value *to him*." *Hart v. TWC Prod. & Tech. LLC*, 526 F. Supp. 3d 592, 603 (N.D. Cal. 2021) (emphasis in original). That genetic information might have economic value to *Tempus*—say, when aggregated with other data, *see* CC ¶ 107—does not mean that it has economic value to *Plaintiffs*. *See Ahringer v. LoanDepot, Inc.*, 715 F. Supp. 3d 1274, 1284 (C.D. Cal. 2024) ("[J]ust because Plaintiffs' personal information is valuable … does not mean that they lost money or property because [defendant] disclosed their information."); *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 804 (N.D. Cal. 2019) (similar). And even if Plaintiffs' genetic information has economic value to them, their claims still

fail because they do not allege that they had "planned to derive economic value" by selling their genetic data, let alone that they conceivably could have done so. *Rodriguez v. ByteDance, Inc.*, 2025 WL 672951, at *12 (N.D. Ill. Mar. 3, 2025) (internal quotation marks omitted).

### b. The California Plaintiffs Do Not Allege an "Unlawful" or "Unfair" Practice

The California Plaintiffs' UCL claim fails for the independent reason that they do not plead an "unlawful" or "unfair" practice. As to the unlawful practice claim, they allege that Tempus disclosed their information "without the authorization required by the CMIA." CC ¶ 206. But, as explained, Plaintiffs do not plead a violation of the CMIA—whether based on Tempus's alleged acquisition or disclosure of data. *See supra* Sections IV.A, IV.B.2. Thus, the UCL unlawful-practice claim fails. *See Birdsong v. Apple, Inc.*, 590 F.3d 955, 960 n.3 (9th Cir. 2009) (dismissing claim under UCL's "unlawful" prong for failure to allege a predicate violation of law).

Nor do the California Plaintiffs' plead an unfair practice. The standard "for determining what business acts or practices are 'unfair' in consumer actions under the UCL is currently unsettled." *Capito v. San Jose Healthcare Sys., LP*, 561 P.3d 380, 386 (Cal. 2024). What is clear, however, is that "courts may not apply purely subjective notions of fairness." *Scripps Clinic v. Superior Ct.*, 134 Cal. Rptr. 2d 101, 118 (Ct. App. 2003). Further, under the UCL's "safe harbor," an unfairness claim cannot succeed when "the Legislature has permitted certain conduct or considered a situation and concluded no action should lie." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 541 (Cal. 1999).

Plaintiffs' unfairness claim fails under the UCL's safe harbor. The legislature considered the scope of "confidentiality of individually identifiable medical information" in the CMIA and provided "circumstances in which the release of such information" is permissible. *Y.C.*, 286 Cal. Rptr. 3d at 448. Because the CMIA permitted Tempus's alleged receipt and disclosure of genetic

information, *see supra* Sections IV.A, IV.B.2, Plaintiffs' unfairness claim should be dismissed under the safe harbor. *See Alvarez v. Chevron Corp.*, 656 F.3d 925, 933 (9th Cir. 2011) (rejecting UCL claim where "California law unequivocally permit[ted] Defendants' conduct").

Even if the safe harbor did not apply, the California Plaintiffs do not plead an unfair practice to begin with. They claim that Tempus has "offend[ed] the public policy" "embodied in the CMIA and California's constitutional right to privacy," and they contend that Tempus's conduct was "immoral, unethical, oppressive, unscrupulous, and substantially injurious" and that "the gravity of the harm it causes … outweighs any legitimate business utility." CC ¶ 207. But Tempus's compliance with the CMIA and HIPAA, *see supra* Sections IV.A, IV.B.2, means that Tempus did not offend public policy or otherwise act unfairly. *See Capito*, 561 P.3d at 384 (hospital's alleged failure to adequately disclose emergency room prices was not unfair because its disclosures "complied with state and federal disclosure requirements"); *Cnty. of San Diego v. Mason*, 147 Cal. Rptr. 3d 135, 139-40 (Ct. App. 2012) (right to privacy not violated where recipient of DNA was required to handle data in accordance with law, including HIPAA).

### 2. The New York Plaintiffs' GBL Claims Fail

The GBL "provide[s] consumers with a means of redress for injuries caused by unlawfully deceptive acts and practices." *Goshen v. Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1194 (N.Y. 2002). To state a § 349 claim, a plaintiff must allege that a defendant engaged in "(1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *City of New York v. Smokes-Spirits.Com, Inc.*, 911 N.E.2d 834, 838 (N.Y. 2009). A materially misleading statement is one that is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013). "The standard for recovery under … § 350, while specific to false advertising, is otherwise identical to section 349." *Goshen*, 774 N.E.2d at 1195 n.1.

To attempt to state GBL claims, Plaintiffs rely chiefly on a "Notice of Privacy Practices" that Plaintiff Bianco's "medical practice[]" provided her before she underwent genetic testing in November 2023. CC ¶ 158. Bianco claims that she understood this privacy notice to mean that "her data" would be treated in accordance with "applicable laws like … HIPAA." *Id.* But the privacy notice was not misleading, for Bianco's data indisputably was handled in accordance with applicable laws like HIPAA. *See supra* Sections IV.A, IV.B. Regardless, Tempus cannot be liable for statements in the privacy notice because they were made (or directed) not by Tempus, but by Bianco's physician. *See Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 129 (E.D.N.Y. 2011) (dismissing § 349 claim based on a statement that "cannot be attributed to the … Defendants").

Beyond the physician's privacy notice, Plaintiffs assert that Ambry and Tempus engaged in "affirmative misrepresentations" and "false advertising." CC ¶ 249, 253, 264. While it is not clear to which statements Plaintiffs refer, they could not have been deceptive because Plaintiffs' data was handled in accordance with HIPAA. *Supra* Sections IV.A, IV.B. Further, Plaintiffs cannot rely on *Ambry's* statements—particularly those made before the acquisition—to state a claim against *Tempus*. *See Woods*, 807 F. Supp. 2d at 129; *Buffalo Xerographix, Inc. v. Hartford Ins. Grp.*, 2021 WL 2003110 (W.D.N.Y. May 19, 2021) (dismissing § 349 claim against parent based on subsidiary's alleged conduct), *aff'd*, 2022 WL 4241191 (2d Cir. Sep. 15, 2022). Plaintiffs identify no Tempus statements that they read and on which they relied, much less that they did so *before* undergoing genetic testing. *See Gale v. IBM Corp.*, 781 N.Y.S.2d 45, 47 (App. Div. 2004) (dismissing § 349 claim where plaintiff did not allege that "he saw any of the[] statements *before* he purchased" defendant's product (emphasis added)). And Plaintiffs cannot claim that they reasonably misunderstood statements such as "[h]ealthcare data singularly belongs—the ownership of that data—is with the patient and no one can ever take that away." CC ¶ 59. Such

"generalized" statements are not what "a reasonable consumer would … interpret as a factual claim upon which he could rely." *Dwyer v. Allbirds, Inc.*, 598 F. Supp. 3d 137, 153-54 (S.D.N.Y. 2022).

Lacking any actionable statements by Tempus, the New York Plaintiffs contend that Tempus "omitted" to advise them about "Tempus AI's acquisition plans, post-acquisition data practices, and third-party commercialization arrangements." CC ¶ 251; *see id.* ¶ 253. But the New York Plaintiffs allegedly underwent genetic testing with Ambry in November 2023—over a year before Tempus acquired Ambry in February 2025. *Id.* ¶¶ 4, 157. Tempus was not obligated to advise a non-customer with whom it had no relationship about potential future acquisition plans. Further, Tempus's alleged omissions could not have "result[ed] in a transaction in which [the New York Plaintiffs] w[ere] harmed" because they had already undergone genetic testing well before Tempus acquired Ambry. *Goshen*, 774 N.E.2d at 1196.

### 3. Plaintiffs' Negligence Claims Fail

"In a negligence action, the plaintiff must show that the defendant owed her a duty of care, the defendant breached that duty, and she suffered injury as a proximate result of the breach." *Negron v. City of Chicago*, 55 N.E.3d 109, 113 (Ill. App. 2016). Plaintiffs' negligence claims fail because they do not plausibly allege that Tempus breached its alleged duty of care.

What Plaintiffs do allege is that Tempus violated a duty of care embodied in a variety of standards, including "HHS guidance … under the HIPAA Security Rule, 45 C.F.R. §§ 164.302–.318," a National Institute of Standards and Technology publication "[i]mplementing the HIPAA Security Rule," and the "HITRUST Common Security Framework." CC ¶ 284. Plaintiffs further contend that Tempus was negligent "per se" for "violat[ing] HIPAA" and the FTC Act by "failing to use reasonable measures" to protect their data. *Id.* ¶¶ 294-97. But Plaintiffs identify no particular provision of HIPAA or any other authority that Tempus allegedly violated. As explained, Tempus's alleged conduct complied with HIPAA as well as the state medical-privacy statutes. *See*

28

*supra* Sections IV.A, IV.B. Because Plaintiffs fail to plead that Tempus breached any duty of care, their negligence claim should be dismissed. *See Nienaber v. Overlake Hosp. Med. Ctr.*, 733 F. Supp. 3d 1072, 1087 (W.D. Wash. 2024) (dismissing negligence claim where plaintiff failed to allege that defendant disclosed data in violation of state privacy statute).

### 4. Plaintiffs' Unjust Enrichment Claims Fail

Finally, Plaintiffs fail to state an unjust enrichment claim. To state such a claim, a plaintiff must allege (1) "that the defendant has unjustly retained a benefit to the plaintiff's detriment" and (2) "that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Cuevas v. Berrios*, 78 N.E.3d 457, 467 (Ill. App. 2017). An unjust enrichment claim is generally not a cause of action itself, but rather a remedy "synonymous with restitution." *Durell v. Sharp Healthcare*, 108 Cal. Rptr. 3d 682, 699 (Ct. App. 2010); *see Gen. Insulation Co. v. Eckman Const.*, 992 A.2d 613, 621 (N.H. 2010); *Capicotto v. W. N.Y. Med. Mgmt., LLC*, 254 N.Y.S.3d 773, 777 (App. Div. 2026) ("[A] plaintiff may not assert an unjust enrichment cause of action as a substitute for other forms of relief" (alterations and citations omitted)). A plaintiff must show that a defendant was "unjustly enriched" under some "legal standard[]" and not merely under "some abstract sense of moral judgment." *McAllister Constr. Co. v. Liu*, 578 P.3d 190, 197 (Or. App. 2025) (citations omitted).

First, Plaintiffs' unjust enrichment claim fails because they do not allege that Tempus engaged in unjust conduct under the law. As shown, Plaintiffs fail to plausibly allege a violation of any statute, and they allege no independently wrongful conduct. The unjust enrichment claim thus should be dismissed. *See Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019) (rejecting unjust enrichment claim where plaintiff failed to state a claim under an Illinois consumer protection statute); *McAllister Constr.*, 578 P.3d at 197 (same, where "there [was] no indication that defendant's conduct was fraudulent or otherwise illegal"); *Cohen v. Frank*

*Devs., Inc.*, 389 A.2d 933, 937 (N.H. 1978) (same, where there was "no evidence of any improper or wrongful acts" by defendant); *Hill v. Roll Int'l Corp.*, 128 Cal. Rptr. 3d 109, 118 (Ct. App. 2011) (same, reasoning that where "[t]here being no actionable wrong, there is no basis for the relief"); *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012) (same, reasoning that "if plaintiffs' other claims are defective, an unjust enrichment claim cannot remedy the defects").

Second, an unjust enrichment plaintiff must allege that the alleged enrichment occurred "at [the] *plaintiff's* expense." *Grimstad v. Knudsen*, 386 P.3d 649, 662 (Or. App. 2016); *see also Edelman v. Starwood Cap. Grp., LLC*, 892 N.Y.S.2d 37, 40 (App. Div. 2009) ("[A]n action not based upon loss is not restitutionary."). Here, Plaintiffs do not plausibly allege that Tempus's alleged acquisition and disclosure of their genetic data caused them to lose anything. *See supra* Section IV.C.1.a. They do not allege any "dealings with" Tempus through which it deprived them of anything to which they were due. *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 747 (N.Y. 2012); *see also Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1111 (N.Y. 2011) (unjust enrichment claim "will not be supported if the connection between the parties is too attenuated"). And the fact that data may have value to Tempus as a business does not mean that it had value to Plaintiffs. *See Ramirez v. LexisNexis Risk Sols.*, 729 F. Supp. 3d 838, 853 (N.D. Ill. 2024) (dismissing unjust enrichment claim based on defendant's alleged profits from consumers' data because defendant "did not deprive [plaintiffs] of any value"). Plaintiffs' unjust enrichment claims accordingly should be dismissed for failure to allege that they suffered any expense. *See Grimstad*, 386 P.3d at 662; *Peterson v. Cellco P'ship*, 80 Cal. Rptr. 3d 316, 323 (Ct. App. 2008); *Concrete Constructors, Inc. v. Harry Shapiro & Sons, Inc.*, 436 A.2d 77, 79 (N.H. 1981).

## V. CONCLUSION

Tempus respectfully requests that the Court dismiss the CC for failure to state a claim.

Dated: August 3, 2026

Respectfully submitted,

*/s/ Gary Feinerman*
Gary Feinerman, One of the Attorneys for
Defendant Tempus AI, Inc.

Gary Feinerman (Illinois Bar No. 6206906)
Sean M. Berkowitz (Illinois Bar No. 6209701)
Robert C. Collins III (Illinois Bar No. 6304674)
Alexandra B. van Doren (Illinois Bar No. 6342849)
Daniel D. Dvorak (Illinois Bar No. 6342197)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Email: gary.feinerman@lw.com
         sean.berkowitz@lw.com
         robert.collins@lw.com
         alexandra.vandoren@lw.com
         danny.dvorak@lw.com

Heather B. Deixler (*pro hac vice forthcoming*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
Email: heather.deixler@lw.com

Jeremy L. Brown (*pro hac vice pending*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
Fax: (202) 637-2201
Email: jeremy.brown@lw.com

*Counsel for Defendant Tempus AI, Inc.*

## CERTIFICATE OF SERVICE

I, Gary Feinerman, hereby certify that on August 3, 2026, I caused the foregoing to be filed with the clerk of the court using the Court's CM/ECF system, which will serve electronic notice upon all parties of record.

*s/ Gary Feinerman*